**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELI SPORN, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

BRAINSTORM CELL THERAPEUTICS INC., CHAIM LEBOVITS, STACY LINDBORG, and RALPH KERN

Defendants.

Case No. 1:23-CV-09630-DEH

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Douglas H. Flaum
Molly L. Leiwant
Dina Ljekperic
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax: 212.355.3333
dflaum@goodwinlaw.com
mleiwant@goodwinlaw.com
dljekperic@goodwinlaw.com

*Attorneys for Defendants BrainStorm Cell
Therapeutics Inc., Chaim Lebovits, Stacy
Lindborg, and Ralph Kern*

ACTIVE/129102448

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    A.    BrainStorm, ALS, and Potential Treatments. ......................................................... 2

    B.    Clinical Drug Trials and The FDA Approval Process. ........................................... 3

    C.    Regulatory Process Before and After NurOwn Phase 3 Trial Completed, and the RTF Letter. ................................................................................................................ 5

    D.    BrainStorm Thoroughly Disclosed Results of Phase 3 Trial and Engagement with FDA. .......................................................................................................................... 6

    E.    In November 2023, This Lawsuit was Filed. ........................................................... 6

ARGUMENT .................................................................................................................................. 7

I.    THE AC FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT. ............... 7

    A.    The AC Fails to Plead Facts Giving Rise to a Strong Inference of Scienter. ........... 9

        1.    The AC Fails to Allege Motive to Commit Fraud. ...................................... 10

        2.    The AC Fails to Plead Conscious Misbehavior or Recklessness. .............. 13

        3.    The AC's Weak Confidential Witness and Resignation Allegations Do Not Add Up to Scienter. ................................................................................ 16

        4.    The Non-Fraudulent Inference Is More Cogent and Compelling Than Any Inference of Scienter. .......................................................................... 17

    B.    The AC Fails to Plead Any Actionable Statements. ............................................... 18

        1.    BrainStorm's Statements Regarding Interpretation of Phase 3 Clinical Trial Design and Results are Non-Actionable Opinion or Belief. ............. 19

        2.    The AC's Forward-Looking Statements Are Non-Actionable. ................. 22

        3.    The AC's Puffery Statements Are Non-Actionable. ................................. 23

    C.    The AC Fails to Plead Loss Causation. .................................................................. 24

II.    PLAINTIFF'S INSIDER TRADING CLAIMS FAIL ............................................... 25

III.    PLAINTIFF'S CONTROL PERSON CLAIMS FAIL ............................................... 25

CONCLUSION ............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)........................................................................................11, 12

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005)..............................................................................18

*In re Alkermes Pub. Ltd. Co. Sec. Litig.*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021) *aff'd sub nom, Midwest Op. Eng'rs
Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079 (2d Cir. Dec.
7, 2021) ....................................................................................................8, 13, 14, 21

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012)...............................................................................................8

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737(S.D.N.Y. 2018)...................................................................8, 22, 23

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)..............................................................................13

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) .................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Inc.*,
493 F.3d 87 (2d Cir. 2007)........................................................................................3, 25

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)..............................................................................12

*In re Axonyx Sec. Litig.*,
2009 WL 812244 (S.D.N.Y. Mar. 27, 2009) ...................................................................17

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)..............................................................................18

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)...........................................................................7, 12

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014)..........................................................................................................8

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   616 F. Supp. 3d 192 (E.D.N.Y. 2022) ................................................................11

*Chiarella v. United States*,
   445 U.S. 222 (1980)..........................................................................................25

*Christiansen v. Spectrum Pharms., Inc.*,
   2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) ........................................................8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)...............................................................................10

*In re CRM Holdings, Ltd. Sec. Litig.*,
   2012 WL 1646888 (S.D.N.Y. May 10, 2012) ....................................................10

*Dalberth v. Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014)...............................................................................19

*Davison v. Ventrus Bioscis., Inc.*,
   2014 WL 1805242 (S.D.N.Y. May 5, 2014) ......................................................22

*In re Draftkings Inc. Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023)................................................................16

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)......................................................................9, 11, 13

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009)...........................................................13, 25

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018)..................................................................3

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...........................................................16, 24

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)...........................................................11, 12

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................... *passim*

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)...........................................................14, 16

*Gomez v. Credit Suisse AG*,
   2024 WL 506240 (2d Cir. Feb. 9, 2024)............................................................10

iii

*Gonzales v. Nat'l Westminster Bank PLC*,
    847 F. Supp. 2d 567 (S.D.N.Y. 2012).......................................................................................3

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)....................8, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)....................................................................................................................7

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ..............................................................................11

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).......................................................................................................9

*Kavanagh v. Zwilling*,
    578 F. App'x 24 (2d Cir. 2014) .................................................................................................7

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) .....................................................................................12

*Kleinman v. Elan Corp. plc*,
    706 F.3d 145, 152 (2d Cir. 2013) ........................................................................................8, 24

*Lehmann v. Ohr Pharm., Inc.*,
    2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019).......................................................................8, 13

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................................................24

*In re Longtop Fin. Techs., Ltd. Sec. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)........................................................................................3

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)....................................................................................................................18

*Midwest Op. Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL
    5782079 (2d Cir. Dec. 7, 2021)  ..............................................................................................13

*In re MELA Scis., Inc. Sec. Litig.*,
    2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).....................................................................15, 21

*In re Molycorp, Inc. Sec. Litig.*,
    2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) .........................................................................16

*Nandkumar v. AstraZeneca PLC*,
    2023 WL 3477164 (2d Cir. May 16, 2023) ...............................................................................9

iv

*In re Neurotrope, Inc. Sec. Litig.*,
    315 F. Supp. 3d 721 (S.D.N.Y. 2018)........................................................................................8

*Omnicare, Inc. v Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).................................................................................................................18

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008)......................................................................................3

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021), *aff'd*, 89 F.4th 408 (2d Cir.
    2023) .......................................................................................................................................19

*Pitman v. Immunovant, Inc.*,
    2024 WL 1342737 (E.D.N.Y. Mar. 29, 2024) ...........................................................................8

*In re ProShares Trust Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013).......................................................................................................18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................................11, 25

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).......................................................................................................15

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).....................................................................................................9, 10

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)..........................................................................8, 13, 21, 23

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................................16

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).........................................................................................................9

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).......................................................................................................18

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018).....................................................................................24

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021)..................................................................................................8, 19

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................................12, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)........................................................................................................7, 17

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)............................................................................................8, 21

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................................24

*Zagami v. Cellceutix Corp.*,
  2016 WL 3199531 (S.D.N.Y. June 8, 2016) .........................................................................19

*Zhou v. NextCure, Inc.*,
  2023 WL 4493541 (S.D.N.Y. July 12, 2023) ..........................................................................8

## Statutes and Rules

Private Securities Litigation Reform Act, *as codified at* 15 U.S.C. § 78u-4 and
  15 U.S.C. § 78u-5 ...........................................................................................7, 8, 18, 23

15 U.S.C. § 78j (Securities Exchange Act § 10) .................................................... *passim*

15 U.S.C. § 78t (Securities Exchange Act § 20) ..................................................................6, 25

Fed. R. Civ. P. 9(b) ....................................................................................................7, 8, 18

