# Exhibit 8

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

**FORM 10-K**

☒  **ANNUAL REPORT UNDER SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2020**

☐  **TRANSITION REPORT UNDER SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

*COMMISSION FILE NUMBER 001-36641*

# BRAINSTORM CELL THERAPEUTICS INC.

(Exact Name of Registrant as specified in its charter)

| | |
|---|---|
| Delaware | 20-7273918 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1325 Avenue of Americas, 28th Floor New York, NY | |
| (Address of principal executive offices) | 10019 (Zip Code) |

Registrant's telephone number, including area code: (201) 488-0460

Securities registered under Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.00005 par value | BCLI | The Nasdaq Stock Market LLC (Nasdaq Capital Market) |

Securities registered under Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.
Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report,. Yes ☒  No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

The approximate aggregate market value of the voting and non-voting common equity held by non-affiliates of the issuer as of June 30, 2020 (the last business day of the registrant's most recently completed second fiscal quarter), was $278,374,634.

As of February 4, 2021, the number of shares outstanding of the registrant's Common Stock, $0.00005 par value per share, was 35,721,429.

Table of Contents

may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal False Claims Act or federal civil money penalties statute;

* the federal civil and criminal false claims laws and civil monetary penalty laws, including the False Claims Act, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, false or fraudulent claims for payment to, or approval by Medicare, Medicaid, or other federal healthcare programs, knowingly making, using or causing to be made or used a false record or statement material to a false or fraudulent claim or an obligation to pay or transmit money to the federal government, or knowingly concealing or knowingly and improperly avoiding or decreasing or concealing an obligation to pay money to the federal government. Manufacturers can be held liable under the False Claims Act even when they do not submit claims directly to government payors if they are deemed to "cause" the submission of false or fraudulent claims. The False Claims Act also permits a private individual acting as a "whistleblower" to bring actions on behalf of the federal government alleging violations of the False Claims Act and to share in any monetary recovery;

* the anti-inducement law, which prohibits, among other things, the offering or giving of remuneration, which includes, without limitation, any transfer of items or services for free or for less than fair market value (with limited exceptions), to a Medicare or Medicaid beneficiary that the person knows or should know is likely to influence the beneficiary's selection of a particular supplier of items or services reimbursable by a federal or state governmental program;

* HIPAA, which includes federal criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program or obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false, fictitious, or fraudulent statements or representations in connection with the delivery of, or payment for, healthcare benefits, items or services relating to healthcare matters; similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;

* HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and their respective implementing regulations, which impose requirements on certain covered healthcare providers, health plans, and healthcare clearinghouses as well as their respective business associates that perform services for them that involve the use, or disclosure of, individually identifiable health information, relating to the privacy, security and transmission of individually identifiable health information;

* the federal transparency requirements under the ACA, including the provision commonly referred to as the Physician Payments Sunshine Act, and its implementing regulations, which requires applicable manufacturers of drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program to report annually to the U.S. Department of Health and Human Services, CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by the physicians described above and their immediate family members. Effective January 1, 2022, these reporting obligations will extend to include transfers of value made to certain non-physician providers such as physician assistants and nurse practitioners;

* federal government price reporting laws, which require us to calculate and report complex pricing metrics in an accurate and timely manner to government programs; and

* federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers.

In addition to the above, on November 20, 2020, the OIG finalized further modifications to the federal Anti-Kickback Statute. Under the final rules, OIG added safe harbor protections under the Anti-Kickback Statute for certain coordinated care and value-based arrangements among clinicians, providers, and others, yet removed safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a safe harbor for certain

28

Table of Contents

fixed fee arrangements between pharmacy benefit managers and manufacturers.  The final rule (with some exceptions) became effective January 19, 2021. We continue to evaluate what effect, if any, these rules will have on our business.

Additionally, we are subject to state and foreign equivalents of each of the healthcare laws and regulations described above, among others, some of which may be broader in scope and may apply regardless of the payor. Many U.S. states have adopted laws similar to the federal Anti-Kickback Statute and False Claims Act, and may apply to our business practices, including, but not limited to, research, distribution, sales or marketing arrangements and claims involving healthcare items or services reimbursed by non-governmental payors, including private insurers. In addition, some states have passed laws that require pharmaceutical companies to comply with the April 2003 OIG Compliance Program Guidance for Pharmaceutical Manufacturers and/or the Pharmaceutical Research and Manufacturers of America's Code on Interactions with Healthcare Professionals. Several states also impose other marketing restrictions or require pharmaceutical companies to make marketing or price disclosures to the state. There are ambiguities as to what is required to comply with these state requirements and if we fail to comply with an applicable state law requirement, we could be subject to penalties. Finally, there are state and foreign laws governing the privacy and security of health information (e.g., the California Consumer Privacy Act), many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

We may also be subject to additional privacy restrictions. The collection, use, storage, disclosure, transfer, or other processing of personal data regarding individuals in the European Economic Area, or EEA, including personal health data, is subject to the General Data Protection Regulation 2016/679 (GDPR), which became effective on May 25, 2018 and the United Kingdom General Data Protection Regulation, as tailored by the Data Protection Act 2018 ("UK GDPR"). The GDPR and UK GDPR are wide-ranging in scope and imposes numerous requirements on companies that process personal data, including requirements relating to processing health and other sensitive data, obtaining consent of the individuals to whom the personal data relates, providing information to individuals regarding data processing activities, implementing safeguards to protect the security and confidentiality of personal data, providing notification of data breaches, and taking certain measures when engaging third-party processors. The GDPR/UK GDPR also impose strict rules on the transfer of personal data to countries outside the European Economic Area and the United Kingdom, respectively, including to the United States, and permit data protection authorities to impose large penalties for violations of the GDPR/UK GDPR, including potential fines of up to €20 million or 4% of annual global revenues, whichever is greater. The GDPR/UK GDPR also confer a private right of action on data subjects and consumer associations to lodge complaints with supervisory authorities, seek judicial remedies, and obtain compensation for damages resulting from violations of the GDPR/UK GDPR. In addition, the GDPR/UK GDPR include restrictions on cross-border data transfers. Compliance with the GDPR/UK GDOR will be a rigorous and time-intensive process that may increase our cost of doing business or require us to change our business practices, and despite those efforts, there is a risk that we may be subject to fines and penalties, litigation, and reputational harm in connection with our European and United Kingdom activities.

Because of the breadth of these laws and the narrowness of the statutory exceptions and safe harbors available, it is possible that some of our business activities could be subject to challenge under one or more of such laws.

Violations of fraud and abuse laws may be punishable by criminal and/or civil sanctions, including penalties, fines, imprisonment and/or exclusion or suspension from federal and state healthcare programs such as Medicare and Medicaid and debarment from contracting with the U.S. government. In addition, private individuals have the ability to bring actions on behalf of the U.S. government under the federal False Claims Act as well as under the false claims laws of several states.

Law enforcement authorities are increasingly focused on enforcing fraud and abuse laws, and it is possible that some of our practices may be challenged under these laws. Efforts to ensure that our current and future business arrangements with third parties, and our business generally, will comply with applicable healthcare laws and regulations will involve substantial costs. If our operations, including our arrangements with physicians and other healthcare providers are found to be in violation of any of such laws or any other governmental regulations that apply to us, we may be subject to penalties, including, without limitation, administrative, civil and criminal penalties, damages, fines, disgorgement, contractual damages, reputational harm, diminished profits and future earnings, the curtailment or restructuring of our operations, exclusion from participation in federal and state healthcare programs (such as Medicare and Medicaid), and imprisonment, any of which could adversely affect our ability to operate our business and our financial results.

If any of the physicians or other healthcare providers or entities with whom we expect to do business are found to be not in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs, which may also adversely affect our business.

Table of Contents

The risk of our being found in violation of these laws is increased by the fact that many of these laws have not been fully interpreted by the regulatory authorities or the courts, and their provisions are open to a variety of interpretations. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. The shifting compliance environment and the need to build and maintain a robust system to comply with multiple jurisdictions with different compliance and reporting requirements increases the possibility that a healthcare company may violate one or more of the requirements. Efforts to ensure that our business arrangements with third parties will comply with applicable healthcare laws and regulations will involve substantial cost.

