**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELI SPORN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BRAINSTORM CELL THERAPEUTICS INC., CHAIM LEBOVITS, STACY LINDBORG, and RALPH KERN <br><br> Defendants. | **Case No: 1:23-cv-09630-DEH** <br><br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL ALLEGATIONS ...................................................................................................... 3

   A.  Brainstorm's BLA for NurOwn to Treat ALS ....................................................... 3

   B.  Defendants Mislead Investors .................................................................................. 5

   C.  Defendants' Fraudulent Conduct is Fully Revealed ................................................ 9

ARGUMENT ............................................................................................................................. 10

   A.  Plaintiffs Adequately Allege False and Misleading Statements ........................... 11

      1.  Defendants' Statements of Fact Are Actionable .............................................. 11

      2.  Defendants' Statements Describing the RTF and Assurances That They Could Remedy the Deficiencies in the BLA Are Actionable ...................................... 18

   B.  Plaintiffs Have Alleged A Strong Inference of Scienter ....................................... 21

   C.  Plaintiffs Adequately Allege Loss Causation ....................................................... 25

CONCLUSION .......................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abely v. Aeterna Inc.,*
2013 WL 2399869 (S.D.N.Y. May 29, 2013)........................................................................ 18

*Abramson v. NewLink Genetics Corp.,*
965 F.3d 165 (2d Cir. 2020).......................................................................... 13, 14, 15

*Acito v. IMCERA Group, Inc.,*
47 F.3d 47 (2d Cir. 1995)........................................................................................ 25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .............................................................................................. 11

*Berger v. Apple REIT Ten, Inc.,*
563 F. App'x 81 (2d Cir. 2014).............................................................................. 11

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
750 F.3d 227 (2d Cir. 2014)............................................................................. 19, 20, 25

*Christiansen v. Spectrum Pharm., Inc.,*
2024 WL 246020 (S.D.N.Y. Jan. 23, 2024)........................................................... 14

*City of Livonia Employees Ret. Sys. v. Wyeth,*
2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010)....................................................... 22

*Cohen v. Kitov Pharms. Holdings, Ltd.,*
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ...................................................... 16

*Cosmas v. Hassett,*
886 F.2d 8 (2d Cir. 1989)....................................................................................... 23

*Credit Suisse First Bos. Corp. v. Arm Fin. Grp.,*
2001 WL 300733 (S.D.N.Y. 2001) ........................................................................ 21

*Davison v. Ventrus Bioscis, Inc.,*
2014 WL 1805242 (S.D.N.Y. 2014) ...................................................................... 17

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.,*
553 F.3d 187 (2d Cir. 2009).................................................................................... 21

*Employees' Ret. Sys. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)............................................................................ 2, 22

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)...................................................... 14, 15, 24

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440, (N.D. Cal. Feb. 23, 2023)............................................... 15

*In re Alkermes Pub. Co. Sec. Litig.*,
  523 F. Supp. 3d 283 (MTD 13-14) ............................................................. 15, 23

*In re AstraZeneca plc Sec Litig.*,
  2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022)............................................... 15

*In re Axonyx Sec. Litig.*,
  2009 WL 812244 (S.D.N.Y. 2009) ............................................................... 24

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................................................... 14

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000).......................................................................... 21

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  616 F.Supp.3d 192 (E.D.N.Y. 2022)............................................................. 24

*In re Chembio, Inc. Sec. Litig.*,
  586 F. Supp. 3d 199 (E.D.N.Y 2022)........................................................... 23

*In re Delcath Sys., Inc. Secs. Litig.*,
  36 F. Supp. 3d 320 ............................................................................. 16, 23, 25

*In re Fannie Mae 2008 Sec. Litig.*,
  2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)............................................... 25

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)........................................................... 22

*In re GPC Biotech AG Sec. Litig.*,
  25 597 F. Supp. 2d 412 (S.D.N.Y. 2009)...................................................... 25

*In re MELA Sciences, Inc. Sec. Litig.*,
  2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)............................................... 15

*In re OSI Pharms., Inc. Secs. Litig.,*
   2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ........................................................................ 16

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. July 30, 2015) ...................................................................... 20

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   2021 WL 4135059 (S.D.N.Y 2021) ....................................................................................... 16

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................................ 23

*In re Schol. Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .................................................................................................... 24

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ........................................................................ 20

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ............................................................................................ 11, 25

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................................... 18

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
   2024 WL 451691 (S.D.N.Y. Feb. 5, 2024) ............................................................................ 14

*IWA Forest Industry Pension Plan v. Textron, Inc.*,
   14 F.4th 141 (2d Cir. 2021) ................................................................................................... 17

*Lehman v. Ohr Pharm. Inc.*,
   2019 WL 4572765 (S.D.N.Y. 2019) ...................................................................................... 15

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) .................................................................................................. 11

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S.Ct. 1309 (2011) ........................................................................................................... 11

*Micholle v. Ophthotech Corp.*,
   2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019) ....................................................................... 18

*Noto v. 22nd Century Grp., Inc.*,
   2023 WL 122305 (W.D.N.Y. Jan. 6, 2023) ........................................................................... 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)........................................................................................ 11, 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .................................................................................................... 13, 19

*Pardi v. Tricida, Inc.*,
   2022 WL 3018144 (N.D. Cal. July 29, 2022).............................................................. 16

*Sanders v. AVEO Pharm., Inc.*,
   2015 WL 1276824 (D. Mass. 2015)............................................................................. 14

*Shanawaz v. Intellipharmaceutics Int'l. Inc.*,
   348 F. Supp. 3d 313 (S.D.N.Y. 2018)......................................................................... 14

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020).............................................................. 23, 24

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010)......................................................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................................... 22

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)......................................................................... 2, 13, 15

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013).......................................................................... 23

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996).......................................................................................... 20

*Zagami v Cellceutix*,
   2016 WL 3199531......................................................................................................... 16

*Zak v. Chelsea Theraps. Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015)........................................................................................ 14

**Rules**

F.R.C.P. 12(d) ..................................................................................................................... 18

**Regulations**

17 C.F.R. § 240.10b-5(b)..................................................................................................... 11

## GLOSSARY OF TERMS

| | |
|---|---|
| AdComm | FDA Center for Biologics Evaluation and Research Cellular, Tissue, and Gene Therapies (CTGR) Advisory Committee |
| AdComm Meeting | The September 27, 2023, FDA Center for Biologics Evaluation and Research (CBER) meeting of the Cellular, Tissue, and Gene Therapies Advisory Committee |
| AdComm Transcript | Transcript from the September 27, 2023, FDA Center for Biologics Evaluation and Research (CBER) 75th Meeting of the Cellular, Tissue, and Gene Therapies Advisory Committee |
| ALS | Amyotrophic Lateral Sclerosis |
| ALSFRS-R | ALS Functional Rating Scale (Revised), a rating scale that measures an ALS patient's functional decline in various areas of motor functioning |
| BLA | Biologics License Application |
| Brainstorm or the Company | Brainstorm Cell Therapeutics, Inc. |
| Briefing Document | FDA Briefing Document issued on September 25, 2023, concerning Brainstorm's Biologics License Application 125783 |
| CAFS | Combined Assessment of Function and Survival, a composite endpoint in a clinical trial of an ALS treatment that combines functional status with overall survival. |
| Complaint | Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on April 1, 2024. |
| Class Period | February 18, 2020, through September 27, 2023, both dates inclusive |
| CMC | Chemistry, Manufacturing, and Controls |
| CMO | Chief Medical Officer |
| CTGR | Cellular, Tissue, and Gene Therapies |
| Defendants | Brainstorm Cell Therapeutics, Inc., Chaim Lebovitz, Stacy Lindborg, and Ralph Kern |
| FDA | United States Food and Drug Administration |
| Individual Defendants | Chaim Lebovitz, Stacy Lindborg, and Ralph Kern |
| Kern | Brainstorm's former CMO, Defendant Ralph Kern |
| Lebovitz | Brainstorm's CEO, Defendant Chaim Lebovitz |