Fed. R. Civ. P. 12(b)(6)....................................................................................................3

## Other Authorities

84 Fed. Reg. 50045 (Sept. 24, 2019) ..................................................................................4

Zoey Becker, *Amylyx's ALS drug finally scores FDA approval, but that's just the
  tip of the iceberg for ALS research, founders say* (Sept. 29, 2022),
  https://www.fiercepharma.com/pharma/amylyxs-als-drug-finally-scores-fda-
  approval-thats-just-tip-iceberg-als-research-amylyx-co ...........................................................4

## PRELIMINARY STATEMENT

In November 2020, biotechnology company BrainStorm Cell Therapeutics Inc. ("BrainStorm" or the "Company") announced disappointing news: its Phase 3 clinical trial (the "Phase 3 Trial") for its primary drug candidate NurOwn, to provide treatment to those with the fatal disease ALS, did not meet statistical significance in either its primary or secondary endpoint. There were, however, indications that, when analyzing a particular subgroup of study participants, there were signs of a clinically meaningful treatment response. While in other areas of clinical development, with more treatment options and a curable disease, this may not have been enough to proceed, the Company understood there to be regulatory flexibility in the approval process towards finding treatments for devastating diseases like ALS *based on the FDA's own regulations and pronouncements*. BrainStorm decided that the data from the Phase 3 Trial supported engagement and review by the FDA, and proceeded along a pathway offered by the FDA. Ultimately, the FDA provided BrainStorm with a briefing document (the "Briefing Document") just days before the FDA Advisory Committee ("AdCom") meeting on September 27, 2023, which demonstrated that the FDA did not intend to engage in an extended discussion with BrainStorm, and at the AdCom meeting, there was a significant vote against approving NurOwn. At several stages in this process, understandably, BrainStorm's stock traded down following disappointing news. Within weeks of the AdCom, this lawsuit was filed by a purported BrainStorm stockholder.

Bringing claims under the Securities Exchange Act of 1934 (the "Exchange Act"), Plaintiff alleges that BrainStorm materially misled the market. While Plaintiff appears to dispute BrainStorm's analysis of its clinical trial data in paragraph after paragraph, his securities claim is essentially that BrainStorm should have known ahead of time the ultimate outcome of the FDA process and given up earlier, despite the needs of ALS patients and its reasonable belief that its clinical trial data provided a pathway forward. Such fraud by hindsight allegations have been

1

rejected by courts time and time again.  BrainStorm not only truthfully disclosed the specifics of its trial design, the failure of the trial's primary and secondary endpoints, and the clinically meaningful data that it wanted to pursue with the FDA—so that investors were fully informed— but also warned investors that approval was far from certain.  Thus, Plaintiff's claims fail for that reason alone.  However, there are multiple additional independent bases for dismissal:

• *No Scienter*:  The AC fails to allege any particularized facts supporting even a plausible inference of scienter, much less the requisite "strong inference."  Plaintiff alleges no motive to commit fraud and fails to satisfy the "correspondingly greater" burden of alleging that Defendants knew, or were reckless in not knowing, that any statement was false or misleading when made. Indeed, the AC lacks a single particularized fact—from a confidential witness, document, or otherwise—to provide any basis about Defendants' knowledge.  At the very least, the AC's illogical scienter theory is not as strong as the obvious non-fraudulent inference that is supported by BrainStorm's public disclosures.

• *No Materially Misleading Statements*: The AC alleges that BrainStorm made misleading statements; yet Plaintiff does not, and cannot, point to a single presently-existing fact needed to make Defendants' truthful statements (regarding interpretation of the Phase 3 Trial data and interactions with the FDA) not misleading.  All remaining statements are inactionable puffery or forward looking, optimistic opinions.  Plaintiff's entire theory is that BrainStorm made the wrong strategic and scientific judgment calls in designing the Phase 3 Trial, in interpreting certain of the results, and in continuing to pursue a regulatory pathway for a patient population with limited-to- no other options.  However, such disagreements are not actionable under the securities laws.

• *No Loss Causation*: The AC alleges that BrainStorm's stock price fell following disappointing news, but does not allege, as Plaintiff must, that Defendants' alleged misstatements—rather than its accurate disclosure of negative results—was the cause of the loss suffered.

For all of these reasons, the AC should be dismissed with prejudice.

## BACKGROUND

### A.    BrainStorm, ALS, and Potential Treatments.

BrainStorm is a clinical-stage biopharmaceutical company dedicated to defeating neurodegenerative diseases using an autologous cellular therapeutic technology platform called NurOwn.  AC ¶¶ 3, 51[1]; *see also* BRAINSTORM CELL THERAPEUTICS, https://BrainStorm-cell.com/

---

[1] Cites to "¶ _" refer to paragraphs of the Amended Complaint (Dkt. 28, the "AC"), and freestanding cites to "Ex. _" refer to exhibits to the Declaration of Molly L. Leiwant, dated May

(last visited May 29, 2024).  BrainStorm has been developing NurOwn as a treatment for a number of disorders, including to treat Amyotrophic Lateral Sclerosis ("ALS").  AC ¶ 3.  NurOwn is a cellular therapy composed of mesenchymal stem cells.  AC ¶ 62.  ALS is a progressive, and ultimately fatal, neurodegenerative disease.  AC ¶ 59.  Most patients die within three to five years of the onset of ALS symptoms.  AC ¶ 60.  There are few approved treatments for ALS, and approved treatments for ALS have at most modest benefits.  AC ¶ 61.

### B.    Clinical Drug Trials and The FDA Approval Process.

Throughout the development of NurOwn, BrainStorm has engaged in a thorough regulatory process with the Food and Drug Administration ("FDA"), who must approve NurOwn through the Biologics License Application ("BLA") process before it can be commercialized and marketed.  AC ¶ 63.  There are two stages that produce the data necessary to support a BLA: pre-clinical and clinical.  AC ¶ 64.  Clinical trials are generally conducted in three sequential phases that may overlap, known as Phase I, Phase II and Phase III clinical trials.  Phase III clinical trials are generally designed to provide the data necessary to demonstrate the efficacy of the product for its intended use, its safety in use, and to establish the overall benefit/risk relationship of the product and provide an adequate basis for product approval.  The FDA can require multiple Phase III clinical trials for approval of a BLA.  AC ¶ 65.

Once clinical trials are complete, the next step toward FDA approval is to submit a BLA, which includes clinical trial data and other information.  BLAs are designed to provide

---

31, 2024, which may be properly considered on a Rule 12(b)(6) motion—*i.e.*, "documents incorporated into the complaint by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Inc.*, 493 F.3d 87, 98 (2d Cir. 2007), and "matters of which a Court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008), including "public documents required to be filed with the SEC*," In re Longtop Fin. Techs., Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012); and "transcripts of companies' earnings calls[,]" *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018).

documentation of the safety and efficacy of the drug.  AC ¶ 66.  In addition to an analysis of the primary and secondary endpoints for a clinical trial, a BLA can include a discussion of data relating to a subgroup analysis.  A subgroup analysis refers to any evaluation of a treatment effect for a specific endpoint in subgroups of patients identified by baseline characteristics.  A prespecified subgroup analysis is one that is planned and documented before any examination of unblinded data.  AC ¶ 94.  When a company submits a BLA, the FDA performs a filing assessment to determine if the BLA contains all the information necessary to permit a substantive review by the FDA staff.  AC ¶ 89.  Within 60 days of receipt of the BLA, the FDA will either file the BLA or inform the applicant of a refusal to file, or "RTF."  *Id.*  Even if the FDA chooses an RTF, the applicant, following the FDA's guidelines,  may choose to "File Over Protest" in order to have the FDA engage with its clinical results.  AC ¶ 91.  If this pathway is utilized, the FDA will review the BLA and may convene an advisory committee or "AdCom".  *Id.*  Given the lack of significant treatment options for ALS, the FDA has stated that it is appropriate to exercise regulatory flexibility.[2]  AC ¶ 72.