### *Healthcare reform*

A primary trend in the U.S. healthcare industry and elsewhere is cost containment. Government authorities and other payors have attempted to control costs by limiting coverage and the amount of reimbursement for particular medical products. For example, in March 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or ACA was enacted, which, among other things, increased the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program; introduced a new methodology by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected; extended the Medicaid Drug Rebate Program to utilization of prescriptions of individuals enrolled in Medicaid managed care plans; imposed mandatory discounts for certain Medicare Part D beneficiaries as a condition for manufacturers' outpatient drugs coverage under Medicare Part D; subjected drug manufacturers to new annual, nondeductible fees based on pharmaceutical companies' share of sales to federal healthcare programs; imposed a new federal excise tax on the sale of certain medical devices; expanded healthcare fraud and abuse laws, including the False Claims Act and the Anti-Kickback Statute, new government investigative powers and enhanced penalties for non-compliance; expanded eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals with income at or below 133% of the federal poverty level, thereby potentially increasing manufacturers' Medicaid rebate liability; expanded the entities eligible for discounts under the Public Health Service Act's pharmaceutical pricing program, also known as the 340B Drug Pricing Program; created new requirements to report financial arrangements with physicians and teaching hospitals, commonly referred to as the Physician Payments Sunshine Act; created a new requirement to annually report the identity and quantity of drug samples that manufacturers and authorized distributors of record provide to physicians; created a new Patient Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research; and established the Center for Medicare Innovation at CMS to test innovative payment and service delivery models to lower Medicare and Medicaid spending.

Since its enactment, there have been numerous judicial, administrative, executive, and legislative challenges to certain aspects of the ACA, and we expect there will be additional challenges and amendments to the ACA in the future. Various portions of the ACA are currently undergoing legal and constitutional challenges in the United States Supreme Court; the Trump Administration issued various Executive Orders which eliminated cost sharing subsidies and various provisions that would impose a fiscal burden on states or a cost, fee, tax, penalty or regulatory burden on individuals, healthcare providers, health insurers, or manufacturers of pharmaceuticals or medical devices; and Congress has introduced several pieces of legislation aimed at significantly revising or repealing the ACA. The United States Supreme Court is expected to rule on a legal challenge to the constitutionality of the ACA in early 2021. The implementation of the ACA is ongoing, the law appears likely to continue the downward pressure on pharmaceutical pricing, especially under the Medicare program, and may also increase our regulatory burdens and operating costs. Litigation and legislation related to the ACA are likely to continue, with unpredictable and uncertain results. It is unclear whether the ACA will be overturned, repealed, replaced, or further amended. We cannot predict what affect further changes to the ACA would have on our business.

Other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, former President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend to Congress proposals in spending reductions. The Joint Select Committee on Deficit Reduction did not achieve a targeted deficit reduction of at least $1.2 trillion for fiscal years 2012 through 2021, triggering the legislation's automatic reduction to several government programs. This includes aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect beginning on April 1, 2013 and, due to legislation amendments to the statute, including the BBA, will stay in effect through 2030 unless additional Congressional action is taken. However, pursuant to the Coronavirus Aid, Relief and Economic Security Act, or CARES Act, and subsequent legislation, these Medicare sequester reductions are suspended from May 1, 2020 through March 31, 2021 due to the COVID-19 pandemic. Proposed legislation, if passed, would extend this suspension until the end of the COVID-19 pandemic. In January 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things,

30

Table of Contents

further reduced Medicare payments to several types of providers, including hospitals, imaging centers and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, reduce the cost of prescription drugs under Medicare, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. At the federal level, the former Trump administration's budget proposal for fiscal year 2021 included a $135 billion allowance to support legislative proposals seeking to reduce drug prices, increase competition, lower out-of-pocket drug costs for patients, and increase patient access to lower-cost generic and biosimilar drugs. On March 10, 2020, the Trump administration sent "principles" for drug pricing to Congress, calling for legislation that would, among other things, cap Medicare Part D beneficiary out-of-pocket pharmacy expenses, provide an option to cap Medicare Part D beneficiary monthly out-of-pocket expenses, and place limits on pharmaceutical price increases.  Further, the Trump administration also previously released a "Blueprint", or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products paid by consumers. HHS has implemented certain of these initiatives. For example, in May 2019, CMS issued a final rule to allow Medicare Advantage Plans the option of using step therapy, a type of prior authorization, for Part B drugs beginning January 1, 2020.  In addition, there have been several changes to the 340B. Legal challenges to certain 340B reimbursement calculations are ongoing, and it is unclear how these developments could affect covered hospitals who might purchase our future products and affect the rates we may charge such facilities for our approved products in the future, if any. While a number of these and other proposed measures will require authorization through additional legislation to become effective, Congress has indicated that it will continue to seek new legislative and/or administrative measures to control drug costs.

Further, on July 24, 2020 and September 13, 2020, former President Trump signed several Executive Orders aimed at lowering drug pricing that seek to implement several of the administration's proposals. In response, the FDA released a final rule on September 24, 2020, which went into effect on November 30, 2020, providing guidance for states to build and submit importation plans for drugs from Canada. Further, on November 20, 2020 CMS issued an Interim Final Rule implementing the Most Favored Nation, or MFN, Model under which Medicare Part B reimbursement rates will be calculated for certain drugs and biologicals based on the lowest price drug manufacturers receive in Organization for Economic Cooperation and Development countries with a similar gross domestic product per capita.  The MFN Model regulations mandate participation by identified Part B providers and will apply in all U.S. states and territories for a seven-year period beginning January 1, 2021 and ending December 31, 2027.  The Interim Final Rule has not been finalized and is subject to revision and legal challenge by certain industry advocacy groups and participants. Additionally, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers. Although a number of these, and other proposed measures may require authorization through additional legislation to become effective, and the Biden administration may reverse or otherwise change these measures, Congress has indicated that it will continue to seek new legislative measures to control drug costs.

Individual states in the United States have also increasingly passed legislation and implemented regulations designed to control pharmaceutical product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

**Compliance with Environmental, Health and Safety Laws**

In addition to FDA regulations, we are also subject to evolving federal, state and local environmental, health and safety laws and regulations. In the past, compliance with environmental, health and safety laws and regulations has not had a material effect on our capital expenditures. We believe that we comply in all material respects with existing environmental, health and safety laws and regulations applicable to us. Compliance with environmental, health and safety laws and regulations in the future may require additional capital expenditures.

31

Table of Contents

**Manufacturing**

We intend to establish and maintain fully-equipped cGMP-certified Cell-Processing Centers in strategic locations to conduct NurOwn® production and distribution over the broadest geographic area. Each Cell-Processing Center would receive an initial bone marrow sample of the patient, harvested at a medical center. The patient's MSC cells would be isolated and expanded, in order to produce an initial dose of NurOwn® cells. A master cell bank for each individual patient would be cryopreserved and maintained for production of subsequent, future NurOwn® doses on a long-term basis for future treatments. These doses would be produced as needed and transported to the medical centers, where they would then be transplanted back into the patient.

We have already initiated activities to support commercial launch if our product is approved by regulatory authorities. These activities include scaling out production capacity, logistics and supply. In support of commercialization and to expand our cGMP capabilities we are engaged in several strategic partnerships. Our tech transfer to Catalent has already been initiated and will allow for continuous supply of NurOwn® for future clinical trials and initial commercialization. Our partnership with RR&D, to help us establish in-house manufacturing capabilities, will accelerate once a regulatory pathway is clear. These partnerships will ensure an ongoing cGMP clinical supply of NurOwn® and enable us to provide rapid treatment access to patients if we obtain regulatory approval.

**Competition**

There are several clinical trials underway evaluating experimental treatments for ALS, of which only two are stem cell-based trials being conducted by other commercial entities. US-based Seneca Biopharma (Nasdaq: SNCA, formally Neuralstem) completed a Phase 2 intraspinal transplantation trial for its allogeneic, human (fetal) spinal cord derived neural stem cells, it is not clear if the sponsor will proceed with a further clinical trial. Q Therapeutics has gained FDA clearance for a Phase 1/2 cervical surgical transplantation study with its Q-Cells®, purified human glial progenitor cells isolated from brain tissue. The study is not recruiting patients yet. Corestem, a Korean company has commercialized its NEURONATA-R® inj., an autologous bone marrow mesenchymal stem cell (BM-MSC) therapy for ALS in South Korea and is searching for a subcontractor for a Phase 3 study in the US. Alexion has submitted an investigational new drug application (IND) for ULTOMIRIS (ravulizumab) in ALS to the FDA in the fourth quarter of 2019 and initiated a Phase 3 study in 2020.

Several experimental ALS therapies such as Masitinib (AB Science), NP-001 (Neuraltus), and Actemra (Tocilizimab, Genentech) are selectively targeting neuroinflammation. AB Science completed a Phase 3 trial for masitinib in ALS and is now conducting another add-on trial of masitionib with Riluzole in ALS. Neuraltus Pharma was developing NP001, is a small molecule that modulates macrophages to promote an anti-inflammatory state in order to reduce the rate of motoneuron loss. NP001 failed to demonstrate efficacy in a phase 2 clinical trial. Cytokinetics is a late-stage biopharmaceutical company that recently completed a Phase 3 clinical trial with tirasemtiv, a muscle troponin sensitizer. This study failed to demonstrate an improvement in slow vital capacity, a measure of breathing strength or other functional improvement, and as a consequence, Cytokinetics has suspended the development of tirasemtiv. Amylyx Pharmaceuticals is developing AMX0035, a combination of two compounds, sodium phenylbutyrate and tauroursodeoxycholic acid, that are proposed to have a synergistic effect when administered together. Amylyx recently published data from its CENTAUR trial demonstrating a clinically meaningful benefit and a favorable safety profile for people living with ALS and possibly a survival advantage over 2 years compared to placebo. Therapies specifically targeting genetic mutations in a small subset of ALS patents, such as SOD1 and C9ORF72, are being evaluated using antisense oligonucleotide technology (Biogen, IONIS, and WAVE Therapeutics).