| | |
|---|---|
| Leiwant Dec. | The Declaration of Molly Leiwant in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint |
| Lindborg | Brainstorm's co-CEO, Defendant Stacy Lindborg |
| Motion | Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint |
| MTD | Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Amended Class Action Complaint |
| NfL | Neurofilament Light, a biomarker thought to be associated with a reduction in neurodegeneration |
| NurOwn | Brainstorm's proprietary stem-cell product which Brainstorm sought FDA approval for to treat ALS, also referred to as MSC-NTF |
| Plaintiffs | Lead Plaintiff George Colby and named Plaintiffs Eli Sporn and Brett Shirley |
| RTF | Refusal-to-file |
| SAE | Serious Adverse Event |
| SAP | Statistical Analysis Plan, the plan determined before a clinical trial begins which documents a method to define and describe the statistical aspects of a trial design and sets forth pre-specified clinical endpoints and the procedures and methods for analyzing the data. |
| SPA | Special Protocol Assessment, a process where a clinical trial sponsor and FDA discuss the design and size of a clinical study to determine if it adequately addresses scientific and regulatory requirements that could support marketing approval. An SPA agreement indicates FDA's concurrence with the adequacy and acceptability of the specific elements of the overall trial protocol design |
| Trial or Phase 3 Trial | Brainstorm's phase 3 clinical trial of NurOwn to treat ALS |

**PRELIMINARY STATEMENT**

The Complaint[1] alleges that during the Class Period Brainstorm and its most senior executives engaged in blatant securities fraud. Before and during the Class Period Defendants' sole business was to develop and commercialize a stem cell therapy called NurOwn to treat ALS. NurOwn required FDA approval through a BLA. During the Class Period, Defendants represented: 1) that Brainstorm and FDA were "aligned" on design of the FDA-required Phase 3 Trial, when in fact FDA told Defendants it disagreed with the Trial's endpoint and that the Trial population was unjustifiably skewed in favor of patients with advanced ALS; 2) that despite the Trial failing to reach its primary endpoint, NurOwn demonstrated a "clinically meaningful treatment response" across "*an important **pre-specified** subgroup*," when in fact, as FDA stated, these subgroup analyses "*were **not prespecified** for hypothesis testing*" and therefore "***do not constitute evidence of effectiveness to support marketing approval***"; 3) that NurOwn had a "strong safety profile" with "fewer deaths than expected", when in fact FDA told Defendants it was concerned about the large number of deaths among patients receiving NurOwn; 4) that "new analyses" from the Trial showed "*positive*", "*strong*" biomarker data "***going in the direction we expected***," when in truth the biomarker data correlated with ***worse*** clinical outcomes, *the **opposite** of what would be expected*, and 5) that patients in the Trial with mild ALS benefitted from NurOwn because patients with advanced disease showed a "floor effect" and that FDA had "seen this data" and "clearly has not disagreed", when in truth FDA invalidated Brainstorm's "floor effect" hypothesis and told Defendants this analysis was "***not [ ] evidence of effectiveness to support approval***." When FDA issued Brainstorm a "refusal to file" (RTF) letter with respect to the

---

[1]Capitalized terms have the meanings set forth in the Glossary of Terms, attached hereto. All references to "¶" are to paragraphs in the Complaint. All emphasis is added, and internal citations and quotations omitted.

BLA, Defendants concealed its contents, telling investors the BLA's deficiencies were "easily fixable" and the manufacturing issues "trivial." In truth, the RTF explicitly informed Defendants that the BLA was "***scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product quality.***"

Based on meetings and communications with FDA that Lebovitz and/or Lindborg and Kern participated in on behalf of Brainstorm, as corroborated by FDA officials and records, Defendants knew, or at least recklessly ignored, that their representations to investors were false and materially misleading at the time they were made. At the same time as Defendants were misleading investors, the Individual Defendants, at various times during the Class Period, caused Brainstorm to sell over $73 million in common stock, which was critical to funding Brainstorm's operations. Lebovitz also sold nearly $1 million in personally held shares. When the truth was revealed through a series of partial disclosures, culminating in FDA's release of the Briefing Document and AdComm meeting denying approval of NurOwn, Brainstorm's stock price fell precipitously.

In their Motion, Defendants argue all the statements above are opinions and are not misleading (or made with scienter) because Plaintiffs have not alleged Defendants did not "truly believe" them. They are wrong on the facts and law. First, most of Defendants' statements are actionable statements of fact. The few opinions are also actionable because, Defendants "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016). Scienter follows because Plaintiffs allege (and Defendants do not dispute) they knew about FDA's repeated warnings. *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (scienter alleged "where defendants…knew facts or had access to information suggesting that their public statements were not accurate…") Defendants' remaining arguments should be rejected for the reasons stated herein.

2

## FACTUAL ALLEGATIONS

### A. Brainstorm's BLA for NurOwn to Treat ALS

Brainstorm is a clinical stage biopharmaceutical company whose sole business is commercializing its stem cell treatment called NurOwn to treat ALS. ¶¶3, 50-51. Prior to commencing its Phase 3 Trial of NurOwn, Brainstorm conducted early phase trials and met with FDA several times to discuss NurOwn's clinical development and the Phase 3 Trial Design. ¶¶99-115. Because NurOwn is a biologic it must be approved by FDA through a BLA. ¶¶65-66. Clinical trial data supporting a BLA must demonstrate safety and efficacy, which also includes information concerning chemistry, manufacturing and control (CMC) of the product candidate. ¶¶66-71. To establish a product's effectiveness, it is essential to distinguish the effect of the drug from other influences, most notably biased observations. ¶74. For this reason, a clinical study must use appropriate endpoints. ¶75. The methodology for measuring and analyzing the endpoints is detailed in a study protocol and SAP which the trial sponsor and FDA should agree on *before* the sponsor begins the trial. ¶¶76-79. FDA Guidance concerning clinical trials for ALS treatments provides that a sponsor should consider a treatment's effect on mortality and survival, in addition to measuring a patient's functional abilities. ¶¶80-87. Functional abilities are assessed using the ALSFRS-R, which measures motor disability, a hallmark of ALS. ¶¶81-83.

In November 2016 Brainstorm met with FDA to discuss the results of its Phase 2 study and plans for the Phase 3 Trial. Brainstorm proposed a primary efficacy endpoint for the Phase 3 Trial which measures change in the slope a patient's ALSFRS-R scores. ¶104. Because the disease course for ALS is heterogeneous and often marked by short intervals of plateau and even improvement, modeling decline in scores as a linear function is inaccurate. ¶102. Accordingly, FDA told Brainstorm it disagreed with its proposed primary efficacy endpoint and "strongly recommended [one] whose clinical meaningfulness is easier to interpret." ¶105. In an August

3

2017 meeting to discuss the Trial protocol FDA again "strongly recommended" Brainstorm use a different primary efficacy endpoint of either survival or CAFS. ¶106. FDA further told Brainstorm it should obtain a SPA (a formal agreement concerning trial design and protocol to ensure the sponsor and FDA are aligned) prior to beginning the Trial. ¶106, ¶79.