Through the time of the filing this action, BrainStorm's clinical development of NurOwn consists of four clinical trials.  Plaintiff's allegations center on the fourth trial, BCT-002-US, which

---

[2] On September 24, 2019, the FDA published final guidance for industry entitled "Amyotrophic Lateral Sclerosis: Developing Drugs for Treatment."  Ex. 2, 84 Fed. Reg. 50045 (Sept. 24, 2019) ("ALS Guidance").  The FDA states that the additions to the ALS Guidance "***emphasize FDA's willingness to exercise flexibility in applying the statutory standards for approval of drugs for the treatment of [ALS].***"  *Id.* at 50047.  The FDA acted on this broad flexibility approach in the ALS space in 2022 (prior to BrainStorm submitting its BLA using the File Over Protest procedure in March 2023) with another company Amylyx, which received approval for its drug Relyvrio prior to its completion of a phase 3 trial, and after denial in an initial AdCom only two months prior to a second AdCom in which it was approved.  *See, e.g.*, Zoey Becker, *Amylyx's ALS drug finally scores FDA approval, but that's just the tip of the iceberg for ALS research, founders say* (Sept. 29, 2022), https://www.fiercepharma.com/pharma/amylyxs-als-drug-finally-scores-fda-approval-thats-just-tip-iceberg-als-research-amylyx-co.

was BrainStorm's only Phase III, randomized, double-blind placebo-controlled study (the "Phase 3 Trial") at the time. AC ¶ 99. In June 2020, prior to completion of the Phase 3 Trial and while the participant and treatment groups remained blinded, BrainStorm provided its Statistical Analysis Plan, which specified subgroups for statistical analysis when the trial was complete, and which was publicly available. *See* Ex. 3, Statistical Analysis Plan § 8.7, Subgroup Analyses.

**C.      Regulatory Process Before and After NurOwn Phase 3 Trial Completed, and the RTF Letter.**

BrainStorm regularly interfaced with the FDA regarding the development of NurOwn, including the Phase 3 Trial. Two interactions between BrainStorm and the FDA in the months prior to the beginning of the putative Class Period (Feb. 18, 2020 to Sept. 27, 2023) demonstrate the iterative process. In November 2019, after a discussion regarding the Phase 3 Trial's primary efficacy endpoint, the FDA told the Company not to modify the existing primary and secondary efficacy endpoints, reasoning that because the Company was collecting survival and joint rank data, the Phase 3 Trial results would still be "interpretable." AC ¶ 114. At another meeting on February 5, 2020 to discuss "outstanding issues" including "efficacy endpoints, and analysis of [BrainStorm's] ongoing Phase 3 study," the FDA told Defendants that it was committed to reviewing the data once the study was completed, "to determine if there is a regulatory path forward that could potentially lead to approval…." AC ¶ 115. Later in 2020, BrainStorm completed the Phase 3 Trial, finding that the Phase 3 Trial did not meet statistical significance in its primary efficacy endpoint. AC ¶ 123. On February 16, 2021, the FDA recommended BrainStorm not submit a BLA in light of the Phase 3 Trial, but said that the Company had the option of submitting a BLA with existing data, and if the FDA refused to file it, BrainStorm could use the File Over Protest procedure. AC ¶ 129.

On August 15, 2022 Defendants announced that the Company would submit a BLA for

5

NurOwn to the FDA, which it did on September 9, 2022.  AC ¶ 139.  On November 8, 2022, the FDA issued an RTF, which "provided the FDA's recommendations on how to resolve the deficiencies" in the BLA submission.  AC ¶ 152.  BrainStorm ultimately decided in February 2023 to use the File Over Protest procedure (AC ¶ 168), and an AdCom took place on September 27, 2023, with the Briefing Document provided by the FDA just two days prior (AC ¶ 191).

> **D.      BrainStorm Thoroughly Disclosed Results of Phase 3 Trial and Engagement with FDA.**

Throughout the putative Class Period, BrainStorm thoroughly disclosed its interactions with the FDA, the results of the Phase 3 Trial, and its beliefs regarding NurOwn's path forward. For example, while the Phase 3 Trial was ongoing, Defendant Kern explained that "based on the BLA application, the FDA will then review all the data supporting materials, and then they will make a decision to approve or disapprove the application" and that "when [the FDA] look[s] at the clinical significance of data, they'll look at what the existing therapies can deliver and at how we compare to that."  Ex. 4, 2/18/20 Earnings Call at 9, 18.  When announcing the results of the Phase 3 Trial, BrainStorm disclosed that the "[c]linical trial *did not meet* statistical significance in its primary efficacy endpoint."  Ex. 5, 11/17/20 Press Release at 1.  This remained consistent.  *See, e.g.*, Ex. 6, 8/15/22 Investor Call at 5.  When the AdCom was scheduled, Lindborg explained why the Company pursued it: "The meeting will provide an open forum for BrainStorm and the FDA, together with medical experts, statisticians, and the ALS community, to thoughtfully review all available evidence supporting NurOwn."  Ex. 7, 3/27/23 Press Release at 1.

> **E.      In November 2023, This Lawsuit was Filed.**

On September 27, 2023, the AdCom voted against approval of NurOwn.  On November 1, 2023, this lawsuit was filed.  In the AC, Plaintiff purports to bring claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of a putative class comprised of all purchasers of BrainStorm

6

common stock during the putative Class Period.[3]  Relying almost entirely on the FDA Briefing

Document provided to BrainStorm on September 25, 2023 (*i.e.* in the last few days of the Class

Period) for the September 27, 2023 AdCom, and notwithstanding BrainStorm's repeated

cautionary statements to investors about the results of the Phase 3 Trial, Plaintiff contends that

Defendants' statements relating NurOwn during a three and a half year period were false and

misleading because they misled investors into believing the FDA would agree with BrainStorm's

analyses and interpretations of the Phase 3 Trial and accept the BLA.  AC ¶¶ 12-37, 213-271.

## ARGUMENT

### I.    THE AC FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT.

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2)

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation

omitted).  A court "must consider the complaint in its entirety, . . . documents incorporated into

complaint by reference, and matters of which a court may take judicial notice[,]"  *Tellabs, Inc. v.*

*Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322  (2007), and need "not accept as true conclusions

unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences[,]"

*Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014), or any "allegation that is contradicted

by documents on which the complaint relies."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp.

2d 549, 555 (S.D.N.Y. 2004).

The AC must meet the "heightened" pleading standards of both Rule 9(b) and the Private

---

[3] While Plaintiff alleges an unusually long class period, he does not allege that any statement or disclosure made between November 17, 2020 and August 15, 2022 was false or misleading.