Currently, there are only two FDA-approved ALS therapies, Riluzole and Radicava, that have demonstrated modest improvements in survival and ALS function, respectively. Riluzole, approved by the FDA in 1995, extends the time to death or ventilation by several months; however, it has not been shown to improve the daily functioning of ALS patients. Radicava (Edaravone) is a free radical scavenger approved by FDA in May 2017 based on a single Phase 3 study carried out in Japan.

**Employees**

We currently have 40 employees, all of whom are full-time. None of our employees is represented by a labor union.

**Human Capital**

Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and new employees, advisors and consultants. The principal purposes of our equity and cash incentive plans are to attract, retain

and reward personnel through the granting of stock-based and cash-based compensation awards, in order to increase stockholder value and the success of our company by motivating such individuals to perform to the best of their abilities and achieve our objectives.

**Additional Information**

We maintain a website at *www.brainstorm-cell.com*. We make available through our website, free of charge, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file those reports with, or furnish them to, the SEC. We also similarly make available, free of charge through our website, the reports filed with the SEC by our executive officers, directors and 10% stockholders pursuant to Section 16 under the Exchange Act. We are not including the information contained at *www.brainstorm-cell.com* or at any other Internet address as part of, or incorporating it by reference into, this Annual Report on Form 10-K.

**Item 1A.     RISK FACTORS**

*Summary of our Risks:*

Our ability to implement our business strategy is subject to numerous risks that you should be aware of before making an investment decision. These risks are described more fully in the section entitled "Risk Factors" in this Form 10-K. These risks include, among others:

* We will need substantial additional funding to pursue our business objectives and continue our operations. If we are unable to raise capital when needed, we may be required to delay, limit, reduce or terminate our research or product development efforts or future commercialization efforts.

* Our Company has a history of losses and we expect to incur losses for the foreseeable future.

* The continuing effects of the novel coronavirus disease, COVID-19, could adversely impact our business, including our clinical trials and supply chain.

* Our product development programs are based on novel technologies and are inherently risky. The field of stem cell therapy is relatively new and our development efforts may not yield an effective treatment of human diseases.

* Our NurOwn® stem cell therapy may not demonstrate safety and efficacy sufficient to obtain regulatory approval, and may not receive regulatory approval. Our NurOwn® stem cell therapy, even if approved, may not be accepted in the marketplace; therefore, we may not be able to generate significant revenue, if any.

* If serious or unexpected adverse side effects are identified during the development of our NurOwn® stem cell therapy, we may need to abandon or limit its development.

* Our success will depend in part on establishing and maintaining effective strategic partnerships and collaborations, which may impose restrictions on our business and subject us to additional regulation.

* We have never manufactured our NurOwn® stem cell therapy at commercial scale and there can be no assurance that it can be manufactured in compliance with regulations at a cost or in quantities necessary to make it commercially viable.

* Part of our business. in the foreseeable future will be based on technology licensed from Ramot and if this license were to be terminated upon failure to make required royalty payments in the future, we would need to change our business strategy and we may be forced to cease our operations.

* Technological and medical developments or improvements in conventional therapies could render the use of stem cells and our services and planned products obsolete.

33

Table of Contents

* We face substantial competition in developing cell therapies for ALS and other neurodegenerative diseases, which may result in others discovering, developing or commercializing products before or more successfully than we do.

* It is uncertain to what extent the government, private health insurers and third-party payors will approve coverage or provide reimbursement for the therapies and products to which our services relate. Availability for such reimbursement may be further limited by an increasing uninsured population and reductions in Medicare and Medicaid funding in the United States.

* We are exposed to fluctuations in currency exchange rates. The dollar cost of our operations in Israel will increase to the extent increases in the rate of inflation in Israel are not offset by a devaluation of the NIS in relation to the dollar, which would harm our results of operations.

**Risks Related to the COVID-19 Pandemic**

***The current pandemic of COVID-19 and the future outbreak of other highly infectious or contagious diseases, could have a material adverse impact on our business, financial condition and results of operations, including our preclinical studies and clinical trials.***

The pandemic caused by the novel strain of coronavirus, SARS-CoV 2 (COVID-19) disease has currently impacted and may continue to adversely impact our business, including our preclinical studies and clinical trials. In December 2019, a novel strain of coronavirus, surfaced in Wuhan, China. Since then, COVID-19 has spread worldwide, significantly impacting the United States, Europe and Israel, where the Company conducts its operations, as well as its clinical trials for NurOwn®. In response to the spread of COVID-19 and to ensure safety of employees and continuity of business operations, we closed our offices, with our administrative employees continuing their work remotely and limited the number of staff in any given research and development laboratory. Our research and development laboratory in Israel and manufacturing sites in U.S. and in Israel remain open. The full extent to which the COVID 19 pandemic will directly or indirectly impact our business, results of operations and financial condition will depend on future developments that are highly uncertain and cannot be accurately predicted at this time, including new information that may emerge concerning COVID 19, the actions taken to contain it or treat its impact and the economic impact on local, regional, national and international markets. Our management team is actively monitoring this situation and the possible effects on our financial condition, liquidity, operations, suppliers, industry, and workforce.

We completed dosing of all participants in our Phase 3 ALS trial in July 2020, and we announced top-line data from this trial on November 17, 2020. Results from the trial showed that NurOwn® was generally well tolerated in the population of rapidly progressing ALS patients. While showing a numerical improvement in the treated group compared to placebo across the primary and key secondary efficacy endpoints, the trial did not reach statistically significant results. In an important, pre-specified subgroup with early disease based on ALS Functional Rating Score ("ALSFRS-R") baseline score 35, NurOwn® demonstrated a clinically meaningful treatment response across the primary and key secondary endpoints and remained consistent with our pre-trial, data-derived assumption. In this subgroup, there were 34.6% responders who met the primary endpoint definition on NurOwn and 15.6% on Placebo (p=0.288), and the average change from baseline to week 28 in ALSFRS-R total score was -1.77 on NurOwn and -3.78 on Placebo (p=0.198), an improvement of 2.01 ALSFRS-R points favoring NurOwn.. When following the SAP to implement sensitivity to the primary endpoint, there is a slight change in the percentage of responders but no P value change. No new safety concerns were identified. Following the completion of our phase 3 ALS trial, we are diligently pursuing next steps, including active discussions with the FDA to identify regulatory pathways that may support NurOwn®'s approval in ALS. We are also in active dialog with the FDA around our Chemistry, Manufacturing and Controls (CMC) plans for registration, and completed a successful meeting in December 2020.

The U.S. Phase 2 PMS trial faced slight delays in enrollment due to the COVID-19 pandemic, but as of June 2020, all the trial sites were back on track to continue with the trial. On December 18, 2020, we announced the completion of all dosing in the study participants in the trial and expects topline clinical trial results by the end of the first quarter of 2021.

We recently announced a new clinical program focused on the development of NurOwn® as a treatment for AD. As part of the newly announced program, we are planning a multi-national Phase 2 clinical trial in Europe to evaluate the safety and preliminary efficacy of NurOwn® treatment in patients with prodromal to mild AD.

Two vaccines for COVID-19 were granted Emergency Use Authorization by the FDA in late 2020, and more are likely to be authorized in the coming months. The resultant demand for vaccines and potential for manufacturing facilities and materials to be commandeered

34

under the Defense Production Act of 1950, or equivalent foreign legislation, may make it more difficult to obtain materials or manufacturing slots for the products needed for our clinical trials, which could lead to delays in these trials.

**Risks Related to our Financial Condition and Capital Requirements**

*We need to raise additional capital. If we are unable to raise additional capital in favorable terms and a timely manner, we will not be able to execute our business plan and we could be forced to restrict or cease our operations.*

Although we have sufficient cash to continue with our operations for at least the next twelve months, we may need to raise additional funds to meet our anticipated expenses so that we can execute our business plan. We expect to incur substantial and increasing net losses for the foreseeable future as we increase our spending to execute our development and commercial programs.

The amount of financing required will depend on many factors including our financial requirements to fund any additional research and clinical trials, our ability to secure partnerships and achieve partnership milestones and our ability to establish manufacturing and delivery processes for our NurOwn® stem cell therapy as well as to fund other working capital requirements. Our ability to access the capital markets or to enlist partners is mainly dependent on the progress of our research and development and regulatory approval of our products.