In October 2019 Brainstorm completed patient enrollment in the Trial. Brainstorm failed to follow FDA's advice concerning the primary efficacy endpoint and did not obtain an SPA. ¶107. Brainstorm enrolled only "rapid progressors", *i.e.* patients with lower baseline ALSFRS scores and thus more severe ALS than patients in their phase 2 study in the Trial. ¶108. This contravened FDA's ALS Guidance telling sponsors not to exclude patients based on disease stage unless "scientifically justified," as well as FDA's explicit advice to the Company. ¶¶108-14. Indeed, FDA told Defendants their exclusion criteria was not scientifically justified. ¶112. FDA explained to Brainstorm in Nov. 2019 that Brainstorm's hypothesis (which it based on *post hoc* exploratory subgroup analysis of data from its Phase 2 study) that NurOwn benefitted "rapid progressors," was "***spurious and misleading***" and based on "***over-interpretation of subgroup results***." FDA warned: "***your subgroup results do not support that your product has any meaningful activity in the treatment of ALS***." ¶¶111-13. As FDA explained, it made no sense that a product with "neuroprotective" effects would harm "slow progressors" and help "rapid progressors": these "***inconsistent***" effects were therefore "***spurious and misleading***." ¶112. Yet, according to FDA, "***despite FDA's <u>consistent concern</u> about the definition or 'rapid progressors' and the <u>exploratory nature of the subgroup findings</u>, the Applicant decided to enroll only 'rapid progressors' in the Phase 3 study***." ¶113. On Feb. 5, 2020, Defendants attended an "Informal Dispute Resolution" meeting where FDA again expressed disagreement with the Trial's design and endpoint but agreed to review the data when completed to determine

4

*if* there is a regulatory path forward that could potentially lead to approval. ¶115.

### B. Defendants Mislead Investors

On a February 18, 2020 investor conference call Kern and Lebovitz updated investors on the Feb. 5 FDA meeting, representing that FDA "confirmed the data we are collecting in this Trial are aligned with current FDA views," and "commented that this is a well-designed trial." ¶¶116-17. In response to an analyst's question concerning FDA's discussion on the Trial's endpoint Kern stated that the ALSFRS-R "really forms the foundation for that," misleadingly omitting that FDA disagreed with Brainstorm's analysis of the ALSFRS-R as the primary endpoint. ¶118.

Between March 6 and September 30, 2020, Brainstorm sold nearly 2.6 million shares of Brainstorm stock to investors for proceeds of over $33 million. ¶¶119-22. Lebovitz likewise sold approximately 72,000 shares, reaping nearly $1 million in cash proceeds. ¶121.

On November 17, 2020, Brainstorm announced the Trial's top-line results, disclosing it failed to reach its primary endpoint. This news caused Brainstorm's stock to fall $7.88/share or 66%. ¶123. But despite not reaching the primary endpoint Brainstorm told investors that NurOwn demonstrated a "clinically meaningful treatment response" across primary and key secondary endpoints in an ***in an important <u>pre-specified</u> subgroup*** with early disease based on ALSFRS-R baseline score ≤ 35." ¶¶124-25. Unbeknownst to investors, and according to FDA, "these subgroup analyses were <u>not</u> prespecified for hypothesis testing," and therefore "can only be considered exploratory and hypothesis generating and ***do not constitute evidence of effectiveness to support marketing approval***." ¶126-27. Against FDA's explicit advice, Brainstorm skewed the Trial population in favor of *advanced* ALS patients. ¶¶111-13. Then, when the Trial was complete, Brainstorm hypothesized, *post hoc*, that a subgroup of patients with *mild* ALS benefitted from NurOwn because the patients with advanced disease showed a

"floor effect", (*i.e.* their ALSFRS-R scores reached zero in certain areas making further decline incapable of measurement and making a treatment effect difficult to measure) Defendants theorized, *post hoc*, that the lack of efficacy in the Trial overall was due to the inability to detect efficacy in a subgroup supposedly impacted by "floor effect." *Id.* Defendants excluded 50% of Trial data on the pretext of floor effect. ¶17. Defendants manipulated the Trial to generate misleading false positive results to support a claim of efficacy, against FDA's explicit directives, and then represented that this *post hoc* analysis was sufficient to support a BLA. ¶127, ¶17.

On February 21, 2021, FDA told Brainstorm submitting a BLA was not appropriate. FDA stated it was concerned about the large number of deaths among patients receiving NurOwn and that if Brainstorm wanted to continue developing NurOwn it should conduct another Phase 3 Trial ***"this time incorporating Agency input regarding study design."*** ¶¶129-33. FDA also discredited Brainstorm's floor effect hypothesis. ¶130. The next day, Brainstorm told investors that FDA had concluded from initial review of the Trial data that it did not provide substantial evidence to support a BLA, but that this recommendation did not preclude Brainstorm from submitting a BLA. ¶134. While this news caused Brainstorm stock to fall 39% ($2.70/share), Defendants concealed FDA's concern about patient deaths, invalidation of the floor effect analysis, and recommendation that Brainstorm conduct a new trial that followed FDA's advice on design. ¶135-36. Defendants instead stated that Brainstorm would consult with regulatory experts and advisers and left open the possibility of submitting a BLA. ¶134.

Then, on August 15, 2022, Brainstorm announced it would submit a BLA. Defendants represented that a "correction" in the statistical analysis plan of the data resulted in one of the "key" ***prespecified*** secondary endpoints reaching statistical significance- again referring to the "***prespecified efficacy subgroup of participants with a baseline score of at least 35***." ¶¶138-41.

Defendants emphasized that this analysis carried a "different level of credence" because it was a "prespecified threshold." Defendants represented that subgroup analyses were critical to determining efficacy because of the high number of Trial participants with advanced ALS. ¶¶142-44. Defendants concealed that FDA told Brainstorm *not* to conduct a Trial skewed toward advanced ALS patients, and *already* invalidated Brainstorm's floor effect analysis. ¶¶145-47.

In touting BLA submission Brainstorm cited new analyses from the Trial purportedly showing a reduction in a biomarker called NfL. ¶¶148-49. Brainstorm represented this biomarker data was "going in the direction we expected with NurOwn and stability." ¶149. In truth, in the Trial, a reduction in NfL correlated with a *worse* clinical efficacy outcome, *the opposite of what would be expected* and an undesired result. ¶150. On September 9, 2022, Brainstorm submitted the BLA to FDA. ¶151. On November 10, 2022, Brainstorm announced FDA issued a RTF. ¶152. In response, Brainstorm's stock fell 42.2% ($1.22/share). ¶159. The RTF letter informed Defendants that the BLA submission was "*scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product qualit*y." ¶152. The RTF letter further detailed the multitude of "critical information" missing the BLA ¶152. The Individual Defendants made sure that nobody at Brainstorm saw the RTF letter, telling investors the deficiencies in the BLA were "easily fixable," and the CMC issues were "trivial," with "no red flags." ¶¶153-58, 163, 238, 242. Defendants also continued to tout NurOwn's safety and efficacy, the "positive" biomarker data, and the importance of the "pre-specified" efficacy subgroup of patients not impacted by the floor effect. ¶¶227-33. Defendants' statements misled analysts into believing that the "totality of the data" pointed to "therapeutic impact," "continued safety", that the CMC deficiencies "can be easily corrected," and that the RTF was "by no means a dead end." ¶¶244-45.