Securities Litigation Reform Act ("PSLRA") for its claim under § 10(b) of the Exchange Act. *Kleinman v. Elan Corp. plc*, 706 F.3d 145, 152 (2d Cir. 2013). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To do so, a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quotation marks and citation omitted). The PSLRA expands on Rule 9(b) and "imposes procedural and substantive limitations upon the scope of the private right of action available under § 10(b) and Rule 10b-5." *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 383 (2014). Specifically, the PSLRA requires that "complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a ***strong*** inference that the defendant[s] acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quotation marks omitted) (emphasis added); 15 U.S.C. § 78u-4(b). Courts in this Circuit routinely dismiss securities fraud claims such as those alleged here under these exacting standards.[4] Here,

---

[4] *See e.g.*, *Pitman v. Immunovant, Inc.*, 2024 WL 1342737, at *11–12 (E.D.N.Y. Mar. 29, 2024) (no scienter); *In re Alkermes Pub. Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 293-295 (E.D.N.Y. 2021) (same) *aff'd sub nom*, *Midwest Op. Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079 (2d Cir. Dec. 7, 2021); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (same); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016) (same); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (same); *Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at *13 (S.D.N.Y. Jan. 23, 2024) (certain statements not actionable as related to likelihood of FDA approval); *Zhou v. NextCure, Inc.*, 2023 WL 4493541, at *11–12 (S.D.N.Y. July 12, 2023) (no actionable misstatements or scienter); *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *7–10 (S.D.N.Y. Sept. 12, 2022) (same); *Lehmann v. Ohr Pharm., Inc.*, 2019 WL 4572765, at *3-7 (S.D.N.Y. Sept. 20, 2019) (same); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-766 (S.D.N.Y. 2018) (same); *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 731-736 (S.D.N.Y. 2018) (same); *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (affirming dismissal for lack of actionable misstatements); *Kleinman*, 706 F.3d 145 (same).

the AC's § 10(b) claim fails because it does not, and cannot, plead (i) scienter or (ii) any actionable misstatement or omission.

### A. The AC Fails to Plead Facts Giving Rise to a Strong Inference of Scienter.

To allege scienter, Plaintiff must "plead with particularity facts giving rise to a **strong** inference that the defendant[s] acted with the required state of mind," which is "an intent to deceive, manipulate, or defraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("ECA") (quotation marks and citation omitted). To meet this heightened pleading requirement, it is **not** sufficient for the plaintiff to set out "facts from which, if true, a reasonable person **could infer** that the defendant acted with the required intent." *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023) (citation omitted) (emphasis added). Rather, the standard demands an inference that is "more than merely plausible or reasonable—**it must be cogent and at least as likely as any opposing inference of nonfraudulent intent.**" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Thus courts must "consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA,* 553 F.3d at 198.

Scienter can be established by "alleging facts demonstrating that defendants had both [1] the motive and an opportunity to commit fraud or [2] otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "Recklessness" is "conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the

extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St., LLC*, 573 F.3d at 109 (quotation marks omitted) (emphasis omitted). The AC accomplishes neither.

### 1. The AC Fails to Allege Motive to Commit Fraud.

The AC's allegations of motive are woefully deficient. *First*, although Plaintiff bears the burden of pleading particularized facts giving rise to a "strong inference" of fraudulent intent "with respect to each defendant and with respect to each act or omission alleged to [constitute securities fraud]," *supra* at 9, the AC makes only generalized allegations regarding "Defendants" as a group. Specifically, the AC alleges that "Defendants were financially motivated to misrepresent the truth and artificially inflate the market price of BrainStorm stock."   ¶ 275.  This group pleading is insufficient. *See In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (scienter "cannot be satisfied through group pleading").  *Second*, Plaintiff's alleged motive is based on the allegation that the Company "needed cash to survive" (¶ 275), a "motive" that is shared by every start-up development stage company, and here, is supported only by the fact that the Company conducted run-of-the-mill offerings of common stock.  ¶¶ 41, 119-120, 122, 128, 137, 186, 276.  Moreover, as Plaintiff acknowledges, the Company disclosed "it required substantial additional funding to continue operations, had a history of losses, and expected to incur losses for the foreseeable future."  AC ¶ 275; Ex. 8, 2/4/21 10-K at 33.  Disclosures of these types of risks are not indicative of motive.  Quite the opposite: "disclosures" "undercut the inference" of scienter. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 & n. 62 (2d Cir. 2014); *Gomez v. Credit Suisse AG*, 2024 WL 506240, at *2-3, at *7 (2d Cir. Feb. 9, 2024) (scienter allegations weakened by detailed "warnings [defendant] included in the press release . . . [that] adequately captured the range of risks investors . . . faced").

Fatally for Plaintiff, the AC does not make particularized allegations that the Company's

"financial survival" depended on raising capital at an *inflated* price.  *See In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 200 (E.D.N.Y. 2022).  To plead "financial survival grounds for motive," it is not sufficient to plead that the product at-issue is a company's "most important and therefore critical" to the company's survival.  *Id.*  Instead, a plaintiff must allege specific facts also suggesting that the company was "in dire financial straits and desperate for a capital infusion to fund their operating expenses." *Id.*[5]  Plaintiff has not done so, nor could he, as this position is again belied by the Company's repeated disclosures. [6]

Plaintiff's insider trading allegations are similarly weak.  Plaintiff only alleges that Lebovits sold 71,753 shares of BrainStorm stock he indirectly owned through ACC International Holdings, Ltd.[7] between July 9, 2020 and July 16, 2020.  AC ¶ 277.  But without more, "the mere fact that insider stock sales occurred does not suffice to establish scienter."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (citation omitted).[8]  This is especially true since these sales occurred a full *three years before* the release of the Briefing

---

[5] *ECA,* 553 F.3d at 201 ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defendant securities fraud actions.") (quotation marks and citation omitted); *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) ("Action taken to maintain the appearance of corporate profitability, or of the success of an investment . . . does not entail concrete benefits sufficient to demonstrate motive.") (quotation marks and citation omitted).

[6] As of September 30, 2020, a few weeks before two of the largest offerings identified in the complaint, BrainStorm had $24.77 million in cash on hand.  *See* Ex. 9, October 10, 2020 10-Q at 6; *see also* Ex. 8, Feb. 2021 10-K at 58 (As of December 31, 2020, the Company's cash equivalents and short-term bank deposits amounted to $41,936,000).

[7] The AC incorrectly identifies this entity as "AAC Holdings."

[8] *See, e.g., Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 54 (2d Cir. 1995) (stock sale by single insider insufficient to create strong inference of scienter); *In re Health Mgmt. Sys., Inc. Sec. Litig.,* 1998 WL 283286, at *6, (S.D.N.Y. June 1, 1998) (no strong inference of scienter where "no one particular event . . . triggered substantial sales" and co-defendants purchased or did not sell stock during the period).