To date, the Company has not generated revenues from its activities and has incurred substantial operating losses. Management expects the Company to continue to generate substantial operating losses and to continue to fund its operations primarily through utilization of its current financial resources and through additional raises of capital.

Management's plan includes raising funds from outside potential investors, including under the ATM Program. However, there is no assurance such funding will be available to the Company or that it will be obtained on terms favorable to the Company or will provide the Company with sufficient funds to meet its objectives. Should we raise additional funds through the issuance of equity, equity-related or debt securities, these securities may have rights, preferences or privileges (including registrations rights) senior to those of the rights of our Common Stock and our stockholders will experience additional dilution.

*Our Company has a history of losses and we expect to incur losses for the foreseeable future.*

As a development stage pre-revenue company, we are in the early stages of executing our business plan. We had no operational revenues for the fiscal years ended December 31, 2018, December 31, 2019 or December 31, 2020. We are currently in the process of introducing the Company to strategic partners. In the upcoming three years, the Company will focus on completing its ongoing clinical trials and commercialization of NurOwn® for ALS, if approved. We are unable, at this time, to foresee when we will generate operational revenues from strategic partnerships. If NurOwn® is approved by the FDA for ALS, we hope to commercialize and start generating revenues shortly thereafter., We expect to incur substantial and increasing operating losses for the next several years as we increase our spending to execute our development programs and commercialization efforts. These losses are expected to have an adverse impact on our working capital, total assets and stockholders' equity.

*We are exposed to fluctuations in currency exchange rates.*

A significant portion of our business, particularly our research and development, is conducted outside the United States. Therefore, we are exposed to currency exchange fluctuations in other currencies such as the New Israeli Shekels ("NIS") and the Euro. Moreover, a portion of our expenses in Israel and Europe are paid in NIS and Euros, respectively, which subjects us to the risks of foreign currency fluctuations. Our primary expenses paid in NIS are employee salaries, fees for consultants and subcontractors and lease payments on our Israeli facilities.

*The dollar cost of our operations in Israel will increase to the extent increases in the rate of inflation in Israel are not offset by a devaluation of the NIS in relation to the dollar, which would harm our results of operations.*

Since a considerable portion of our expenses such as employees' salaries are linked to an extent to the rate of inflation in Israel, the dollar cost of our operations is influenced by the extent to which any increase in the rate of inflation in Israel is or is not offset by the devaluation of the NIS in relation to the dollar. As a result, we are exposed to the risk that the NIS, after adjustment for inflation in Israel, will appreciate in relation to the dollar. In that event, the dollar cost of our operations in Israel will increase and our dollar-

35

Table of Contents

measured results of operations will be adversely affected. During the past few years inflation-adjusted NIS appreciated against the dollar, which raised the dollar cost of our Israeli operations. We cannot predict whether the NIS will appreciate against the dollar or vice versa in the future. Any increase in the rate of inflation in Israel, unless the increase is offset on a timely basis by a devaluation of the NIS in relation to the dollar, will increase labor and other costs, which will increase the dollar cost of our operations in Israel and harm our results of operations.

**Risks Related to our Cell Therapy Product Development Efforts**

***If our NurOwn® stem cell therapy does not demonstrate safety and efficacy sufficient to obtain regulatory approval, it may not receive regulatory approval and we will be unable to market it.***

The therapeutic treatment development and regulatory approval process is expensive, uncertain and time-consuming. As part of the regulatory process, we are conducting clinical trials, for our NurOwn® stem cell therapy to demonstrate safety and efficacy in humans to meet the requirements of the FDA and regulatory authorities in other countries. We have recently completed our Phase 3 ALS trial and are in active discussions with FDA for potential pathways for approval of NurOwn® for ALS. If we fail to obtain regulatory approval for our NurOwn® stem cell therapy, we will be unable to market and sell it and we may never be profitable.

As of June 23, 2020, the FDA noted it is continuing to ensure timely reviews of applications for medical products during the COVID-19 pandemic in line with its user fee performance goals; however, FDA may not be able to continue its current pace and approval timelines could be extended, including where a pre-approval inspection or an inspection of clinical sites is required and due to the COVID-19 pandemic and travel restrictions FDA is unable to complete such required inspections during the review period. In 2020, several companies announced receipt of complete response letters due to the FDA's inability to complete required inspections for their applications.

A failure of one or more of our clinical trials can occur at any stage of testing. Results of later stage clinical trials may fail to show the desired safety and efficacy despite acceptable results in earlier clinical trials. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses and many companies that have believed their product candidates performed satisfactorily in preclinical and clinical trials have nonetheless failed to obtain marketing approval of their treatments.

Specifically, we are currently comparing NurOwn® stem cell therapy against placebo. Comparisons of outcomes of other reported clinical trials may provide some insight into the efficacy of NurOwn® stem cell therapy, however, these studies may be of limited comparative value due to the many factors that affect the outcome of clinical trials, some of which are not apparent in published reports.

Additionally, several of our past, planned and ongoing clinical trials utilize an "open-label" trial design. An "open-label" clinical trial is one where both the patient and investigator know whether the patient is receiving the investigational product candidate or either an existing approved drug or placebo. Most typically, open-label clinical trials test only the investigational product candidate and sometimes may do so at different dose levels. Open-label clinical trials are subject to various limitations that may exaggerate any therapeutic effect as patients in open-label clinical trials are aware when they are receiving treatment. Open-label clinical trials may be subject to a "patient bias" where patients perceive their symptoms to have improved merely due to their awareness of receiving an experimental treatment. In addition, open-label clinical trials may be subject to an "investigator bias" where those assessing and reviewing the physiological outcomes of the clinical trials are aware of which patients have received treatment and may interpret the information of the treated group more favorably given this knowledge. The results from an open-label trial may not be predictive of future clinical trial results with any of our product candidates for which we include an open-label clinical trial when studied in a controlled environment with a placebo or active control.

***Our product development programs are based on novel technologies and are inherently risky.***

We are subject to the risks of failure inherent in the development of products based on new technologies. The novel nature of our stem cell therapy creates significant challenges with regard to product development and optimization, manufacturing, government regulations, and market acceptance. For example, the FDA has relatively limited experience with stem cell therapies. None have been approved by them for commercial sale, and the pathway to regulatory approval for our stem cell therapies may accordingly be more complex and lengthy. As a result, the development and commercialization pathway for our therapies may be subject to increased uncertainty, as compared to the pathway for new conventional drugs.

36

Table of Contents

***If serious or unexpected adverse side effects are identified during the development of our NurOwn® stem cell therapy, we may need to abandon or limit its development.***

Results of our clinical trials could reveal a high and unacceptable severity and prevalence of side effects or unexpected characteristics. Undesirable side effects caused by NurOwn® could cause us or regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay or denial of regulatory approval by the FDA or comparable foreign regulatory authorities. The drug-related side effects could affect patient recruitment or the ability of enrolled patients to complete the trial or result in potential product liability claims. If patients treated with our NurOwn® stem cell therapy suffer serious or unexpected adverse effects, we may need to abandon its development or limit development to certain uses or subpopulations in which these effects are less prevalent, less severe or more acceptable from a risk-benefit perspective. Any of these occurrences may harm our business, financial condition and prospects significantly.

***Despite our experience conducting and managing clinicals, we may not be able to be conduct and manage future trials successfully and have limited experience in the application process necessary to obtain regulatory approvals.***

Despite our prior experience in conducting and managing clinicals, we may not be able to be conduct and manage future trials successfully. We have limited experience in the application process to obtain regulatory approvals. If our clinical trials are unsuccessful, or if we do not complete our clinical trials, we may not receive regulatory approval for or be able to commercialize our stem cell therapies.

If we do not succeed in conducting and managing our preclinical development activities or clinical trials, or in obtaining regulatory approvals, we might not be able to commercialize our stem cell therapies, or might be significantly delayed in doing so, which will materially harm our business.

Our ability to generate revenues from any of our stem cell therapies will depend on a number of factors, including our ability to successfully complete clinical trials, obtain necessary regulatory approvals and implement our commercialization strategy. We may, and anticipate that we will need to, transition from a company with a research and development focus to a company capable of supporting commercial activities and we may not succeed in such a transition.

***We may not be able to secure and maintain research institutions to conduct our clinical trials.***

We rely on research institutions to conduct our clinical trials. Our reliance upon research institutions, including hospitals and clinics, provides us with less control over the timing and cost of clinical trials and the ability to recruit subjects. If we are unable to reach agreements with suitable research institutions on acceptable terms, or if any resulting agreement is terminated, we may be unable to quickly replace the research institution with another qualified institution on acceptable terms. Furthermore, we may not be able to secure and maintain suitable research institutions to conduct our clinical trials.