7

Then, one week before a planned January 11, 2023, meeting with FDA to discuss the RTF CMO Kern resigned. ¶164. At the meeting, Defendants again presented FDA with Brainstorm's "floor effect" analysis. ¶166. FDA told Defendants in no uncertain terms that *the lack of efficacy of NurOwn over placebo cannot be explained by a floor effect*" and that "these findings from the exploratory subgroup analysis can only be used for hypothesis generation, *not as evidence of effectiveness to support approval*." *Id.* FDA presented two options: submit a *new* BLA with evidence of safety and efficacy from *new* clinical investigations, or request that the BLA be filed over protest. ¶167. Defendants chose the latter, informing investors on March 27, 2023, that Brainstorm filed the BLA using the file over protest procedure. ¶174. Defendants claimed that Brainstorm filed an amendment to the BLA that responded to most of FDA's outstanding concerns. *Id.* Defendants touted that the Trial showed that NurOwn had "a strong safety profile" with "fewer deaths than expected," and represented that at the January 11 meeting FDA gave Brainstorm "multiple options to return the BLA to regulatory review." ¶¶174-75. FDA would recommend whether to approve NurOwn at the AdComm Meeting to take place in September.

In the months leading up to the AdComm, Defendants continued to represent the Trial demonstrated NurOwn's safety and efficacy. Defendants continued to represent that the Trial's failure was due to the floor effect, and that the data demonstrated efficacy in a pre-specified subgroup of patients with ALSFRS-R scores over 35. ¶¶176, 185, 189. When an analyst asked how FDA felt about this "floor effect" analysis Lindborg represented, "*the FDA has certainly seen this data and clearly and has not disagreed with the statements we've made*." ¶¶176-78. Defendants touted the "*robust and compelling dataset*," "*significantly better outcomes in participants treated with NurOwn*", "*clinically meaningful effectiveness [with] strong and consistent biomarker data, which are predictive of clinical response*," and "*no safety*

8

*concerns*." ¶¶182-85, 188-89. As to FDA's concerns regarding CMC, Lebovitz touted Brainstorm's "exemplary record of high-quality manufacturing" and represented the Company, "***already conducted much of the necessary work in a short time frame...***" ¶¶179, 181, 256, 259. Between the time Defendants announced they filed the BLA and the AdComm, Defendants sold over 5.85 million shares of Brainstorm securities for proceeds of over $10.8 million. ¶¶186, 190.

**C. Defendants' Fraudulent Conduct is Fully Revealed**

On September 25, 2023, FDA Released the Briefing Document. ¶191. The AdComm Meeting took place two days later, with a vote of 17:1 against NurOwn's approval. *Id.* The Briefing Document and AdComm Transcript fully revealed the truth concerning Defendants' prior misrepresentations. First, As to Brainstorm's purported "alignment" with FDA on Study Design: "*FDA and applicant did not reach an agreement on the primary efficacy endpoint for the Phase III Study*" "*change in slope...would not be suitable as the primary efficacy endpoint*", "*FDA communicated to [Brainstorm] concerns about the definition of rapid progressors...However, for the Phase 3 study the applicant selected only patients who appear to be rapid progressors*." ¶¶200-01. Second, As to Defendants' representations concerning safety: "*Survival [ ] was worse at study completion* for subjects who received NurOwn," "particularly concerning was the *larger number of deaths in the NurOwn group*...survival is the ultimate clinically meaningful outcome for a fatal disease like ALS," "Safety Summary: *the higher incidence of deaths indicates lack of survival benefit [ ] and warrants further investigation*...the NurOwn group had a higher numbers of SAEs" and "higher frequency of pain." ¶¶198-99. Third, as to the contents of the RTF and Brainstorm's purported record of "high quality manufacturing": "on initial receipt of the BLA, FDA determined that the submission was *scientifically incomplete to demonstrate substantial evidence of effectiveness*, and that the *manufacturing information was grossly deficient* to ensure

9

adequate product quality…the BLA did not contain information on numerous critical elements of product manufacturing…The extent of the deficient information…suggested that the best path forward would be to file a new BLA." ¶196. Further, contrary to Defendants' assurances that they remedied FDA's CMC concerns: FDA's "***substantial concerns about product manufacturing [ ] have yet to be resolved.***" ¶197. <u>Fourth</u>, the Trial's floor effect subgroups were *not* prespecified: "the Applicant states that the sub-group analyses were 'prespecified.' However, it is important to note that these subgroup analyses were not prespecified for hypothesis testing and no multiplicity adjustment strategy was employed…***Prespecification is the cornerstone of reliable regulatory evidence…this subgroup analysis of patients with baseline ALSFRS-R score greater than or equal to 35 is an exploratory analysis…[that] cannot be used to rescue the trial because of a large chance of finding false positive results***." ¶202. <u>Fifth</u>, as to Defendants' floor effect data, "***no floor effect was demonstrated in the analyses***," "***the lack of efficacy of [NurOwn] over placebo cannot be explained by a floor effect***." Brainstorm's floor effect hypothesis "***was invalidated by the FDA review showing that there was no evidence of a sponsored hypothesized floor effect***." ¶203. <u>Sixth</u>, the "positive" biomarker data, were "***exploratory and did not support clinical benefit***" and "***not quite what the sponsor is suggesting***" because patients with *greater* loss of function have a higher reduction in [biomarker] NfL, "***the opposite of what would be expected.***" ¶204. News of the Briefing Document caused Brainstorm stock to fall 48% ($0.39/share). ¶¶286-87. News of the AdComm vote caused Brainstorm stock to fall 49%, ($0.19/share) further damaging investors. ¶¶288-90.

## ARGUMENT

To state a claim under Rule 10b-5, Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of

securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). A plaintiff is not required to plead a "detailed evidentiary matter," but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## A. Plaintiffs Adequately Allege False and Misleading Statements

A statement is actionable if it, "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014). "Disclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1321 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Moreover, "[i]t is well-established in this Circuit that once a company speaks on an issue or topic, there is a duty to tell **the whole truth**." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

### 1.    Defendants' Statements of Fact Are Actionable

Throughout the Class Period, Defendants made numerous false statements of fact and repeatedly misrepresented the factual contents of their meetings with the FDA:

- Statements about Trial Design: On Feb. 18, 2020, Lebovitz represented that FDA "***confirm[ed] the data we are collecting in the Phase 3 Trial are <u>aligned</u> with current FDA views***" and "**[FDA] *commented that this is a well-designed trial.*" In response to an analyst's inquiry on "***any one single endpoint*** [] if you were focus on your FDA discussions," Kern represented that the ALS guidance was "***one of the reasons we needed to have a realignment [with FDA]***". This was false because "***FDA and applicant did not reach agreement on the primary efficacy endpoint.***" Instead, FDA told Defendants the chosen endpoint was "***not suitable.***" Further, FDA told Defendants enrolling only patients with severe ALS ("rapid progressors") was ***<u>scientifically unjustified</u>*** and based on ***<u>misleading subgroup analyses</u>*** yet Defendants enrolled only rapid progressors. Defendants and FDA were therefore not "aligned." ¶¶213-17.