Document that Plaintiff alleges caused BrainStorm's stock to drop. *See id.* at 271 (trades occurring *weeks before* principal misstatement allegations and months before the release of negative information that caused stock drop are "empty vessels"); *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) (lapse of "approximately four months between these substantial sales and the revelation of the alleged falsity[ ] inescapably attenuates any inference of scienter").[9]

What is more, Lebovits personally acquired more BrainStorm shares during the Class Period.[10] In fact, between July 2020 and August 2023, Lebovits ***more than doubled*** the amount of shares he directly owned in BrainStorm. *Compare* Ex. 11, 7/31/20 Form 4 (reporting 124,740 directly-owned shares) *with* Ex. 14, 8/4/23 Form 4 (reporting 293,295 directly-owned shares). Courts consistently decline to infer motive where the individual defendants ***increased*** their holdings in shares during the class period.[11] And, Plaintiff has not alleged any other insider sales—"[t]he fact that [other insiders] did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'" *Acito*, 47 F.3d at 54 (citation omitted); *see also In re Gildan*, 636 F. Supp. 2d at

---

[9] *See e.g.*, *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595–96 (S.D.N.Y. 2006) (collecting cases); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385–86 (E.D.N.Y. 2003) (four-to-six-week gap between stock sales and release of negative information not indicative of suspicious trading in light of other relevant factors).

[10] *See* Ex. 10, 7/26/19 Form 4 (acquiring 31,185 shares); Ex. 11, 7/31/20 Form 4 (acquiring 31,185 shares); Ex 12, 12/10/21 Form 4 (acquiring 31,185 shares); Ex. 13, 1/4/23 Form 4 (acquiring 31,185 shares); Ex. 14, 8/4/23 Form 4 (acquiring 31,185 shares); Ex. 15, 4/4/24 Form 4 (acquiring 75,000 shares).

[11] *Aeterna Zentaris Inc.*, 2013 WL 2399869, at *20 (S.D.N.Y. May 29, 2013) (no inference of scienter when "the individual defendants increased their holdings in Aeterna shares during the class period"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561 (finding that a defendant increasing stock holdings across the relevant time period is "a fact wholly inconsistent with fraudulent intent").

271-272 (same).

### 2.    The AC Fails to Plead Conscious Misbehavior or Recklessness.

Absent motive, Plaintiff is left to contend with the "correspondingly greater" burden of alleging strong circumstantial evidence of conscious misbehavior or recklessness. *ECA,* 553 F.3d at 199. That is, "not merely a heightened form of negligence" but "a state of mind *approximating actual intent*." *Midwest Operating Engineers Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079, at *2 (2d Cir. Dec. 7, 2021) (emphasis in original). Plaintiff again fails.

The drug approval process is unique territory in securities fraud cases. Since suits like this one are not meant "to provide investors with broad insurance against market losses" resulting from the "all-but-inevitable decline in the price of [a company's] stock following [the] announcement that the FDA had not approved [a drug]." *Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009). "[T]he mere allegation that defendants failed to disclose relevant information does not in and of itself constitute strong evidence that they did so with scienter." *In re Sanofi Sec. Litig.*, 87 F. Supp 3d at 534. Accordingly, securities class action complaints of this nature are regularly dismissed unless they specifically allege that "management knows that certain facts will ***necessarily prevent*** regulatory approval . . . and conceals those facts from the investing public." *In re Alkermes Pub. Ltd. Co. Sec. Litig.,* 523 F. Supp. 3d at 293.[12]

The AC does not approach this exacting standard. Plaintiff alleges that "[b]y virtue of BrainStorm's meetings with FDA" and the receipt of the RTF letter, Defendants had knowledge that the FDA disagreed with the Phase 3 Trial design, including its primary efficacy endpoint;

---

[12] *See, e.g.*, *Ohr Pharm., Inc.*, 2019 WL 4572765, at *6; *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d at 395; *QRX Pharma Ltd.*, 197 F. Supp. 3d at 579; *In re Sanofi Sec. Litig*, 87 F. Supp. 3d at 529, 524–535; *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470–472 (S.D.N.Y. 2008).

disagreed with the Company's "floor effect" analysis; was concerned about the disproportionately large number of deaths in the Phase 3 Trial's treatment group; flagged CMC deficiencies; and "would not approve the BLA for NurOwn without demonstration of substantial evidence of effectiveness through adequate and well-controlled studies." ¶ 272; *see also* ¶¶ 272-73.[13]  None of these assertions, however, render Defendants' statements to the investing public even to be questionable, much less highly unreasonable.  While the FDA expressed concerns about the trial design, they also gave BrainStorm encouraging feedback.  Plaintiff ignores that in the same interactions that it alleges form the basis of these scienter allegations (*see* AC ¶¶ 191-203), the FDA also "recommended that [BrainStorm] *not change the existing primary and secondary efficacy endpoints* . . . [because] the study results would still be interpretable"; "offered to review the Phase 3 study data prior to formal regulatory submission"; and even as it disagreed "regarding the primary efficacy endpoint [] noted that in the study [BrainStorm] was collecting data that the Agency considers critical to assess the efficacy of the product . . . [and] [] committed to reviewing the data, once the study is completed, to determine if there is a regulatory path forward that *could potentially lead to approval.*"  AC ¶ 115; Ex. 16, Briefing Document at 52-54 (emphasis added). "Implicit in the ongoing dialogue between the FDA and [BrainStorm] was a collective expectation that the process was an iterative one and that [BrainStorm] would continue to respond to feedback in its continued effort to seek approval of [NurOwn]," *In re Alkermes Pub. Ltd. Sec. Litig.*, 523 F. Supp. 3d at 294; *QRX Pharma Ltd.*, 197 F. Supp. 3d  at 601-03  (no scienter where FDA "no

---

[13] Plaintiff also alleges that "Defendants' knowledge (*i.e.* scienter) of BrainStorm's communications with FDA concerning the Phase 3 Trial and the BLA can be inferred because these facts were critical to BrainStorm's core operations."  ¶ 273.  But, the "core operations" doctrine is not stand-a-lone evidence of scienter; it can only "bolster[] the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595-596 (S.D.N.Y. 2011).

14

agreement letter" "did not approve of [] proposed efficacy endpoint and statistical approach" but did not support inference that "NDA was destined to fail").[14]

In light of these interactions, Defendants' refusal to give up, and statements to that effect about the Phase 3 Trial data that they were sharing with the public, are not a basis for securities fraud. Simply put, Defendants could not foretell with any certainty the contents of the Briefing Document prior to receiving it two days before the AdCom. Plaintiff now suggests, with the benefit of 20-20 hindsight, that Defendants "should have seen this coming" but that is not a basis for securities fraud. *See Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness," as management is "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage") (citation and quotation marks omitted).

Further undercutting any inference of scienter is the fact that Defendants' statements that they were continuing to fight for NurOwn were accompanied by specific warnings about the risks of continuing to seek regulatory approval[15] and by clear and repeated messages to investors that the "[c]linical trial did not meet statistical significance in primary efficacy endpoint."[16] It is not securities fraud that Defendants continued their efforts to obtain FDA approval for a treatment for

---

[14] *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *8 (S.D.N.Y. Sept. 19, 2012) (Optimistic statements despite accompanying FDA disapproval/concerns "do not present evidence of defendants' egregious refusal to see the obvious or to investigate the doubtful, or failure to review or check information they had a duty to monitor. In fact, the representations show defendants intended to and did work with the FDA to timely address the FDA's concerns").