**Risks Related to Our Business Operations and Commercialization of Stem Cell Therapies**

***The field of stem cell therapy is relatively new and our development efforts may not yield an effective treatment of human diseases.***

Our intended cell therapeutic treatment NurOwn® for ALS involves a new approach using stem cells to treat ALS. Cell therapy is still a developing area of research, with few cell therapy products approved for clinical use. Many of the existing cellular therapy candidates are based on novel cell technologies that are inherently risky and may not be understood or accepted by the marketplace. The novel nature of our cell therapy technology creates significant challenges with respect to product development and optimization, manufacturing, government regulation and approval, third-party reimbursement.

***Our NurOwn® stem cell therapy, even if approved, may not be accepted in the marketplace; therefore, we may not be able to generate significant revenue, if any.***

Even if our NurOwn® stem cell therapy is approved for sale, physicians and the medical community may not ultimately use it or may use it only in applications more restricted than we anticipate. Our NurOwn® stem cell therapy, if successfully developed, will compete with a number of traditional products manufactured and marketed by major pharmaceutical and biotechnology companies. Our NurOwn® stem cell therapy may also compete with new products currently under development by such companies and others.

37

Table of Contents

Physicians will prescribe a treatment only if they determine, based on experience, clinical data, side effect profiles and other factors, that it is beneficial as compared to other products currently available and in use. Physicians also will prescribe a product based on their traditional preferences. Many other factors influence the adoption of new products, including patient perceptions and preferences, marketing and distribution restrictions, adverse publicity, product pricing, views of thought leaders in the medical community and reimbursement by government and private payors. Any of these factors could have a material adverse effect on our business, financial condition, and results of operations.

***Adoption of our NurOwn® stem cell therapy for the treatment of patients with ALS, PMS, AD or other neurodegenerative diseases, even if approved, may be slow or limited. If our NurOwn® stem cell therapy does not achieve broad acceptance as a treatment option for ALS, PMS, AD or other neurodegenerative diseases, our business would be negatively impact our revenue forecast.***

If approved, the rate of adoption of our NurOwn® stem cell therapy as a treatment for ALS, PMS, AD or other neurodegenerative diseases, and the ultimate sales volume for our treatment, will depend on several factors, including educating treating physicians on how to use our NurOwn® stem cell therapy. Our NurOwn® stem cell therapy utilizes individualized stem cell therapy, which is significantly different from the pharmacological approach currently used to treat neurodegenerative diseases. Acceptance of our NurOwn® stem cell therapy by physicians may require us to provide them with extensive education regarding the mechanism of action of our treatment, the method of delivery of the treatment, expected side effects and the method of monitoring patients for efficacy and follow-up. In addition, the manufacturing and delivery processes associated with our treatment will require physicians to adjust their current treatment of patients, which may delay or prevent market adoption of our NurOwn® stem cell therapy as a preferred therapy, even if approved.

***Our success will depend in part on establishing and maintaining effective strategic partnerships and collaborations, which may impose restrictions on our business and subject us to additional regulation.***

A key aspect of our business strategy is to establish strategic relationships to expand or complement our research and development or commercialization capabilities, and to reduce the cost of such activities. There can be no assurance that we will enter into such relationships, that the arrangements will be on favorable terms or that such relationships will be successful. If we are ultimately successful in executing our strategy of securing collaborations with companies that would undertake advanced clinical development and commercialization of our products, we may not have day-to-day control over their activities. Potential collaborators may have significant discretion in determining the efforts and amount of resources that they dedicate to our collaborations or may be unwilling or unable to fulfill their obligations to us, including their development and commercialization. Potential collaborators may underfund or not commit sufficient resources to the testing, marketing, distribution or other development of our products. They may also not properly maintain or defend our intellectual property rights or they may utilize our proprietary information in such a way as to invite litigation that could jeopardize or potentially invalidate our proprietary information or expose us to potential liability. Potential collaboration partners may have the right to terminate the collaboration on relatively short notice and if they do so or if they fail to perform or satisfy their obligations to us, the development or commercialization of products may be delayed and our ability to realize any potential milestone payments and royalty revenue would be adversely affected.

***We will need to develop or acquire additional capabilities in order to commercialize our NurOwn® stem cell therapy, if approved for sale, and we may encounter unexpected costs or difficulties in doing so.***

We will need to acquire additional capabilities and effectively manage our operations and facilities to successfully pursue and complete future research, development and, if our NurOwn® stem cell therapy receives regulatory approval, commercialization efforts. Currently, we have no experience in preparing applications for marketing approval, commercial-scale manufacturing, managing of large-scale information technology systems or managing a large-scale distribution system. We will need to add personnel and expand our capabilities, which may strain our existing managerial, operational, regulatory compliance, financial and other resources. To do this effectively, we must:

* train, manage and motivate a growing employee base;

* accurately forecast demand for our treatment; and

* expand existing operational, financial and management information systems.

***Your percentage ownership will be diluted by future issuances of our securities.***

In order to meet our financing needs, we may issue additional significant amounts of our Common Stock and warrants to purchase shares of our Common Stock. The precise terms of any future financings will be determined by us and potential investors and such future financings may also significantly dilute your percentage ownership in the Company.

***ACCBT holds equity participation rights and other rights that could affect our ability to raise funds.***

Pursuant to the Subscription Agreement with ACCBT Corp. ("ACCBT"), a company under the control of Mr. Chaim Lebovits, our President and Chief Executive Officer, we granted ACCBT the right to acquire additional shares of our Common Stock whenever we issue additional shares of Common Stock or other securities of the Company, or options or rights to purchase shares of the Company or other securities directly or indirectly convertible into or exercisable for shares of the Company (including shares of any newly created class or series). This participation right could limit our ability to enter into equity financings and to raise funds from third parties. ACCBT is entitled to purchase its pro rata share of any additional securities we offer, so that its percentage ownership of the Company remains the same after any such issuance of additional securities. Such additional securities will be offered to ACCBT at the same price and on the same terms as the other investors in the transaction. ACCBT will have 30 days from the date of our notice to ACCBT of any intended transaction, to decide whether it wishes to exercise its participation rights in the transaction. We also are prohibited from taking certain corporate actions without the consent of ACCBT, including entering into transactions greater than $500,000. Further, ACCBT also has the right to appoint 30% of our Board. In connection with the Subscription Agreement, we entered into a registration rights agreement with ACCBT pursuant to which we granted piggyback registration rights to ACCBT. In addition, we issued ACCBT warrants to purchase up to 2,016,666 shares of Common Stock, of which 2,016,666 warrants are presently outstanding. The outstanding warrants contain cashless exercise provisions, which permit the cashless exercise of up to 50% of the underlying shares of Common Stock. 672,222 of such warrants have an exercise price of $3.00 and the remainder have an exercise price of $4.35. We registered 1,920,461 shares of Common Stock and 2,016,666 shares of Common Stock underlying the ACCBT Warrants on registration statement No. 333-201705 dated January 26, 2015 pursuant to ACCBT's registration rights. ACCBT has waived its participation rights and anti-dilution rights with respect to issuances that were made on or prior to November 2, 2017. In March 2014, we entered into an agreement with ACCBT according to which ACCBT waived certain anti-dilution rights. On November 2, 2017, the Company entered into a Warrant Amendment Agreement with ACCBT, pursuant to which the expiration date of each Warrant held by ACCBT was extended until November 5, 2022, in consideration of ACCBT having provided a series of waivers of their rights and reduction of rights.

***You may experience difficulties in attempting to enforce liabilities based upon U.S. federal securities laws against us and our non-U.S. resident directors and officers.***

Our principal operations are located through our subsidiary in Israel and our principal assets are located outside the U.S. Our Chief Executive Officer and Chief Business Officer and some of our directors are foreign citizens and do not reside in the U.S. It may be difficult for courts in the U.S. to obtain jurisdiction over our foreign assets or these persons and as a result, it may be difficult or impossible for you to enforce judgments rendered against us or our directors or executive officers in U.S. courts. Thus, should any situation arise in the future in which you have a cause of action against these persons or entities, you are at greater risk in investing in our Company rather than a domestic company because of greater potential difficulties in bringing lawsuits or, if successful, collecting judgments against these persons or entities as opposed to domestic persons or entities.

***If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately report our results of operations or prevent fraud, and investor confidence and the market price of our Common Stock may be materially and adversely affected.***

As a public company in the United States, we are subject to the reporting obligations under the U.S. securities laws. The SEC, as required under Section 404 of the Sarbanes-Oxley Act of 2002, has adopted rules requiring every public company to include a report of management on the effectiveness of such company's internal control over financial reporting in its annual report. In prior years, management has identified material weaknesses in our internal control over financial reporting. If any of our prior material weaknesses recurs, or if we identify additional weaknesses or fail to timely and successfully implement new or improved controls, our ability to assure timely and accurate financial reporting may be adversely affected, and we could suffer a loss of investor confidence in the reliability of our financial statements, which in turn could negatively impact the trading price of our shares of Common Stock, result in lawsuits being filed against us by our stockholders, or otherwise harm our reputation. If material weaknesses are identified in the future, it could be costly to remediate such material weaknesses, which may adversely affect our results of operations. In addition, our auditor

is not required to attest to the effectiveness of our internal controls over financial reporting due to our status of qualifying as a smaller reporting company. As a result, current and potential investors could lose confidence in our financial reporting, which could harm our business and have an adverse effect on our share price.