11

- Statements about "prespecified subgroup results": On November 17, 2020, Lebovits described the Trial as including a "more severely affected ALS population," stating that Trial participants in a "*prespecified subgroup of patients with less advanced disease*" exhibited a superior treatment response. ¶¶218-220. On August 15, 2022, Brainstorm represented that a correction in data "*employing the efficacy model as prespecified in the statistical analysis plan*" in the "*prespecified efficacy subgroup*" of slow progressors has "meaningful positive implications", *i.e.*, the Trial "*achieved statistical significance in a key important secondary endpoint for multiple subgroups including the trial's pre-specified efficacy subgroup.*" ¶¶227-29 Lindborg emphasized that these "*pre-specified analyses [are] important*" and "*give objectivity and a different level of rigor to being able to draw conclusions from the trial*" and "*carry a different level of credence.*" ¶231. Defendants repeated their representations that this analysis was "prespecified" numerous times during the Class Period. ¶¶251-52, 255, 265, 270. This was false because, as FDA stated, "*these subgroup analyses were not prespecified for hypothesis testing,*" are "*exploratory and hypothesis generating and do not constitute evidence effectiveness.*" Further, because (as FDA stated) "*prespecification is the cornerstone of reliable regulatory evidence*" the results "*cannot be used to rescue the trial."* ¶¶145-46.

- Statements about the "Floor Effect": On August 15 and November 14, 2022, and March 27, March 30, May 15 and August 14, 2023, Defendants represented that the Trial's failure was "*driven by participants who entered the trial with advanced ALS, who fell victim to the floor effect.*" However, "*after controlling for the impact of the ALSFRS-R floor effects, participants treated with NurOwn had a higher rate of clinical response*" and "*a clinically meaningful treatment response on primary and secondary endpoints*" with "*statistically significant results.*" ¶¶225-31, 239, 248, 251, 265, 270. On March 27, 2023, when analyst asked Lindborg "*how FDA feels about floor effect…the impact it can have* on a trial like yours?" Lindborg represented "*the FDA certainly has seen this data and clearly has not disagreed with the statements we've made*." ¶¶252-53. This was false because on February 16, 2021 FDA told Defendants the Trial's failure to demonstrate efficacy was *not* due to supposed floor effects, because the floor effect was inconsistent across the study population. ¶130. As FDA explained, if a "floor-effect" accounted for the study's failure, a similar floor effect would be present in both the treatment and placebo arm (it was not). *Id.* On January 11, 2023 FDA again told Defendants that lack of efficacy could not be explained by a floor effect. ¶166. Further, as far back as 2017 FDA told Brainstorm that it should not enroll only patients with advanced ALS. ¶¶106-13.

- Statements about Biomarker data and safety: On August 15 and November 14, 2022, and March 27, March 30, May 15 and August 14, 2023 Defendants made factual statements concerning the Trial's biomarker data and patient deaths, representing, *e.g.,* that biomarker data "*shows changes in the direction that we expected with NurOwn*," "were shown to be statistically important to the clinical outcomes observed," that are "strong and consistent [ ] which are *predictive of clinical response*," "clinical and *biomarker data* [] demonstrate *evidence of significantly better outcomes*." Defendants represented: "there *were no safety concerns*," "*fewer deaths than expected*" and that NurOwn had a "*very strong safety profile*." These statements were false. ¶¶227-28, 232-33, 240, 245, 247, 255, 262, 264-65, 268. As FDA stated, biomarker data "*was*

12

associated with a *worse* clinical *outcome*," "*greater loss of function*" and was "*the opposite of what would be expected*." ¶¶150, 204. And in February 2021, FDA told Brainstorm it was concerned about the large number of deaths. ¶131. Indeed, there were *over three times the number of deaths* in the Trial's treatment arm, *higher numbers of serious adverse events*, higher incidence of respiratory failure and pain. ¶¶198-99. "*Survival in the [Trial] was worse at study completion for subjects who received NurOwn…higher incidence of death indicates lack of survival benefit and warrants further investigation.*" ¶132.

These are statements of fact. The "certainty" of these unqualified assertions characterizes them as statements of facts. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). They are "not framed like…statement[s] of opinion" as they are not "couch[ed] with prefatory language like 'I believe' or 'In my estimation.'" *Abramson v. NewLink Genetics Corp.,* 965 F.3d 165, 176 (2d Cir. 2020), that conveys the "uncertainty" that is the hallmark of opinions. *Omnicare*, 575 U.S. at 190.

Even if opinions, these statements are still actionable because Defendants "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 209-10. In determining whether an opinion is misleading based on a failure to disclose facts underlying the opinion, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id*. As the Supreme Court explained in *Omnicare*:

> [A] reasonable investor may…understand an opinion statement to convey facts about…the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience…[An investor] expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

575 U.S. at 188-189. Here, a jury would have no trouble finding that Defendants' statements did not "fairly align[] with the information in [their] possession at the time." *Id*.

Courts in the Second Circuit and across the country have repeatedly held that companies are required to disclose FDA feedback on trial design, data, and the approval process where, as here,

13

they make affirmative statements that "***plausibly contradict***…FDA's [ ] feedback on the same material." *See, e.g., In re Y-mAbs Therapeutics, Inc. Sec. Litig.* 2024 WL 451691, at *11 (S.D.N.Y. Feb. 5, 2024) (rejecting assertion that FDA interim feedback is inactionable where "defendants made public statements concerning back-and-forth with FDA which indicates that *Defendants* themselves understood that FDA's feedback was material"); *Christiansen v. Spectrum Pharm., Inc.,* 2024 WL 246020, at *8 (S.D.N.Y. Jan. 23, 2024) (statement that trial's dosing regimen was "aligned with [the] FDA" misleading where FDA told company it needed more data before determining whether dosage was optimized, rejecting assertion that FDA "signed off" on dosage regimen where FDA only agreed dose was "preferable" to company's proposed prior dose)[2] Defendants falsity arguments can be easily dispatched.[3]

First, Defendants' assertion that there is no affirmative duty to disclose "interim feedback" received from the FDA is wrong, and their cases are distinguishable.[4]

---

[2] *See also Abramson*, 965 F.3d at 178 (finding statements of opinion describing outcome of a drug study actionable because a "jury could conclude that the sheer volume of competing facts required" the defendant "either to speak less confidently" about the results or "to disclose the existence of" contrary information"); *Shanawaz v. Intellipharmaceutics Int'l. Inc.*, 348 F. Supp. 3d 313, 324–25 (S.D.N.Y. 2018)(finding actionable "Defendants' allegedly false descriptions of the contents of the NDA itself" and distinguishing such descriptions from "Defendants' opinions about the NDA's prospects before the FDA"); *Zak v. Chelsea Theraps. Int'l, Ltd.*, 780 F.3d 597, 609-10 (4th Cir. 2015) (statements touting "strength of [clinical trial] data" actionable where drug company "misled investors by failing to disclose critical information received from the FDA"); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *4, *12 (N.D. Cal. Jan. 6, 2022) (statements touting "clinical benefit demonstrated" in study and progress of NDA misleading where failed to disclose that "the FDA had raised concerns" that "heightened risk of denying approval."); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *6 (D. Mass. 2015) (statements touting "safety" misleading where defendants "fail[ed] to disclose the FDA's concerns about [drug's] safety and approvability").

[3] In a footnote Defendants assert the Complaint is a "puzzle pleading." This could not be farther from the truth given the Complaint's addendum which lays out in detail in a chart each of the alleged false statements, dates, speakers and reasons why each statement was false/misleading.