[15] *E.g.*, Ex. 5, Nov. 17, 2020 Press Release at 3 (warning that "[t]he potential risks and uncertainties include . . . the regulatory approval potential of BrainStorm's NurOwn® treatment candidate").

[16] Ex. 5, Nov. 17, 2020 Press Release at 1.

an incurable and always fatal disease while fully disclosing the difficulties of that process.

### 3.    The AC's Weak Confidential Witness and Resignation Allegations Do Not Add Up to Scienter.

Finally, the Former Employee ["FE"] and executive resignation allegations do nothing to resuscitate Plaintiff's claims—indeed, they serve to highlight the paucity of the scienter allegations.  To determine whether allegations from confidential sources can contribute to the inference of scienter, "[t]he Court must assess whether there are allegations that the [confidential witnesses] were privy to the Individual Defendants' knowledge or had direct contact with the Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false." *In re Gentiva Sec. Litig.,* 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013).  The AC does not allege that the FEs were privy to Defendants' knowledge or that the FEs discussed these matters with the Defendants.  Oddly enough, the sum of the AC's FE allegations is the opposite—that the FEs were *not* made privy to information regarding the Defendants' decision-making interactions with the FDA.  This type of "strikingly non-particular" allegation is woefully inadequate. *In re Draftkings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023) (rejecting former employee statement that "lack details . . . as to where, when, and how").[17]

---

[17] *See also Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (confidential witnesses' allegations too vague, speculative, and conclusory to be credited); *In re Molycorp, Inc. Sec. Litig.,* 2015 WL 1097355, at *13 (S.D.N.Y. Mar. 12, 2015) ("[T]he allegation from a confidential witness that if anyone in management was 'paying attention,' they would know by late 2012 that SorbX had no short term commercial potential, does not meet this standard"). Furthermore, the mere fact that Kern resigned and took another position (*see* AC ¶ 278), does not offer any indicia of scienter absent indication that his departure was "highly unusual or suspicious." *See e.g.*, *Glaser*, 772 F. Supp. 2d 598; *QRX Pharma Ltd.*, 197 F. Supp. 3d at 605-606 (collecting cases).

### 4.    The Non-Fraudulent Inference Is More Cogent and Compelling Than Any Inference of Scienter.

Ultimately, the AC is devoid of any plausible explanation why BrainStorm or any of the Individual Defendants would have continued to pursue the BLA for NurOwn, including putting time and resources into addressing the FDA's concerns and preparing for the AdCom if, as Plaintiff claims, they believed the FDA had already concluded clinical trial data was insufficient and NurOwn was doomed.  This undermines any "cogent" inference of fraud.  *Tellabs, Inc.*, 551 U.S. at 324.  The opposing, non-fraudulent inference is far more compelling—*i.e.*, that Defendants had a basis to continue engaging with the FDA (which had publicly disclosed that it would have regulatory flexibility for ALS treatment options and had shown that flexibility a month earlier with a competitor's drug) regarding the results of the Phase 3 Trial in an effort to address a treatment for a 100% fatal disease, which is supported by the Company's public disclosures: BrainStorm was encouraged by certain aspects of its clinical data, made a series of disclosures that highlighted that optimism, informed the public of the failure of the primary and secondary endpoints and other FDA concerns, and conveyed Defendants' cautious optimism that BrainStorm would be able to work with the FDA to ultimately secure NurOwn's approval.  And Courts regularly refuse to infer scienter when confronted with the "illogical allegations" that exist here.  *QRX Pharma Ltd.*, 197 F. Supp. 3d at 601 (granting motion to dismiss "implausible" allegations that defendant invested "substantial time and resources in clinical studies and NDA submissions that it knew were doomed to fail"); *see also In re Axonyx Sec. Litig.*, 2009 WL 812244, at *4 (S.D.N.Y. Mar. 27, 2009) (granting motion to dismiss where "[a]ny inference of scienter . . . is, to say the least, significantly less compelling than the opposing inference—that [the Company] did its best to design and carry

17

out a successful clinical trial, but that despite these best efforts, [the compound] was not an effective drug . . ..").

## B. The AC Fails to Plead Any Actionable Statements.[18]

The Exchange Act claims should also be dismissed for the independent reason that statements challenged in the AC are not materially false or misleading, and Plaintiff has not plead an actionable omission. The scope of Rule 10b-5 is not limitless and the "materiality hurdle" is a meaningful obstacle. *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). Ultimately, whether " a statement is 'misleading' depends on the perspective of the reasonable investor." *Omnicare, Inc. v Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the "context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted).

Likewise, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 45 (2011) (citation omitted). In other words,

---

[18] As a threshold matter, the 320-paragraph, 98-page AC should be dismissed because it engages in impermissible puzzle pleading; Plaintiff has not explained with particularity as required by Rule 9(b) and the PSLRA why each challenged statement is false or materially misleading. *See, e.g.*, *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing section 10(b) and rule 10(b)(5) claims for failure to plead with sufficient particularity where "Plaintiffs list[ed] various statements—often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts—then follow[ed] each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false."). As in *Alcatel*, Plaintiff lists multiple statements from a disclosure or investor call, and alleges all of the statements are false and materially misleading based on a litany of repeated allegations that are not tied to each specific statement. AC ¶¶ 234, 243, 249, 254, 266; *see Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478 (S.D.N.Y. 2021) (dismissing complaint for failure to meet requisite pleading standards where "[p]laintiffs employ[ed] a 100-page, 268-paragraph Complaint, of which 69 paragraphs spanning over 30 pages [were] dedicated to reciting Defendants' statements during the Class Period" and "[a]fter each subsection . . include[d] a substantially similar paragraph containing some variation of the same five or so generalized, conclusory statements."). This improperly places "the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d at 534.

18

"a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citation omitted).  "This duty may arise when . . . a statement is made that would be inaccurate, incomplete, or misleading without further context."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 167 (quotation omitted).

### 1.    BrainStorm's Statements Regarding Interpretation of Phase 3 Clinical Trial Design and Results are Non-Actionable Opinion or Belief.

The bulk of the statements Plaintiffs challenge are those providing BrainStorm's interpretation of the Phase 3 Trial design and data.  *See* AC ¶¶ 219, 220, 225, 227, 228, 229, 232, 233, 239, 240, 247, 248, 251, 262, 264, 265, 268, 270.  At the outset, these statements are not actionable, as "[c]ourts have repeatedly held" that "publicly stated interpretations of the results of various clinical studies" are "opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."  *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at \*9 (S.D.N.Y. Sept. 10, 2021), *aff'd*, 89 F.4th 408 (2d Cir. 2023) (citation omitted); *see also Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at \*12-13 (S.D.N.Y. June 8, 2016) (finding statements about whether a specific biomarker was "indicative of a clinically meaningful outcome for treatment" were not false or misleading, and stating that "[s]ecurities law is simply not a vehicle through which courts will police disagreements in . . . the parameters of clinical trials.")