***Delaware law could discourage a change in control, or an acquisition of us by a third party, even if the acquisition would be favorable to you, and thereby adversely affect existing stockholders.***

The Delaware General Corporation Law contain provisions that may have the effect of making more difficult or delaying attempts by others to obtain control of our Company, even when these attempts may be in the best interests of stockholders. Delaware law imposes conditions on certain business combination transactions with "interested stockholders." These provisions and others that could be adopted in the future could deter unsolicited takeovers or delay or prevent changes in our control or management, including transactions in which stockholders might otherwise receive a premium for their shares over then current market prices. These provisions may also limit the ability of stockholders to approve transactions that they may deem to be in their best interests.

***We do not expect to pay dividends in the foreseeable future, and accordingly you must rely on stock appreciation for any return on your investment.***

We have paid no cash dividends on our Common Stock to date, and we currently intend to retain our future earnings, if any, to fund the continued development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Further, any payment of cash dividends will also depend on our financial condition, results of operations, capital requirements and other factors, including contractual restrictions to which we may be subject, and will be at the discretion of our Board.

**Item 1B.        UNRESOLVED STAFF COMMENTS**

None.

**Item 2.        PROPERTIES**

**Corporate Headquarters and other office space**

Our United States corporate headquarters are located at 1325 Avenue of Americas, 28th Floor, New York, NY 10019. Our Israeli Subsidiary is party to a lease agreement for the lease of premises in 12 Basel Street, Petach Tikva, Israel, which include approximately 600 square meters of office and laboratory space, including an animal research facility.

In addition, we lease a GMP certified manufacturing facility with two cleanrooms in Jerusalem, Israel, and have recently leased a new GMP certified facility, which includes three state-of-the-art cleanrooms, at the Tel Aviv Sourasky Medical Center.

We believe that the current office, laboratory space, and cleanrooms are adequate to meet our needs for research and development, clinicals trials and administrative operations.

**Item 3.        LEGAL PROCEEDINGS**

From time to time, we may become involved in litigation relating to claims arising out of operations in the normal course of business, which we consider routine and incidental to our business. We currently are not a party to any legal proceedings the adverse outcome of which, in management's opinion, would have a material adverse effect on our business, results of operation or financial condition.

**Item 4.        MINE SAFETY DISCLOSURES.**

Not required.

Table of Contents

**PART II**

**Item 5.     MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

*Market Information*

Our Common Stock is currently traded on the Nasdaq Capital Market under the symbol "BCLI".

*Record Holders*

As of January 31, 2020, there were approximately 31 holders of record of our Common Stock.

*Dividends*

We have not paid or declared any cash or other dividends on our Common Stock within the last two fiscal years. Any future determination as to the payment of dividends will depend upon our results of operations, and on our capital requirements, financial condition and other factors relevant at the time.

*Equity Compensation Plans*

Information regarding our equity compensation plans and the securities authorized under the plans is included in Item 12 below.

*Recent Sales of Unregistered Securities*

*Exercises of 2018 Amended Warrants:*

On June 6, 2018, the Company entered into Warrant Exercise Agreements with certain holders ("2018 Warrant Holders"), pursuant to which holders were issued warrants to purchase an aggregate 2,458,201 unregistered shares of Common Stock, at an exercise price of $9 per share, with an expiration date of December 31, 2020 (the "2018 Warrants"). In connection with the issuance of the 2019 Warrants (described below), certain 2018 Warrants were amended on August 2, 2019 to reduce the exercise price to $7.00 per share and to extend the expiration date to December 31, 2021 (the "Amended 2018 Warrants").

Between July 20, 2020 and July 24, 2020, 2018 Warrant Holders exercised an aggregate of 280,000 shares of the Amended 2018 Warrants (the "2018 Exercised Shares"), which exercises generated gross cash proceeds to the Company of $1.96 million.

The 2018 Warrants have not been registered under the Securities Act of 1933, as amended (the Securities Act), or state securities laws. The 2018 Exercised Shares have been registered for resale on the Company's registration statement on Form S-3 (File No. 333-225995). The issuance of the 2018 Exercised Shares and 2018 Warrants was exempt from the registration requirements of the Securities Act pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act. The Company made this determination based on the representations that each party is an "accredited investor" within the meaning of Rule 501 of Regulation D. The Company expects to use cash received from exercises for general corporate and working capital purposes.

*Exercises of 2019 Warrants:*

On August 2, 2019, the Company entered into Warrant Exercise Agreements with certain 2018 Warrant Holders ("2019 Warrant Holders"), pursuant to which holders were issued warrants to purchase an aggregate 842,000 shares of Common Stock (the "2019 Warrants"), at an exercise price of $7.00, with an expiration date of December 31, 2021 (the "2019 Warrants").

Between July 15, 2020 and July 24, 2020, 2019 Warrant Holders exercised an aggregate of 620,000 shares of the 2019 Warrants (the "2019 Exercised Shares"), which exercises generated gross cash proceeds to the Company of $4.34 million.

55

The 2019 Warrants have not been registered under the Securities Act, or state securities laws. The 2019 Exercised Shares have been registered for resale on the Company's registration statement on Form S-3 (File No. 333-233349).  The issuance of the 2019 Exercised Shares and 2019 Warrants is exempt from the registration requirements of the Securities Act pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act.  The Company made this determination based on the representations that each party is an "accredited investor" within the meaning of Rule 501 of Regulation D.  The Company expects to use cash received from exercises for general corporate and working capital purposes.

**Item 6.**    **SELECTED FINANCIAL DATA**

Not required.

**Item 7.**    **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis should be read in conjunction with our audited consolidated financial statements and the related notes that appear elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements reflecting our current expectations that involve risks and uncertainties. Actual results may differ materially from those discussed in these forward-looking statements due to a number of factors, including those set forth in the section entitled "Risk Factors" and elsewhere in this Annual Report on Form 10-K. For further information regarding forward-looking statements, please refer to the "Special Note Regarding Forward-Looking Statements" at the beginning of Part I of this Annual Report on Form 10-K.*

**Company Overview**

We are a leading biotechnology company engaged in the development of best-in-class autologous cellular therapies derived from a patient's own bone marrow cells for the treatment of neurodegenerative diseases. We hold the rights to clinical development and commercialization of the NurOwn® technology platform through an exclusive, worldwide licensing agreement (see details herein). NurOwn® has received Fast Track designation from the FDA in ALS and has additionally been granted Orphan Drug Status by the FDA and the EMA. For more information, visit our website at www.brainstorm-cell.com.

We are committed to bring innovative central nervous system ("CNS") adult stem cell therapies to the market to improve the lives of patients with debilitating neurodegenerative diseases. As a leader in CNS regenerative cellular medicines, we are leveraging NurOwn®, its proprietary autologous mesenchymal stem cell platform technology, a strong and expanded intellectual property portfolio, as well as manufacturing and commercialization capabilities, to address growing unmet medical needs across a broad range of neurodegenerative disorders, such as ALS, PMS, AD and other neurodegenerative diseases. NurOwn® uses proprietary cell culture conditions to induce MSCs to secrete high levels of  multiple neurotrophic factors to modulate neuroinflammatory and neurodegenerative disease processes, promote neuronal survival and improve neurological function.

**Results of Operations**

For the period from inception (September 22, 2000) until December 31, 2020, we did not generate any revenues from operations. In addition, we incurred operating costs and expenses of approximately $31,811,000 during the year ended December 31, 2020.

*Research and Development, net*

Our business model calls for significant investments in research and development. Our research and development expenditures, net in the year ended December 31, 2020 were $22,329,000, an increase of $5,125,000 compared to $17,204,000 for the year ended December 31, 2019.

This increase is due to (i) an increase of $2,135,000 in connection with materials, consultants, depreciation, payroll and stock-based compensation expenses and other activities; (ii) a decrease of $1,481,000 received in connection with the treatment of patients under the hospital exemption regulatory pathway; (iii) a decrease of $2,576,000 in participation of the Israel Innovation Authority ("IIA") and CIRM in 2020, under various awarded grants and (iv) an increase of $269,000 for costs related to travel, patents and other costs. This increase was partially offset by a decrease of $1,336,000 in connection with the Phase 3 Clinical Trial. Excluding participation from IIA

and CIRM under the grants and proceeds received under the hospital exemption regulatory pathway, research and development expenses decreased by $133,000 from $24,741,000 in 2019 to $24,608,000 in 2020.