[4] In *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016) (MTD *passim*) the court stated that FDA feedback "must be disclosed" where an omission would render another

14

<u>Second</u>, Defendants argue that their statements merely reflect a differing interpretation of clinical trial results from FDA's, and that Plaintiffs must show they disbelieved their statements. Again Defendants are wrong.[5] As the Second Circuit held: "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson*, 965 F.3d at 175, 177("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable."). *See, e.g., Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440 at *9, *14, (N.D. Cal. Feb. 23, 2023) ("in the context of a Phase III trial…an investor would expect that speaker's proposed interpretation of trial results ***had not already been undermined by the agency tasked with evaluating the NDA***…omissions rendered Defendants' statements about trial's efficacy results misleading [because] investors were led to believe efficacy results were far stronger and more meaningful than they actually were…***regardless of***

---

statement materially misleading, which is the case here. *Gillis*, 197 F. Supp. 3d at 584-85. In *In re Alkermes Pub. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 294 (MTD 13-14) (E.D.N.Y. 2021) plaintiffs did not allege "any information conveyed to Alkermes that should reasonably have been interpreted to suggest that FDA approval of ALKS 5461 was not possible ***or even unlikely***" and FDA "voiced no objection to the use of SPCD as a proof-of-concept study." The opposite is true here. In *In re MELA Sciences, Inc. Sec. Litig.* 2012 WL 4466604, at *9-10 (S.D.N.Y. Sept. 19, 2012) (MTD 15, 21), FDA ultimately approved the product and the complaint did not indicate what issues with the trial FDA raised in its letter, or that defendants knew of or omitted contradictory facts when they expressed optimism about the product. In *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (MTD 8, 21), "fatal" to the case was "the absence of any serious conflict" between the FDA's concerns about methodology and "Defendants' optimism about FDA approval" or any "rational connection" between defendants' statements concerning the drug's efficacy and the FDA's feedback. Here, Defendants' statements were directly at odds with what FDA repeatedly told them and were unreasonable given the patient deaths and worse clinical outcomes correlating with "positive" biomarker data.

[5] *Lehman v. Ohr Pharm. Inc.*, 2019 WL 4572765 (S.D.N.Y. 2019) (MTD 8, 13) involved an alleged failure to disclose the trial's results in comparison to historical trials, a true dispute about the proper interpretation of data. *In re AstraZeneca plc Sec Litig.*, 2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) (MTD fn. 4) is far afield as plaintiffs did not identify any statements made inaccurate by the alleged omissions, or any relevant context to create a misleading impression.

***whether agency's concerns would preclude approval they at least increased the risks that the drug would not be approved***.").[6,7]

Accordingly, while the FDA may well have given Brainstorm "encouraging feedback" (MTD 14) about the trial design, Defendants were not free to tout that feedback and represent FDA "alignment" without also disclosing FDA's statements concerning the endpoint and enrollment population. While Defendants may have (however unreasonably) believed that there were "fewer deaths than expected" in the Trial, they were not free to tout this, telling investors NurOwn had a "strong safety profile" without also disclosing that FDA previously told them it was "concerned about the larger number of deaths among subjects treated with [NurOwn]." While Defendants may have (however unreasonably) believed that their "floor effect" hypothesis was correct, they were not free to tout it to investors and represent that "FDA has certainly seen this data" and "has not disagreed," when in fact FDA previously discredited their floor effect analysis. As in *Y-*

---

[6] *See also Cohen v. Kitov Pharms. Holdings, Ltd.* 2018 WL 1406619 at *5 (S.D.N.Y. Mar. 20, 2018) (alleged material omissions regarding trial results actionable because omission "created [the false] impression" that the study showed statistically significant efficacy); *In re Delcath Sys., Inc. Secs. Litig.*, 36 F. Supp. 3d 320, 331032 (S.D.N.Y. 2014) (same because failure to disclose certain data "combined with" misleading statements, gave false impression of the drug's safety); *In re OSI Pharms., Inc. Secs. Litig.,* 2007 WL 9672541, at *8-9 (E.D.N.Y. Mar. 31, 2007) (finding statements about trial misleading because they were allegedly contradicted by clinical trial results at defendants' disposal). *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *12–14 (N.D. Cal. July 29, 2022) ("Defendants could have remained altogether silent about the review issues they discussed with the FDA. But they could not disclose only one review issue discussed with the FDA and conclude that they were thus confident about their chances for approval, while omitting the other review issue they knew the FDA was concerned about.")

[7] *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059 at *9 (S.D.N.Y 2021) is far afield. The Court found Defendants' statements constituted "reasonable interpretations of data and were not substantially undermined by omitted facts" at *12 where FDA approval of product undercut argument that the results of four undisclosed studies undermined the company's reporting of its data, and the FDA's endorsement of defendants' views was based on the information defendants' allegedly withheld showing defendants' views were reasonable. The opposite is true here. In *Zagami v Cellceutix*, 2016 WL 319953 the alleged false statements were not misleading because the fact allegedly withheld (that an elevated biomarker correlates with a return in cancer) was in truth disclosed and was not inconsistent with the disease being "clinically stable."

16

*mAbs*, Defendants' statements "plausibly contradict FDA's feedback on the same material."

Third, Defendants misleadingly cast the Complaint as alleging "fraud by hindsight" because they received the Briefing Document at the end of the Class Period. Defendants ignore that the Briefing Document contains a detailed timeline of FDA's interactions and meetings with Defendants since 2016 and details what FDA told Defendants and when, referencing FDA contemporaneous correspondence Defendants received. [8] Complaint Ex. A, 52-55 (Appendix I).

Fourth, Defendants try to rewrite history asserting that FDA did not discredit Brainstorm's floor effect efficacy hypothesis in February 2021 (but instead in January 2023), because in 2021 FDA did not use the word "spurious" to describe it, instead telling Defendants merely that "the floor effect did not appear to be consistent" (MTD 20). Placed in context, this is a distinction without a difference. As FDA explained at the February 2021 meeting, for the floor effect hypothesis to hold true, participants in both the NurOwn and placebo group would exhibit a similar floor effect. ¶147. That the floor effect was not consistent across the study population (*i.e.* both groups) *means* that the hypothesis was spurious. *Id.* ¶¶170, 203. "Spurious" and "inconsistent" and one in the same given the context. Moreover, at the motion to dismiss stage the court is "required to credit plaintiffs' plausible theory, and "defendants' contrary and competing explanation" of a statement is "entitled to little weight.[9]"

Fifth, Defendants wrongly attempt to dispute the Complaint's factual allegations ***and*** the content of the FDA Briefing Document, citing a heavily redacted copy of Brainstorm's purported statistical analysis plan dated June 19, 2020, asserting that the subgroup analyses FDA stated

---

[8] *Davison v. Ventrus Bioscis, Inc.* 2014 WL 1805242 (S.D.N.Y. 2014) (MTD 22), is inapposite. In *Davison* plaintiffs criticized the study's methodology absent any stated concerns by FDA.
[9] *IWA Forest Industry Pension Plan v. Textron, Inc.*, 14 F.4th 141, 147-47 (2d Cir. 2021) (finding reversible error in crediting defense explanation inconsistent with complaint).