Plaintiff tries to argue that Defendants had no basis for their interpretation of the Phase 3 Trial data and seemingly ***could not*** have believed it to be true at the time because, for example, the "FDA had already informed the Company at the February 16, 2021 meeting that its "floor effect" analysis was spurious and that the Phase 3 Trial's failure to demonstrate efficacy was not

19

due to any supposed floor effects." AC ¶ 234; *see also* AC ¶¶ 18, 21, 32, 130, 136, 166, 170, 243, 254, 261, 266, 271-272, 313, 315. However, Plaintiff's argument is belied by the FDA's own record of its regulatory history of the BLA, which Plaintiff attached to the AC and which was appended in summary form to the Briefing Document provided to BrainStorm days before the September 2023 AdCom, ***not*** contemporaneously with their interactions. Ex. 16; Dkt. 28-2. In fact, the summary of an informal teleconference between BrainStorm and FDA on February 16, 2021 does not support Plaintiff's position; the word "spurious" is not used, and the FDA did not come to an ultimate conclusion. Rather the summary reflects that the FDA considered that the "'floor effect' did not ***appear*** to be consistent," [19] and that if BrainStorm filed the BLA, the FDA "***may*** refuse to file it." Ex. 16. at 53 (emphasis added). And the AC is likewise devoid of any other contemporaneous facts showing Defendants did not genuinely believe their stated opinions interpreting clinical trial data regarding the floor effect and biomarker results or that they supplied any false supporting data or facts in the challenged disclosures.[20] That the FDA expressed

---

[19] Plaintiff relies on the same language from the regulatory history summary in support of its allegation that Lindborg's statement in the March 27, 2023 Business Update Call that "the FDA certainly has seen this data [regarding a "floor effect"] … and has not disagreed with the statements we've made" was false and materially misleading. AC ¶¶ 253-254. Again, the February 2021 meeting minutes did not constitute a definitive and final conclusion from the FDA. *Infra* at 21 n. 21.

[20] Plaintiff repeatedly contends that Defendants' statements about the clinical trial results relating to a "pre-specified subgroup" were materially misleading because in fact these "subgroup analyses were *post hoc* exploratory analyses and not 'pre-specified,' and "results from *post hoc* exploratory analysis do not constitute evidence of efficacy to support a BLA." AC ¶¶ 202, 222, 234, 243, 266, 271. However, BrainStorm and the Individual Defendants did not falsify any facts about the analysis of the trial data, nor did they hide what they meant when describing the challenged subgroup analysis as "pre-specified." In the same disclosures Plaintiff challenges, Defendants never equate the pre-specified subgroup to a hypothesis or primary or secondary endpoint, but instead describe a "prespecified subgroup of participants with a baseline score of at least 35." Ex. 6, 8/15/22 Investor Call at 6; *see also id.* at *17* ("When we look at subgroups, for example . . . we focused on the participants that were 35 or above. This was a prespecified threshold." (AC ¶ 231)); Ex. 5, 11/17/20 Press Release at 1 ("[w]e also carried out pre-specified statistical modeling"; "[w]e identified a superior treatment response in a pre-specified subgroup of patients with less advanced

concerns and skepticism does not create a securities law violation. *Sanofi*, 816 F.3d at 214 (holding that "Defendants' statements about the effectiveness of [drug] cannot be misleading merely because the FDA disagreed with the conclusion—so long as Defendants conducted a 'meaningful' inquiry and in fact held that view, the statements did not mislead in a manner that is actionable."); *In re MELA Scis. Inc., Sec. Litig.*, 2012 WL 4466604, at *1, 13 (finding that even in the wake of an FDA communication conveying "*serious concerns* about the clinical trial," "***Plaintiffs cannot premise a fraud claim upon a mere disagreement with how defendants chose to interpret the results of the clinical trial***") (emphasis added); *QRX Pharma Ltd.*, 197 F. Supp. 3d at 595, 598 (dismissing Section 10(b) claim based on statements providing company's interpretation of clinical trial data because "SAC failed "to plead[] facts on which to conclude that defendants disbelieved their own statements" and "***[t]hat the FDA … ultimately disagreed with defendants' interpretation of the data does not render their subjective assessments false or misleading.***") (emphasis added).[21]

_____

disease" (AC ¶ 220)).  Contrary to Plaintiff's characterization, Defendants' statements were consistent with the Statistical Analysis Plan for the Phase 3 Trial dated June 19, 2020 that was available publicly to investors ***prior to any of the challenged statements on this topic***, and which designated this subgroup for analysis prior to the unblinding of treatment groups and participants in the Phase 3 Trial.  *See* Ex. 3 at 33 ("Baseline ALSFRS-R: • < 35[;]• ≥ 35.").  *See Aeterna Zentaris Inc.*, 2013 WL 2399869, at *22  ("[I]t is appropriate to review the versions of the studies' designs as published and available online through the National Institutes for Health at ClinicalTrials.gov.").

[21] To the extent Plaintiff alleges that certain statements were false or misleading based on a failure to disclose alleged communications that were ongoing through the putative class period with the FDA regarding the Phase 3 Trial data, these claims also fail.  The communications to which Plaintiff cites prior to and including the RTF (AC ¶¶ 18, 114-115, 129-133, 234, 238, 243, 254), did not constitute a final and binding determination, and BrainStorm did not have a duty to disclose the FDA's interim feedback, even if "it tended to cut against their projections."  *In re Alkermes Pub. Ltd. Sec. Litig.*, 523 F. Supp. 3d at 292-293 (quoting *Sanofi*, 816 F. 3d at 212) (dismissing 10(b) claim based on failure to disclose alleged FDA "concerns" regarding statistical interpretation of clinical trial data); *see also QRX Pharma Ltd.*, 197 F. Supp. 3d at 585 n.13 ("[A] defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology.") (cleaned up); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 539 (same).

21

Similarly, the AC contains no particularized facts undermining Defendants' belief that BrainStorm had "clinical and biomarker data that demonstrate evidence of significantly better outcomes in participants treated with NurOwn" (AC ¶ 265); that there was a "clinically meaningful treatment response on the primary and secondary endpoints with NurOwn compared to placebo"; (AC ¶ 265); or that "when you're able to eliminate the advanced patients, we see both in the primary and secondary endpoints, statistical[ly] significant results" (AC ¶ 270). The securities laws do not provide a remedy for Plaintiff to look back, knowing the results of the AdCom, and declare that BrainStorm's interpretation of this data was not reasonably made at the time. *Davison v. Ventrus Bioscis., Inc.*, 2014 WL 1805242, at *9 (S.D.N.Y. May 5, 2014) (rejecting as impermissible fraud-by-hindsight plaintiffs' allegations that claim that statements regarding Ventrus's intention to complete an SPA with the FDA were false based on the allegation that they did not ultimately complete an SPA where the complaint was "devoid of any facts demonstrating that Ventrus did not intend to complete an SPA at the time of the alleged misstatements").[22]

### 2.    The AC's Forward-Looking Statements Are Non-Actionable.

In an effort to save his claims, Plaintiff also turns his attention to several statements made after receipt of the RTF, including that BrainStorm requested a Type A meeting with the FDA to "facilitate NurOwn's advancement following receipt of a refusal to file letter regarding the Company's new [BLA]" (AC ¶ 239); that BrainStorm "filed an amendment to the BLA which responds to most of the outstanding questions the FDA has posed" (AC ¶ 247); that BrainStorm has "full confidence that [it] will be able to remediate each of these points [made in the RTF] in a

---

[22] *See also In re Aratana Therapeutics Inc. Sec. Litig.,* 315 F. Supp. 3d at 761 (rejecting allegations that "defendants' serial revisions of the commercialization timeline demonstrate their culpable knowledge" of information belying their statements and concluding that these were inactionable fraud by hindsight allegations that "collapse allegations of the objective wrongness of the opinions with claimed subjective insincerity.").

straightforward manner (AC ¶ 259),  the Company "firmly believe[s] that NurOwn's data package is strong enough to support regulatory approval" (AC ¶ 265).