*General and Administrative*

General and administrative expenses for the years ended December 31, 2020 and 2019 were $9,355,000 and $5,797,000, respectively. The increase of $3,558,000 in general and administrative expenses is mainly due to: (i) an increase of $2,611,000 in payroll and stock-based compensation expenses; (ii) an increase of $1,031,000 in the rent, the costs of our stock costs, consultants, costs of our investor relations and public relations activities and various other expenses. This increase was partially offset by a decrease of $84,000 in travel costs.

*Financial Expenses*

Financial expense for the year ended December 31, 2020 was $127,000 as compared to financial expense of $252,000 for the year ended December 31, 2019 as a result of the adoption of the Accounting Standard Update ASU 2016-02 "Leases" and due to interest earned on our cash, cash equivalents and short-term deposits.

*Net Loss*

Net loss for the year ended December 31, 2020 was $31,811,000, as compared to a net loss of $23,253,000 for the year ended December 31, 2019. Net loss per share for the year ended December 31, 2020 and December 31, 2019 was $1.07 and $1.06, respectively.

The weighted average number of shares of Common Stock used in computing basic and diluted net loss per share for the year ended December 31, 2020 was 29,848,217 compared to 21,906,257 for the year ended December 31, 2019.

The increase in the weighted average number of shares of Common Stock used in computing basic loss per share for the year ended December 31, 2020 was due to: (i) the issuance of shares to employees and directors, (ii) issuance and sale of shares of Common Stock pursuant to the Distribution Agreement and (iii) the exercise of options and warrants.

Since its inception, the Company has devoted substantially all of its efforts to research and development. The Company is still in its development and clinical stage and has not yet generated revenues. The extent of the Company's future operating losses and the timing of becoming profitable are uncertain.

Additional funding will be required to begin the commercialization efforts and to achieve a level of sales adequate to support the Company's cost structure.

To meet its capital needs, the Company is considering multiple alternatives, including, but not limited to, additional public and private sales of its Common Stock and warrants, the exercise of warrants, the issuance of convertible promissory notes, sales of Common Stock via its September 25, 2020 ATM program and other funding transactions. While the Company has been successful in raising financing recently and in the past, there can be no assurance that it will be able to do so in the future on a timely basis on terms acceptable to the Company, or at all.

The COVID-19 pandemic may continue to adversely disrupt the Company's operations, including the ability to complete the ongoing clinical trials and may have other adverse effects on Company's business and operations. In addition, this pandemic has caused substantial disruption in the financial markets and may adversely impact economies worldwide, both of which could result in adverse effects on Company's business, operations and ability to raise capital.

Management expects that the Company will continue to generate losses from the clinical development and regulatory activities, which will result in a negative cash flow from operating activity. The Company has recently completed its Phase 3 ALS clinical trial. The Company currently has sufficient cash to complete its ongoing Phase 2 PMS and Phase 2 AD clinical trials. Over the longer term, if the Company is granted a BLA approval, additional capital raise will be needed in connection with strategic partnerships and to commercialize Nurown® for ALS, and to conduct additional trials for other indications. If the Company is not able to raise additional capital for these purposes, management may need to slow the pace of commercialization or the Company may not be able to continue

Table of Contents

to function as a going concern. The Company's consolidated financial statements do not reflect any adjustments that might result from the outcome of this uncertainty.

**Liquidity and Capital Resources**

Since inception, the Company has financed its operations primarily through public and private sales of its Common Stock and warrants, the exercise of warrants, the issuance of convertible promissory notes, sales via the ATM programs and through various grants. At December 31, 2020 cash, cash equivalents and short-term bank deposits amounted to $41,936,000.

Net cash used in operating activities for the year ended December 31, 2020 was $35,193,000. Cash used for operating activities was primarily attributed to cost of clinical trials, rent of clean rooms and materials for clinical trials, payroll costs, rent, outside legal fee expenses and public relations expenses.

Net cash used in investing activities for the year ended December 31, 2020 was $4,452,000 representing primarily a net decrease in short-term deposits and purchase of property and equipment.

Net cash provided by financing activities for the year ended December 31, 2020 was $76,938,000 from the exercises of warrants during the year, issuance of new warrants, sales of common stock under March 6, 2020 registered direct offering and sales of common stock under the June 11, 2019 ATM, March 6, 2020 ATM and September 25, 2020 ATM programs.

On June 8, 2018, we filed a shelf registration statement on Form S-3 (File No. 333-225517) (the "Shelf Registration Statement"), which was declared effective by the SEC on June 29, 2018, relating to Common Stock, warrants and units that we may sell from time to time in one or more offerings, up to a total dollar amount of $100,000,000. Other than the supplements filed on June 11, 2019, March 6, 2020 and on September 25, 2020 in connection with the ATM offerings discussed below, and the prospectus supplement filed on March 6, 2020 in connection with the registered direct offering discussed below, we have not filed any supplemental prospectus defining particular terms of securities to be offered under the shelf registration statement.

*At-the-market (ATM) Offerings:*

On June 11, 2019, the Company entered into the June 11, 2019 ATM in an "at the market" offering as defined in Rule 415 promulgated under the Securities Act, including, without limitation, by sales made directly on the Nasdaq Capital Market, on any other existing trading market for the Shares, through a market maker or as otherwise agreed by the Company and the Agent. On February 21, 2020, the Company completed the sale of all remaining shares issuable under the June 11, 2019 ATM and exhausted its full ATM capacity. Under the June 11, 2019 ATM, the Company sold an aggregate of 4,141,569 shares of Common Stock at an average price of $4.83 per share, raising gross proceeds of approximately $20 million.

On March 6, 2020, the Company entered into a new distribution agreement with Raymond James (the "Agent"), pursuant to which the Company was able to sell from time to time, through the Agent, shares of Common Stock, having an aggregate offering price of up to $50,000,000 (the "March 6, 2020 ATM"). Sales under the March 6, 2020 ATM were made by any method permitted by law that is deemed to be an "at the market" offering as defined in Rule 415 promulgated under the Securities Act, including, without limitation, sales made directly on the Nasdaq Capital Market, on any other existing trading market for the Shares, through a market maker or as otherwise agreed by the Company and Raymond James. Under the March 6, 2020 ATM, the Company sold an aggregate of 2,446,641 shares of Common Stock at an average price of $9.45 per share, raising gross proceeds of approximately $23.11 million.

On September 25, 2020, the Company entered into an Amended and Restated Distribution Agreement (the "Distribution Agreement") with SVB Leerink LLC ("Leerink") and Raymond James & Associates (together with Leerink, the "Agents") pursuant to which the Company may sell from time to time, through the Agents, shares of Common Stock, having an aggregate offering price of up to $45,000,000, which aggregate amount includes amount unsold pursuant to the March 6, 2020 ATM (the "September 25, 2020 ATM"). Sales under the September 25, 2020 ATM are to be made by any method permitted by law that is deemed to be an "at the market" offering as defined in Rule 415 promulgated under the Securities Act, including, without limitation, sales made directly on the Nasdaq Capital Market, on any other existing trading market for the Shares, through a market maker or as otherwise agreed by the Company and the Agents. The Distribution Agreement amends and restates in its entirety the Company's prior agreement with Raymond James entered on March 6, 2020 (the "March 6, 2020 ATM"). The Company previously sold 2,446,641 shares of Common Stock for gross proceeds of approximately $23.11 million of Common Stock under the March 6, 2020 ATM. During the quarter ended December 31,

2020, the Company sold an aggregate of 3,564,385 shares of Common Stock pursuant to the September 25, 2020 ATM at an average price of $6.10 per share, raising gross proceeds of approximately $21.8 million.

The Company has no obligation under the September 25, 2020 ATM to sell any shares and may at any time suspend sales or terminate the September 25, 2020 ATM in accordance with its terms. Subject to the terms and conditions of the Distribution Agreement, the Agents will use their commercially reasonable efforts to sell on the Company's behalf, from time to time consistent with its normal sales and trading practices, such Shares based upon instructions from the Company (including any price, time or size limits or other customary parameters or conditions the Company may impose). The Company has provided the Agents with customary indemnification rights, and the Agents will be entitled to a fixed commission of 3.0% of the aggregate gross proceeds from the Shares sold. The Distribution Agreement contains customary representations and warranties, and the Company is required to deliver customary closing documents and certificates in connection with sales of the Shares. Shares sold under the ATMs are issued pursuant to the Company's existing Shelf Registration Statement, and the Prospectus Supplement to the Registration Statements filed June 11, 2019, March 6, 2020 and September 25, 2020, respectively.

*Registered Direct Offering:*

On March 6, 2020, the Company entered into and closed a $10.0 million registered direct offering of 1,250,000 shares of Common Stock at a per share purchase price equal to $8.00. Purchaser also received a three-year warrant to purchase up to 250,000 shares of Common Stock at an exercise price of $15.00 per share.