"were not prespecified for hypothesis testing" and were "exploratory" were in fact prespecified. Defendants' assertion directly conflicts with FDA's assertion that "...*these subgroup analyses were not prespecified for hypothesis testing and no prespecified multiplicity adjustment strategy was employed*" ¶¶144-45. Defendants' tactic is an improper attempt to distract the Court and avoid making legal arguments directed towards the facts as alleged.[10] Additionally, the Court may not consider this document and should strike it, because it is neither attached to nor incorporated by reference in the Complaint.[11] Moreover, that FDA stated Defendants' representations about prespecification were misleading more than suffices at the pleading stage.[12]

### 2. Defendants' Statements Describing the RTF and Assurances That They Could Remedy the Deficiencies in the BLA Are Actionable

On November 14, 2022, Defendants announced they received the RTF letter (which they refused to disclose to investors). ¶239. That day, in response to an analyst's question about "the CMC issues that the FDA brought up" in the RTF, Lebovitz represented that the CMC issues were "*trivial*." ¶242. On March 30, 2023 Lebovitz stated the RTF included only "*one item related to the trial not meeting the standard for substantial evidence of effectiveness*," and that with respect to CMC, "*we have full confidence that we will be able to remediate these points*" representing, "*we have already conducted much of the necessary work in a short time frame*

---

[10]*See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) (rejecting defendants' introduction of "evidence and arguments intended to establish [their point]" because "they will have an opportunity to do so at a later stage ... when it is appropriate to weigh the parties' competing evidentiary submissions."

[11] *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *6 (S.D.N.Y. Sept. 17, 2019) (where materials outside of motion to dismiss introduced, court may, under F.R.C.P. 12(d), either exclude them or convert motion to one for summary judgment).

[12]Unlike in *Abely v. Aeterna Inc.,* 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013)(MTD 12) Plaintiffs are not asking the Court to credit their *ipse dixit* definitions concerning prespecification (considering document not for "truth contained therein, but to compare the trials' publicly disclosed descriptions with the alleged misstatements and omissions asserted by plaintiff).

*and submitted an amendment to the BLA…which responds to the majority of the manufacturing items raised*." ¶259. Defendants also touted Brainstorm's "*exemplary record of high-quality manufacturing*." *Id.* Defendants portrayed their interactions with FDA leading up to the RTF and their decision to file the BLA over protest in a positive light, stating that FDA presented Brainstorm with "*multiple* options to return the BLA to regulatory review." ¶250.

These statements were demonstrably false and directly conflict with FDA's description of the RTF Letter which informed Defendants, *inter alia,* that "*the manufacturing information was grossly deficient*" and that the BLA was "*scientifically incomplete*", and which included multiple examples of "*critical information not provided*," "*numerous critical elements*" lacking, and "*the extent of the deficient information*" which made a substantive review "*not possible*." ¶196. Contrary to Defendants' representation that FDA provided Brainstorm "multiple options" concerning FDA review of the BLA it gave Brainstorm one clearcut choice: take "*the best path forward*" *i.e.,* "*submit a new BLA from new adequate and well-controlled clinical investigations*" *or* "*request that the BLA be filed over protest*." ¶¶167, 196. These statements are likewise misleading under *Omnicare,* because, when considered in context, did not "fairly align with information in defendants' possession at the time." *Omnicare*, 575 U.S. at 189.

Defendants incorrectly assert that their assurances to investors concerning the RTF and filing over protest are immaterial "puffery" (MTD at 23-24).[13] "'[A] complaint may not properly be dismissed…on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,

_____

[13]Contrary to Defendants' characterization of the Complaint, Plaintiffs do not challenge statements about "Brainstorm's continued dedication to its mission." (MTD 24).

19

750 F.3d 227, 235 (2d Cir. 2014) (ellipsis in original). "'[B]ecause the materiality element presents "a mixed question of law and fact," it will rarely be dispositive in a motion to dismiss[.]'" *Id.* Further, "when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors."[14] Here, NurOwn was Brainstorm's lead product candidate and the progress of the BLA following the RTF was of the utmost importance to investors. Recognizing this, Defendants reassured investors following receipt of the RTF and Type A meeting with FDA (¶¶242, 246), analysts specifically asked questions about the RTF (¶¶163, 242), and analyst reports addressed the RTF as well as Defendants' assurances (¶¶245-46, 255). For example, following Defendants' November 14, 2022 statements describing CMC issues as "trivial," an analyst stated that Brainstorm believes the CMC "can be easily corrected" commenting that "the refusal to file letter is disappointing, however it is by no means a dead end." ¶246. Moreover, statements are not immaterial puffery when, as here, the speaker "knew the contrary was true." *Novak*, 216 F.3d at 315 (holding statements that inventory situation was "in good shape" or "under control" are actionable).

Defendants also assert that their statements assuring investors that Brainstorm fully responded to FDA's concerns in resubmitting the BLA and that the data was strong enough to support FDA approval (MTD at 22-23) are protected by the PSLRA safe harbor. First, as discussed below, the Complaint alleges that Defendants had actual knowledge that their statements were false when

---

[14] *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *10 (E.D.N.Y. May 20, 2020); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. July 30, 2015) (statements of "general integrity and ethical soundness" were not puffery because they were "made repeatedly in an effort to reassure the investing public about the Company's integrity"); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) ("optimistic statements" that "everything [was] going fine" with FDA approval were actionable where designed to "reassure" investors).

made. Second, cautionary language cannot be "meaningful" if it is "misleading in light of historical fact[s], *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010), "that were established at the time the statement was made." *Id.* at 769. For example, on March 30, 2022 when Defendants stated they had submitted an amendment to the BLA and did much of the work to remedy FDA's manufacturing concerns, they knew the deficiencies had not been cured (and later admitted that "***additional work needs to be done and complete to fully satisfy the FDA requirements.***") ¶192. Similarly, when Defendants stated that the data was "strong enough to support regulatory approval" because there were "statistically significant results" when you "eliminate the advanced patients," "strong and consistent biomarker data...predictive of clinical response," and "positive safety data with fewer deaths than expected" Defendants ***knew*** that FDA found the data and analysis based on eliminating advanced patients inadequate and was highly concerned about safety data and patient deaths. ¶¶130-32.[15]

## B. Plaintiffs Have Alleged A Strong Inference of Scienter

"[S]cienter can be established by alleging facts to show...strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). A strong inference of scienter exists where a complaint alleges defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA*, 553 F.3d at 199. Scienter allegations must be viewed

---

[15] *See Credit Suisse First Bos. Corp. v. Arm Fin. Grp.*, 2001 WL 300733, at *23 (S.D.N.Y. 2001) ("warnings of specific risks...do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *Homyk* at *18 (no safe harbor where defendants "were aware of and concealed adverse facts that gave investors a misleading impression of the trial results, prospective FDA approval process...").

holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

A classic fact pattern giving rise to a strong inference of scienter is "where defendants . . .knew facts or had access to information suggesting that their public statements were not accurate…" *Employees' Ret. Sys.*, 794 F.3d at 306. Plaintiffs allege, and Defendants don't dispute, that they were aware of FDA's concerns in the RTF and meetings. This alone suffices to allege scienter.

Scienter is further strengthened for each Defendant because each spoke in detail about the RTF letter, their meetings with FDA, the BLA, and the Trial data.[16] When executives speak about a topic of "critical importance", they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *See, e.g., Y-mAbs* at *13 (recklessness adequately alleged where defendants were "actively involved in the BLA", provided "detailed statements on behalf of [company] on the progress of BLA and discussions with FDA," company was "responsible for submitting BLA and updated material to FDA" and product at issue was "lead product candidate.").[17] Scienter "is further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about [the relevant issue]." *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) (collecting

---

[16] ¶¶213-16, 220, 227-29, 231-33, 239, 242, 247-48, 250-53, 256-57, 262, 264-65, 268, 270.