However, these alleged misstatements are forward-looking statements that are protected by two independent grounds under the PSLRA's statutory safe harbor.[23] *First*, the statements were accompanied by meaningful, cautionary disclosures, including that "[t]he potential risks and uncertainties include, without limitation . . . prospects for future regulatory approval of NurOwn® [and] whether BrainStorm's future interactions with the FDA will have productive outcomes." Ex. 17, 11/14/22 Press Release at 2; Ex. 7, 3/27/23 Press Release at 2; Ex. 18, 8/14/23 Press Release at 3. *Second*, as discussed above, *supra* at 13-17, 19-22, the AC does not allege that any Defendant acted with actual knowledge that these statements were false or misleading. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 538 (safe harbor applied despite conclusory allegations "that defendants were aware of the FDA's concerns and therefore 'knew or were severely reckless in disregarding' the misleading nature of their statements"); *QRX Pharma Ltd.*, 197 F. Supp. 3d at 584 (same).[24]

### 3.    The AC's Puffery Statements Are Non-Actionable.

Finally, Plaintiff's claims also fail because certain of the AC's alleged misstatements are

---

[23] Under the safe harbor, "[a] forward-looking statement is not actionable if it is identified and accompanied by meaningful cautionary language or . . . the plaintiff fails to prove that it was made with actual knowledge it was false or misleading." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d at 755 (granting motion to dismiss); *see* 15 U.S.C. § 78u-5(c).

[24] Certain of the AC's alleged misstatements from the beginning of the putative class period regarding alignment with the FDA regarding the Phase 3 Trial are also non-actionable and protected by the safe harbor provision.  First, these statements were not false or misleading. Second, in the same February 2020 disclosures that Defendants stated that they confirmed that the type of data being collected in the Phase 3 Trial was "aligned with current FDA views when considering a BLA for approval," that the Company was "excited" the FDA was "having these early conversations about the endpoint"; and that the FDA confirmed they were conducting a "well-run study" (AC ¶¶ 213-216), they told investors that "based on the BLA application, the FDA will then review all the data supporting materials, and then they will make a decision to approve or disapprove the application. And of course, we can't speculate on the outcome of that review" and that the FDA "will look at the totality of our data." Ex. 4, 2/18/20 Earnings Call at 8.

classic puffery that courts find nonactionable as "too general to cause a reasonable investor to rely upon them." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016) (labeling company's strategy as "analytic" and "quantitative" was puffery).  For example, no reasonable investor would rely on general statements that BrainStorm had a "wonderful discussion" with the FDA (AC ¶ 213), that the Company's "commitment to ALS patients and [] belief in NurOwn's potential to address with unmet medical needs remains unchanged" (AC ¶ 239); that there was "no downside" to utilizing the File Over Protest option (AC ¶ 250), and that the File Over Protest path "is a standard regulatory procedure and is not inherently antagonistic" (AC ¶ 257); or that issues disclosed in the RTF were "trivial" (AC ¶ 242).  These statements about the tenor of interactions with the FDA, BrainStorm's continued dedication to its mission, and a description of the File Over Protest mechanism *offered by the FDA*[25] offer no "concrete information" and thus "amount[] to puffery." *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 489-490 (S.D.N.Y. 2018) (statement regarding "organic development opportunities" was puffery); *see also Kleinman*, 706 F.3d at 153 (statements regarding "encouraging" results and findings were "expressions of puffery and corporate optimism").

### C.     The AC Fails to Plead Loss Causation.

Plaintiff's 10(b) claim also independently fails for failure to adequately plead loss causation.  "Loss causation is not adequately pled simply by allegations of a drop in price following an announcement of bad news if the news did not disclose the fraud." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 384.  Instead, the plaintiff must demonstrate a "sufficiently direct", "[un]attenuated" link between the plaintiff's investment loss and the *subject* of the misstatements or omissions. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (quotations

---

[25] *See e.g.*, Ex. 19, CBER, SOPP 8404.1, Procedures for Filing an Application When the Applicant Protests a Refusal to File Action.

and citations omitted). Practically speaking, this means that courts dismiss conclusory allegations premised on "the all-but-inevitable decline in the price of [a company's] stock" after the announcement of a drug candidate's poor performance. *Biovail Corp.*, 615 F. Supp. 2d at 229. Here too, Plaintiff alleges only that BrainStorm's stock price fell following disappointing news (AC ¶¶ 280–290) not that any loss was "caused by the materialization of [a] risk *concealed*." *ATSI Commc'ns, Inc.*, 493 F.3d at 107 (emphasis added).

## II.    PLAINTIFF'S INSIDER TRADING CLAIMS FAIL

Plaintiff adds an allegation that BrainStorm and Lebovits violated Section 10(b) of the Exchange Act for insider trading, basing this on the same allegations as for motive to support scienter. AC ¶¶ 312-317.[26] This claim fails on the same basis that Plaintiff has not alleged scienter, *see supra* Sec. I.A.1:  the AC is devoid of particularized allegations tending to show that Defendants believed that the FDA disagreed with their opinions about the Phase 3 Trial results and sold their shares without disclosing this information. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 310 (S.D.N.Y. 2008) (rejecting insider trading claim where no particularized allegations that certain defendants "knew" the alleged material non-public information.").

## III.    PLAINTIFF'S CONTROL PERSON CLAIMS FAIL

The control person liability claim under Section 20 of the Exchange Act fail because this claim is "necessarily predicated on a primary violation of securities law," and the AC fails to allege any such violation. *Rombach*, 355 F.3d at 177-178.

**CONCLUSION**

For all of these reasons, the Court should dismiss the AC with prejudice.

---

[26] As an initial matter, Plaintiff does not allege which provision of Section 10(b) (or Rule 10b-5) he brings this claim under. *Chiarella v. United States*, 445 U.S. 222, 225 n. 5 (1980) (indicating that only Rule 10b–5(a) and (c) were at issue in case involving alleged insider trading because Rule 10b–5(b) deals with alleged material misrepresentations).

Dated: May 31, 2024

Respectfully submitted,

BRAINSTORM CELL THERAPEUTICS INC.,
CHAIM LEBOVITS, STACY LINDBORG, and
RALPH KERN

By their attorneys,


*/s/ Douglas H. Flaum*
Douglas H. Flaum
Molly L. Leiwant
Dina Ljekperic
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax: 212.355.3333
dflaum@goodwinlaw.com
mleiwant@goodwinlaw.com
dljekperic@goodwinlaw.com

*Attorneys for Defendants BrainStorm Cell
Therapeutics Inc., Chaim Lebovits, Stacy Lindborg,
and Ralph Kern*

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all attorneys of record.

/s/ Douglas H. Flaum
Douglas H. Flaum

27