*Recent Sales of Unregistered Securities:*

Exercises of 2018 Amended Warrants: On June 6, 2018 the Company entered into Warrant Exercise Agreements with certain holders ("2018 Warrant Holders"), pursuant to which holders were issued warrants to purchase an aggregate 2,458,201 unregistered shares of Common Stock, at an exercise price of $9 per share, with an expiration date of December 31, 2020 (the "2018 Warrants"). In connection with the issuance of the 2019 Warrants (described below), certain 2018 Warrants were amended on August 2, 2019 to reduce the exercise price to $7.00 per share and to extend the expiration date to December 31, 2021 (the "Amended 2018 Warrants").

Between July 20, 2020 and July 24, 2020, 2018 Warrant Holders exercised an aggregate of 280,000 shares of the Amended 2018 Warrants (the "2018 Exercised Shares"), which exercises generated gross cash proceeds to the Company of $1.96 million.

The 2018 Warrants have not been registered under the Securities Act of 1933, as amended (the Securities Act), or state securities laws. The 2018 Exercised Shares have been registered for resale on the Company's registration statement on Form S-3 (File No. 333-225995). The issuance of the 2018 Exercised Shares and 2018 Warrants was exempt from the registration requirements of the Securities Act pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act. The Company made this determination based on the representations that each party is an "accredited investor" within the meaning of Rule 501 of Regulation D. The Company expects to use cash received from exercises for general corporate and working capital purposes.

Exercises of 2019 Warrants: On August 2, 2019, the Company entered into Warrant Exercise Agreements with certain 2018 Warrant Holders ("2019 Warrant Holders"), pursuant to which holders were issued warrants to purchase an aggregate 842,000 shares of Common Stock (the "2019 Warrants"), at an exercise price of $7.00, with an expiration date of December 31, 2021 (the "2019 Warrants").

Between July 15, 2020 and July 24, 2020, 2019 Warrant Holders exercised an aggregate of 620,000 shares of the 2019 Warrants (the "2019 Exercised Shares"), which exercises generated gross cash proceeds to the Company of $4.34 million.

The 2019 Warrants have not been registered under the Securities Act, or state securities laws. The 2019 Exercised Shares have been registered for resale on the Company's registration statement on Form S-3 (File No. 333-233349). The issuance of the 2019 Exercised Shares and 2019 Warrants is exempt from the registration requirements of the Securities Act pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated under the Securities Act. The Company made this determination based on the representations that each party is an "accredited investor" within the meaning of Rule 501 of Regulation D. The Company expects to use cash received from exercises for general corporate and working capital purposes.

59

With the recent warrant exercises in July 2020, the Company has reduced its outstanding warrants shares to non-affiliates by approximately 37% and reduced its overall warrants shares outstanding by approximately 19%. In total, 900,000 of the 4,724,868 Company warrant shares outstanding were exercised between July 15 and July 24, 2020. 2,266,667 of the remaining 3,824,868 outstanding warrants shares are owned by affiliates of the Company.

Our material cash needs for the next 12 months, assuming we do not expand our clinical trials beyond our ongoing Phase 2 PMS trials in the United States, and the Phase 2 AD trials in Europe will include (i) costs of the clinical trial in the U.S. and Europe, (ii) employee salaries, (iii) payments for rent and operation of the GMP facilities and manufacturing of NurOwn®, and (iv) fees to our consultants and legal advisors, patents, and fees for facilities to be used in our research and development.

We believe our existing cash will be sufficient to fund our anticipated operating cash requirements for at least twelve months following the date of this filing. We currently have sufficient cash to execute on our ongoing Phase 2 PMS and Phase 2 AD clinical trials and support our operating activities. We expect that we will continue to generate losses from the clinical development and regulatory activities, which will result in a negative cash flow from operating activity. If we are granted a BLA approval, additional capital raise will be needed to commercialize NurOwn® for ALS, and to conduct additional trials that may be needed for other indications. The actual amount of cash that the Company will need to operate is subject to many factors, including, but not limited to, the timing, design and conduct of clinical trials for our product candidates along with cost to commercialize these product candidates.

We anticipate that we will need to raise substantial additional financing in the future to fund our operations. In order to meet these additional cash requirements, we may incur debt, license certain intellectual property, and seek to sell additional equity or convertible securities that may result in dilution to our stockholders. If we raise additional funds through the issuance of equity or convertible securities, these securities could have rights or preferences senior to those of our common stock and could contain covenants that restrict our operations. There can be no assurance that we will be able to obtain additional equity or debt financing on terms acceptable to us, if at all. Our future capital requirements will depend on many factors, including:

*   our ability to obtain funding from third parties, including any future collaborative partners;

*   the scope, rate of progress and cost of our clinical trials and other research and development programs;

*   the time and costs required to gain regulatory approvals;

*   the terms and timing of any collaborative, licensing and other arrangements that we may establish;

*   the costs of filing, prosecuting, defending and enforcing patents, patent applications, patent claims, trademarks and other intellectual property rights;

*   any product liability or other lawsuits related to our product candidates;

*   the expenses needed to attract and retain skilled personnel;

*   the costs and timing of future commercialization activities, including product manufacturing, marketing, sales, and distribution, for any of our product candidates for which we receive marketing approval;

*   the revenue, if any, received from commercial sales of our product candidates for which we receive marketing approval;

*   the general and administrative expenses related to being a public company;

*   the effect of competition and market developments; and

*   future pre-clinical and clinical trial results.

The full extent to which the COVID 19 pandemic will directly or indirectly impact our business, results of operations, financial condition, liquidity and capital resources will depend on future developments that are highly uncertain and cannot be accurately predicted at this

60

time, including new information that may emerge concerning COVID 19, the actions taken to contain it or treat its impact and the economic impact on local, regional, national and international markets. Our management team is actively monitoring this situation and the possible effects on our financial condition and liquidity.

**Contractual Obligations and Commitments**

The following is a table of contractual obligations and commitments as of December 31, 2020 (in thousands):

|  | Payments Due by Period | | | |
|  | Total | Less than 1 year | 1-3 years | 3-5 years |
|---|---|---|---|---|
| Operating Leases | 6,851 | 2,760 | 3,239 | 852 |
| **Total** | 6,851 | 2,760 | 3,239 | 852 |

**Off-Balance Sheet Arrangement**

We have no off balance sheet arrangements that have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the U.S. The preparation of our consolidated financial statements and disclosures requires us to make judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported revenue and expenses during the reporting periods. We base our estimates on historical experience, known trends and events and various other factors that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. We evaluate our estimates and assumptions on an ongoing basis. Our actual results may differ from these estimates under different assumptions and conditions.

While our significant accounting policies are described in more detail in the notes to our audited consolidated financial statements appearing elsewhere in this Annual Report on Form 10-K we believe that the following accounting policies are those most critical to the judgments and estimates used in the preparation of our consolidated financial statements

**Accounting for stock-based compensation:**

We grant equity-based awards under share-based compensation plans. We estimate the fair value of share-based payment awards using the Black-Scholes option valuation model. This fair value is then amortized over the requisite service periods of the awards. The Black-Scholes option valuation model requires the input of subjective assumptions, including price volatility of the underlying stock, risk-free interest rate, dividend yield, and expected life of the option. Share-based compensation expense is based on awards ultimately expected to vest, and therefore is reduced by expected forfeitures. Changes in assumptions used under the Black-Scholes option valuation model could materially affect our net loss and net loss per share.

**Item 7A.      QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK**

Not required.

Table of Contents

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BRAINSTORM CELL THERAPEUTICS INC.**

*Date: February 4, 2021*                    By:   */s/ Chaim Lebovits*
                                                  Name: Chaim Lebovits
                                                  Title: Chief Executive Officer

In accordance with the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Chaim Lebovits*<br>Chaim Lebovits | *Chief Executive Officer*<br>*(Principal Executive Officer)* | *February 4, 2021* |
| */s/ Preetam Shah*<br>Preetam Shah | *Chief Financial Officer and Treasurer*<br>*(Principal Financial and Accounting Officer)* | *February 4, 2021* |
| */s/ Irit Arbel*<br>Irit Arbel | *Director* | *February 4, 2021* |
| */s/ June S. Almenoff*<br>June S. Almenoff | *Director* | *February 4, 2021* |
| */s/ Jacob Frenkel*<br>Jacob Frenkel | *Director* | *February 4*, 2021 |
| */s/ Anthony Polverino*<br>Anthony Polverino | *Director* | *February 4, 2021* |
| */s/ Malcolm Taub*<br>Malcolm Taub | *Director* | *February 4, 2021* |
| /s/ *Uri Yablonka*<br>Uri Yablonka | *Director* | *February 4, 2021* |
| */s/ Sankesh Abbhi*<br>Sankesh Abbhi | *Director* | *February 4, 2021* |

124