[17] *See also City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *6-7 (S.D.N.Y. Sept. 29, 2010); *see In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements); Scienter "is further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about [the relevant issue]." *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) (collecting cases).

cases). Defendants issued all of their statements in response to the Trial design and results, BLA submission, and the RTF, and analysts' concerns about the same. Defendants provided assurances following every FDA meeting, and receipt of the RTF. ¶¶213-16, 238-42, 250-52, 259-61.[18] Moreover, Brainstorm was a small company with only one product platform and no commercial sales, whose prospects hinged solely on the BLA for NurOwn (¶¶51, 62), facts that support an inference of scienter. *See Skiadas v. Acer Thera. Inc.*, 2020 WL 3268495 at *10 (S.D.N.Y. June 16, 2020); *Delcath*, 36 F.Supp. 3d at 335. Furthermore, Kern's resignation shortly after Brainstorm received the RTF (¶¶164, 154, 278) supports an inference of scienter.[19] The Individual Defendants' unusual secrecy concerning the RTF and FDA communications (¶¶154-56, 279), is yet another piece of the scienter puzzle.[20]

While not required, the Complaint also adequately alleges facts demonstrating Defendants had a motive for committing fraud.[21] During the Class Period Brainstorm sold over 14 million shares

---

[18] The Complaint could not be farther from group pleading, as Defendants assert. (MTD 10). The Complaint meticulously alleges how *each* Individual Defendant issued statements demonstrating their knowledge of the BLA, FDA interactions, and clinical trial results. Lebovitz tasked himself as supervisor of Brainstorm's communications with FDA and spoke to FDA directly (¶¶52, 156-57); Lindborg was the overall leader for the entire BLA process and authored the key portions of the BLA (¶54), and Kern, as CMO presented Trial results to FDA (¶55).

[19] *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013).

[20] Defendants assert that a securities case in the purportedly "unique" drug approval context is dismissed unless plaintiff alleges management knows facts that "necessarily prevent regulatory approval" and conceals them. (MTD 13). This is not the law and Defendants' cases do not say this. For example, in *Alkermes*, 523 F. Supp. 3d 283(MTD 13) plaintiffs *alleged* that FDA told the company that its trial design "would necessarily prevent approval," the Court did not independently require it. Instead, regardless of the context, (and as Defendants' citations state), recklessness is established by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Chembio, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 219 (E.D.N.Y 2022).

[21] *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (motive not required so long as plaintiff "adequately identifies circumstances indicating conscious behavior by the defendants").

of stock for proceeds of $73,285,000 at artificially inflated prices as high as $14.48 per share. ¶276. Defendants ignore the Complaint's allegation that Brainstorm has operated at a loss since its inception, "**consistently warned investors that it may not be able to continue as a going concern if it does not raise sufficient capital,**" and had no saleable products, (¶52) and assert that the motive to raise funds is "generic." This Court's decision in *Skiadas* rejected this argument under nearly identical circumstances. 2020 WL 3268495, at *8-11.[22] The Court in *Skiadas* likewise rejected the assertion that fraud would be "illogical" because, as here, Defendants engaged in a reckless gamble, concealing bad news in the farfetched hope that it would be overtaken by good; in other words "[b]etter to say what was necessary to raise the money and hope that the FDA would eventually approve [drug]."[23]

Additionally, Lebovitz's insider sales at a time when he knew of negative material non-public information likewise support scienter.[24]  *See, e.g., In re Schol. Corp. Sec. Litig.*, 252 F.3d 63, 74-

---

[22] Here, unlike in *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F.Supp.3d 192, 200 (E.D.N.Y. 2022) (MTD 10-11), Plaintiffs allege (and Defendants do not contest) that Brainstorm needed to raise capital to fund its operating expenses. Defendants' citation to the amount of cash Brainstorm had on hand in a given quarter does not negate motive as Brainstorm's cash on hand came from stock offerings, not product sales.

[23] In *Gillis v. QRX*, 197 F. Supp. 3d 557, the Court found the fraud implausible because the complaint's theory was that defendants **knew** at the outset that the NDA submission was doomed to fail. Here by contrast, Plaintiffs allege Defendants mispresented and omitted material facts increasing the risk of non-approval and hoped against odds that FDA would change its mind. *In re Axonyx Sec. Litig.*, 2009 WL 812244 at *4 (S.D.N.Y. 2009) (MTD 17) is nothing like this case. Plaintiffs alleged defendants improperly designed their trial but alleged no plausible claim of knowing or reckless defects in the trial that defendants concealed from investors, making the inference that defendants did their best to carry out a successful trial more plausible.

[24] The Complaint also adequately alleges insider trading claims as to Lebovitz. Defendants do not deny that Lebovitz made nearly $1 million in profits selling Brainstorm shares while in possession of material non-public information. Their only defense to Plaintiffs' insider trading claim is lack of scienter. Because the Complaint adequately alleges Lebovitz's scienter, as set forth above, the Complaint also adequately alleges a violation of §10b-5(1).

24

75 (2d Cir. 2001).[25] Finally, Kern's and Lindborg's lack of sales does not negate scienter.[26, 27]

## C. Plaintiffs Adequately Allege Loss Causation

Loss causation is adequately pled where a plaintiff alleges either "(a)…that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters*, 750 F.3d at 233 (2d Cir. 2014). These "are not wholly distinct theories of loss causation." *In re Vivendi,* 838 F.3d at 261. The Complaint alleges Defendants' fraudulent statements concealed the true risks associated with the NurOwn BLA that materialized in a series of partial corrective disclosures which culminated when FDA released the Briefing Document and the CTGR voted against approval of NurOwn.¶¶280-89, Moreover, the Briefing Document and AdComm meeting also revealed the falsity of Defendants' statements concerning, *inter alia*, Trial design and FDA "alignment", the "floor effect" hypothesis and data, "prespecified" subgroup results, safety and patient deaths, biomarker data, and the RTF and CMC issues. ¶¶195-207. Cases finding loss causation adequately alleged under similar circumstances are legion.[28]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.[29]

---

[25] The assertion that Lebovits sold these shares three years before release of the Briefing Document ignores the preceding corrective disclosures and the fact that Lebovits sold these shares less than eight weeks before the Trial completion, whose design FDA disagreed with, which Lebovitz knew failed. ¶277. The assertion that Lebovitz's share ownership doubled is misleading. His "acquisitions" were shares of restricted stock awarded under an option plan that vested *automatically* on a set date, for which Lebovitz paid nothing. Leiwant Dec. Ex.10-15.

[26] *See In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011).

[27] Because the Complaint adequately alleges a violation of §10(b) as to Lebovitz, Lindborg, and Kern, including scienter, the Complaint also adequately alleges a violation of Section 20(a).

[28] *E.g., In re GPC Biotech AG Sec. Litig.*, 25 597 F. Supp. 2d 412, 425 (S.D.N.Y. 2009) (stock price declines after disclosure of FDA Briefing Document sufficient to allege loss causation); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014) (similar).

[29] Alternatively, Plaintiffs request leave to amend if the Court finds the Complaint falls short of any applicable pleading standards. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).

Respectfully submitted,

Dated: July 31, 2024

**THE ROSEN LAW FIRM, P.A.**

/s/*Sara Fuks*
Laurence M. Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com

*Lead Counsel for Plaintiffs*

26