UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELI SPORN, Individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>BRAINSTORM CELL THERAPEUTICS, INC., et al.,<br><br>       Defendants. | 23 Civ. 9630 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

In this action, lead Plaintiff George Colby and named Plaintiffs Eli Sporn and Brett Shirley bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants BrainStorm Cell Therapeutics Inc. ("BrainStorm"), Chaim Lebovits, Stacy Lindborg, and Ralph Kern. BrainStorm is a clinical stage biopharmaceutical company that developed a stem-cell-based product, "NurOwn," for the purpose of treating various neurodegenerative and neurological disorders, including Amyotrophic Lateral Sclerosis ("ALS"). Am. Compl. ¶ 3, ECF No. 28. As of the second fiscal quarter of 2022, Lebovits served as BrainStorm's Chief Executive Officer, Kern served as President and Chief Medical Officer, and Lindborg served as Executive VP and Chief Development Officer. Leiwant Decl. Ex. 6 at 3, ECF No. 33-6.

Plaintiffs bring this securities class action on behalf of themselves and all other persons or entities who purchased publicly traded BrainStorm common stock during the period February 18, 2020 through September 27, 2023 (the "Class Period"), alleging that Defendants misrepresented, *inter alia*, the results of and the Food and Drug Administration's ("FDA's") feedback regarding NurOwn's Phase 2 and 3 Clinical Trials, and that after the truth was revealed, "Brain[S]torm's

stock price fell precipitously."  Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp.") at 1-4, ECF No. 34.

Defendants move to dismiss.  See ECF No. 31.  For the reasons given below, Defendant's motion is **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

Unless otherwise stated, the following facts are taken from the Amended Complaint and are assumed to be true solely for purposes of adjudicating Defendants' motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

On November 21, 2016, BrainStorm had the first of a series of meetings with the FDA to discuss the results of the Phase 2 Trial of NurOwn, and its plans for a Phase 3 Trial.  Am. Compl. ¶¶ 4, 8.  For the Phase 3 Trial, BrainStorm proposed a primary efficacy endpoint measuring the rate of change in participants' scores on the ALS Functional Rating Scale ("ALSFRS"), which "measures an ALS patient's functional decline in various areas of motor functioning."  *Id.* ¶ 6.  BrainStorm also determined that, for the Phase 3 Trial, it would enroll only "rapid progressors"—i.e., patients with advanced ALS.  *Id.* ¶¶ 7, 10.  BrainStorm made this determination based on a post hoc subgroup analysis of the Phase 2 Trial purportedly showing that treated rapid progressors demonstrated "better results" than treated slow progressors.  *Id.* ¶ 7.

During the November 2016 meeting, the FDA stated that BrainStorm's proposed primary efficacy endpoint "may potentially be acceptable for a Phase 3 study intended to support a market application," Am. Compl. Ex. A at 52, but also told BrainStorm that it "strongly recommended" that BrainStorm instead use a primary efficacy endpoint "whose clinical meaningfulness is easier to interpret (e.g., survival . . . )."  Am. Compl. ¶¶ 9, 105.  The FDA also told BrainStorm it should not enroll only rapid progressors, stating that doing so would not be scientifically justified because

the apparently different effect of NurOwn on rapid progressors as compared to on slow progressors was "most likely spurious and misleading." *Id.* ¶¶ 10, 112. Nevertheless, "in contravention of FDA's explicit advice," BrainStorm utilized its proposed primary efficacy endpoint and enrolled only rapid progressors. *Id.* ¶ 11.

BrainStorm subsequently had additional meetings with the FDA on August 17, 2017; November 8, 2019; and February 5, 2020. *Id.* ¶ 8. At the November 2019 meeting, while the Phase 3 Trial was underway, the FDA noted that BrainStorm's "Phase 2 study failed to show a statistically significant benefit of treatment . . . compared with [a] placebo." Am. Compl. Ex. A at 52. But the FDA also recommended that BrainStorm "not change the existing primary and secondary efficacy endpoints" because the "study results would still be interpretable," and "committed to review[] the data, once the study is completed, to determine if there is a regulatory path forward that could potentially lead to approval." Am. Compl. Ex. A at 52-53.

Several months later, Defendant Lebovits represented to investors during a February 18, 2020 quarterly earnings call that the Phase 3 Trial was "aligned with current FDA views" and that the FDA "commented that this is a well-designed trial." Am. Compl. ¶¶ 12, 116, 213. During the same call, Defendant Kern stated that the FDA:

> [C]onfirmed we're completing a well-run study. It is a very high-quality study, and the data that will be collected at the end of this study is relevant and critical to the assessment of NurOwn efficacy. It's an important confirmation for us . . . We obviously were very reassured by their position.

*Id.* ¶ 215. In response to a question whether there was "any one single endpoint . . . if you were to focus in on your FDA discussions," Kern referred to the FDA's "ALS guidance document" and stated that "the easiest thing to measure in a trial . . . is function," and that "there's a well enough appreciated scale called the ALS functional rating scale, which really forms the foundation of that."

Leiwant Decl. Ex. 4 at 18,[1] ECF No. 33-4.[2]  He added that "[t]here are different ways to evaluate that data and different companies have looked at different aspects of it in terms of slope versus score.  And I think that's a really good discussion that we had with the FDA." *Id.*  However, during the call, Kern also cautioned, "based on the [Biologic License Application], the FDA will . . . review all the data supporting materials, and then they will make a decision to approve or disapprove the application.  And of course, we can't speculate on the outcome of that review. . . ." *Id.* at 10.  Kern further noted, "[o]f course, as is usually the case, [FDA] will look at the totality of our data." *Id.* at 9.

Ultimately, however, the Phase 3 Trial failed to reach statistical significance on its primary endpoint, and BrainStorm announced those results to the public on November 17, 2020.  Am. Compl. ¶ 13.  In the announcement, BrainStorm acknowledged that the overall population in the Phase 3 Trial failed to have statistically significant results, but represented that it had "identified a superior treatment response in a pre-specified subgroup of patients with less advanced disease." *Id.* ¶¶ 14-15.  The November 17, 2020 announcement also stated that "[t]he potential risks and uncertainties include . . . the regulatory approval potential of BrainStorm's NurOwn® treatment candidate, the success of BrainStorm's product development programs and research, [and] regulatory and personnel issues . . . ."  Leiwant Decl. Ex. 5 at 4, ECF No. 33-5.

Plaintiffs point to two issues related to BrainStorm's representation.  First, the purportedly "pre-specified subgroup" was actually identified based on a post hoc exploratory analysis, which,

---

[1] Pincites to the Leiwant Declaration Exhibits reference PDF pagination when internal pagination is not present.

[2] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

according to FDA, "cannot be used to rescue the trial because of a large chance of a false positive finding." Am. Compl. ¶ 15; see also id. ¶ 16. Second, this post hoc exploratory analysis "focus[ed] on what is referred to as [a] 'floor effect,'" or the statistical phenomenon whereby bounded scales like the ALSFRS cannot detect further deterioration after a certain point. BrainStorm "conjectured that the lack of efficacy in the Phase 3 Trial overall was due to the inability to detect efficacy in a subgroup that was supposedly impacted by [a] 'floor effect.'" Id. ¶ 15; see also id. ¶ 17.

During a February 21, 2021 teleconference with BrainStorm, the FDA gave additional feedback. Id. ¶ 18. First, the FDA told BrainStorm that it interpreted the Phase 3 Trial as a negative trial, that submission of a Biologic License Application ("BLA") was not appropriate, and that the data did not meet the standard required for approval. Id. Second, with respect to the "floor effect" analysis, the FDA stated that the purported floor effect "did not appear consistent across the study population." Id. Third, the FDA counseled BrainStorm to "conduct another Phase 3 study, this time incorporating [FDA] input regarding the study design." Id. Fourth, the FDA expressed concern about the larger number of deaths among subjects treated with NurOwn compared to that among subjects treated with a placebo. Id.

The next day, on February 22, 2021, BrainStorm represented to investors that although the FDA concluded that "the current level of clinical data does not provide the threshold of substantial evidence that FDA is seeking to support a [BLA]," the FDA had advised that that this "does not preclude BrainStorm from submitting a BLA." Id. ¶ 19 (alteration in original). All the while, BrainStorm "concealed FDA's concerns about the number of deaths in the Phase 3 Trial's treatment group, the existence of the deaths themselves, FDA's invalidation of Brain[S]torm's 'floor effect' analysis, [and] FDA's recommendation that Brain[S]torm conduct a new trial . . . ." Id. ¶ 21.

Eighteen months later—on August 15, 2022—BrainStorm announced that it would go forward and submit a BLA, emphasizing its purportedly "prespecified" efficacy subgroup analysis. *Id.* ¶¶ 22-23.  BrainStorm also highlighted new biomarker analyses from the Phase 3 Trial showing a reduction in a biomarker called Neurofilament Light ("NfL") thought to be associated with neurodegeneration.  *Id.* ¶ 24.  However, Plaintiffs allege that in BrainStorm's Phase 3 Trial, a reduction in NfL actually correlated with a worse clinical efficacy outcome and thus amounted to an unexpected and undesirable result.  *Id.*  Nevertheless, Defendants touted the data as "going in the direction that we expected with NurOwn and stability."  *Id.*

BrainStorm ultimately submitted its BLA on September 9, 2022.  *Id.* ¶ 25.  On November 8, 2022, FDA issued a "refuse to file" ("RTF").  Am. Compl. Ex. A at 54.  The RTF informed BrainStorm that its BLA submission was "scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product quality."  Am. Compl. ¶ 28.  It noted the absence of "critical information," including "control materials," "validation of methods," and "data demonstrating manufacturing consistency."  *Id.*  On November 10, 2022, BrainStorm issued a press statement about the RTF.  *Id.* ¶ 26.  BrainStorm represented that the RTF discussed only "one item related to the trial not meeting the standard for substantial evidence of effectiveness and Chemistry, Manufacturing and Controls ("CMC") related items."  *Id.* ¶ 27.  BrainStorm characterized the BLA's deficiencies as "easily fixable" and CMC issues as "trivial."  *Id.* ¶ 30.  Former senior employees at BrainStorm stated that Individual Defendants "didn't want anybody to know" about the contents of the RTF, which was "highly unusual and frustrating" because the RTF was directly relevant to these senior employees' job functions.  *Id.* ¶ 29.

On January 11, 2023, BrainStorm met with the FDA to discuss the BLA's deficiencies. *Id.* ¶ 31. One week prior to the meeting, BrainStorm's Chief Medical Officer—Ralph Kern— resigned. *Id.* At the January meeting, FDA stated "that the lack of efficacy of NurOwn over placebo cannot be explained by a floor effect," and that the exploratory subgroup analysis "can only be used for hypothesis generation, not as evidence of effectiveness to support approval." *Id.* ¶ 32. FDA offered BrainStorm two options—either submit a new BLA with data from new, adequate, and well-controlled clinical investigations, or request that the BLA be filed over protest. *Id.*

On March 27, 2023, BrainStorm informed the public that it used the file-over-protest procedure. *Id.* ¶ 33. BrainStorm represented that "there was no downside utilizing the File Over Protest pathway," that BrainStorm had "filed an amendment to the BLA" responding to "most of the outstanding questions the FDA has posed," that the Phase 3 Trial had "fewer deaths than we expected," and that "[we] have a very strong safety profile." *Id.* When asked by an analyst how the FDA felt about the floor effect analysis, BrainStorm responded that "FDA has certainly seen this data and clearly . . . has not disagreed with the statements we made." *Id.* ¶ 34.

On September 25, 2023, the FDA released the Briefing Document regarding NurOwn. *Id.* ¶ 36. Two days later, the FDA's Advisory Committee meeting voted 17:1 against FDA approval of NurOwn. *Id.* At the meeting, a BrainStorm representative—when asked about CMC deficiencies—acknowledged that "additional work needs to be done and complete[d] to fully satisfy the FDA requirements." *Id.* ¶ 37. The Briefing Document and Advisory Committee transcript described FDA's various concerns. *Id.* ¶ 38.

BrainStorm's share price fell from $11.90 on November 16, 2020—the day before BrainStorm announced that the Phase 3 Trial failed to reach statistical significance on its primary

endpoint—to $0.20 on September 28, 2023—the day after the FDA Advisory Committee meeting. *Id.* ¶¶ 13, 40.  During the Class Period (i.e., from February 18, 2020 through September 27, 2023), BrainStorm sold over $73 million in common stock to investors in at-the-market (ATM) offerings, and BrainStorm's CEO Defendant Leibovits sold nearly $1 million worth of his own BrainStorm stock.  *Id.* ¶¶ 41-42.

**LEGAL STANDARDS[3]**

### A.  Pleading Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor."  *Id.* at 106-07.  However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'"  *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021).  Rule 9(b) requires that "a party . . . state with particularity the circumstances constituting fraud or mistake."  In concrete terms. this means that "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794

---

[3] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

F.3d 297, 305 (2d Cir. 2015).  The PSLRA "expanded on the Rule 9(b) standard."  *Anschutz Corp.*

*v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).  The PSLRA requires that a plaintiff

"(1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is

misleading was formed, and (3) state with particularity facts giving rise to a strong inference that

the defendant acted with scienter—the required state of mind."  *Set Cap. LLC*, 996 F.3d at 75.

### B.  Section 10(b)

"To state a cause of action under Section 10(b) . . . , a plaintiff must plead [1] that the

defendant made a false statement or omitted a material fact, [2] with scienter, and [3] that plaintiff's

reliance on defendant's action caused plaintiff injury."  *Rombach v. Chang*, 355 F.3d 164, 169 n.4

(2d Cir. 2004).  SEC Rule 10b-5 implements Section 10(b)'s prohibition on false or misleading

statements and makes it unlawful for issuers of registered securities to "make any untrue statement

of a material fact or to omit to state a material fact necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §

240.10b-5(b) (2022).  The Supreme Court "has found a right of action implied in the words of [§

10(b) of the Exchange Act] and its implementing regulation."  *Stoneridge Inv. Partners, LLC v.*

*Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

## DISCUSSION

Defendants argue that the Amended Complaint fails to adequately plead: (1) a false

statement or material omission, (2) facts to support a strong inference of scienter, and (3) loss

causation, required elements for each of Plaintiffs' causes of action.  As explained below, the Court

agrees with Defendants that certain statements fail to satisfy the first element, but it holds that for

the remainder of the statements Plaintiffs have adequately pleaded all three elements.

## I.    Section 10(b)

Defendants argue that the Complaint fails to adequately plead any of the three elements of a 10(b) claim.  The Court considers each in turn.

### A.  False or Misleading Statement

#### 1.  Standard for a Material Misrepresentation

To adequately allege a material misrepresentation, a plaintiff must allege particularized facts showing that the statement "was false at the time it was made." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023) (citation omitted).  The challenged misstatement must be both (1) false or misleading and (2) material.  *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23 Civ. 1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019)).

##### a.  False or Misleading

Rule 10b-5 prohibits "two things": (1) "any untrue statement of a material fact—*i.e.*, false statements or lies," and (2) "omitting a material fact necessary to make the statements made . . . not misleading."  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024).  With respect to the second category, "Rule 10b–5(b) does not proscribe pure omissions," *id.* at 264—that is, "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence," *id.* at 263.  Rather, the Rule only "prohibits omitting material facts necessary to make the statements made . . . not misleading.  Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . ." *Id.* at 264; *see also Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y. 2023) ("[A]lthough Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.").

### b. Materiality

"The standard of materiality is whether the omitted fact 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Shapiro*, 652 F. Supp. 3d at 421 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

> [B]ecause of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014)).

### 2. Application

As an initial matter, Defendants argue that the alleged false or misleading statements challenged by Plaintiffs cannot give rise to a claim because they fall into three non-actionable categories: opinion statements, forward-looking statements, and puffery. First, the general proposition that statements of opinion or belief cannot normally form the basis of a securities fraud claim extends to "publicly stated interpretations of the results of various clinical studies"—such statements are non-actionable "opinions because reasonable persons may disagree over how to analyze data and interpret results." *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18 Civ. 8049, 2021 WL 4135059, at *9 (S.D.N.Y. Sep. 10, 2021), *aff'd*, 89 F.4th 408 (2d Cir. 2023). The Court agrees that, to the extent that Plaintiffs challenge Defendants' statements as to their own interpretations of the results of the clinical trial, *see, e.g.*, Am. Compl. ¶ 219 (citing statement that "NurOwn demonstrated a 'clinically meaningful treatment response'"), such statements are not actionable.

Second, "[a] forward-looking statement is not actionable if it is identified and accompanied by meaningful cautionary language or . . . the plaintiff fails to prove that it was made with actual knowledge it was false or misleading." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 755 (S.D.N.Y. 2018) (granting motion to dismiss); *see* 15 U.S.C. § 78u-5(c). To the extent Plaintiffs challenge Defendants' statements on the grounds that, broadly speaking, they painted an allegedly "overly optimistic picture of NurOwn's prospects for FDA approval," Am. Compl. ¶ 258, the Court agrees such statements are not actionable here because: (1) Defendants made the requisite disclosures to avail themselves of the PSLRA's safe harbor, *see, e.g.*, Leiwant Decl. Ex. 17 at 3, ECF No. 33-17 (stating that "[t]he potential risks and uncertainties include, without limitation . . . prospects for future regulatory approval of NurOwn® . . . and whether BrainStorm's future interactions with the FDA will have productive outcomes"); and (2) the FDA provided at least some feedback indicating that regulatory approval might be possible, *see, e.g.*, Am. Compl. Ex. A at 52-53 (describing the FDA's "commit[ment] to reviewing the data, once the study is completed, to determine if there is a regulatory path forward that could potentially lead to approval").

Third, statements that are "too general to cause a reasonable investor to rely upon them" constitute non-actionable puffery. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016). The Court agrees that certain statements challenged by Plaintiffs, such as Leibovits's statement during a February 18, 2020 quarterly earnings call that Defendants had a "wonderful discussion" with the FDA, Am. Compl. ¶ 213, are too general to form the basis of a claim.

Notwithstanding the above, Plaintiffs point to five categories of allegedly false or misleading statements that are more specific in nature and arguably fall outside of these non-actionable categories.  The Court takes each in turn.

### a.    Statements about the FDA's views on trial design.

Plaintiffs point to various statements regarding the FDA's views on the design of BrainStorm's clinical trials, including:

- Lebovits's statement during a February 18, 2020 quarterly earnings call that the "the FDA confirmed that the full results of Phase 3 trial is collecting relevant data critical to the assessment of NurOwn's efficacy. [FDA] commented that this is a well-designed trial."

- Kern's statement during the same call, that the FDA "confirmed we're completing a well-run study. It is a very high-quality study, and the data that will be collected at the end of this study is relevant and critical to the assessment of NurOwn efficacy. It's an important confirmation for us . . . We obviously were very reassured by their position."

- In response to a question whether there was "any one single endpoint . . . if you were to focus in on your FDA discussions," Kern responded by referring to the FDA's "ALS guidance document" and stated that "the easiest thing to measure in a trial . . . is function," and that "there's a well enough appreciated scale called the ALS functional rating scale, which really forms the foundation of that."  He added that "[t]here are different ways to evaluate that data and different companies have looked at different aspects of it in terms of slope versus score. And I think that's a really good discussion that we had with the FDA."

Am. Compl. ¶¶ 213-15; Leiwant Decl. Ex. 4, at 18.  These statements are more specific in nature than Leibovits's characterization of BrainStorm's conversation with the FDA as "wonderful." "Unlike statements about 'confidence' in resubmission or 'alignment' with the FDA, these statements are not forward-looking and do not convey general notions of optimism regarding the prospect of future approval."  *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, No. 23 Civ. 431, 2024 WL 451691, at *11 (S.D.N.Y. Feb. 5, 2024).  Plaintiffs maintain that these statements were false because, in fact, the FDA had told Defendants that enrolling only patients with severe ALS ("rapid progressors") in the clinical trial was "scientifically unjustified and based on misleading subgroup

analyses." Pls.' Opp'n at 11 (citing Am. Compl. ¶¶ 213-17). And with respect to the endpoint, the FDA told Defendants that using rate of change in the ALSFRS-R score was "of unclear clinical significance and therefore not suitable as the primary efficacy endpoint in a study intended to provide primary evidence of effectiveness." Am. Compl. ¶ 217. The challenged statements are therefore actionable because they "plausibly contradict the FDA's immediately preceding feedback." *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, No. 23 Civ. 431, 2024 WL 451691, at *11 (S.D.N.Y. Feb. 5, 2024).

Defendants' principal argument in response is that their statements about the Clinical Trial—in terms of both the soundness of its methodology and the conclusions that they drew from its results—constitute non-actionable opinion statements. *See* Defs.' Br. at 19-20 (citing *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *9). "[S]ecurities law is not "a tool to second guess how clinical trials are designed and managed." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13 Civ. 1307, 2014 WL 585658, at *1 (S.D.N.Y. Feb. 14, 2014); *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) (finding that plaintiffs' disagreement with drug trial methodology and allegation that company "deviated from the established protocol" for such trials were insufficient to allege falsity).

But at least some of the statements challenged by Plaintiffs are not Defendants' own opinions as to the soundness of their trial design—rather, they are Defendants' statements of fact about *the FDA's views* on their trial design, and whether the FDA agreed with Defendants' views. And Plaintiffs have sufficiently alleged that the FDA did not. Defendants point to what they characterize as "encouraging feedback" from the FDA, such as: (1) the FDA's recommendation at the November 2019 meeting that BrainStorm "not change the existing primary and secondary efficacy endpoints" because the "study results would still be interpretable"; and (2) the FDA's

stated "commit[ment] to reviewing the data, once the study is completed, to determine if there is a regulatory path forward that could potentially lead to approval."  Am. Compl. Ex. A at 52-53. But this feedback falls far short of the FDA stating that Defendants' Phase 3 Trial was "well-designed," or that the FDA "confirmed" that it was "well-run"—which Plaintiffs' allegations as a whole tend to contradict.  *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (concluding that statements were actionable because a "jury could conclude that the sheer volume of competing facts required" the defendant "either to speak less confidently" about the results or "to disclose the existence of" contrary information).  Defendants also note that they are not required to disclose interim feedback from the FDA.  *See* Defs.' Br. at 21 n.21.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) ("The law [does] not impose an affirmative duty to disclose the FDA's interim feedback just because it would be of interest to investors."). But "[h]ere, Defendants made several public statements concerning the back-and-forth with the FDA, which indicates that Defendants themselves understood that the FDA's feedback was material.  Having done this, Defendants were not permitted to disclose this interim feedback in a partial and misleading manner."  *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *11.

Accordingly, the Court concludes that Plaintiffs have adequately alleged false or misleading statements as to the FDA's views on trial design.

      **b.**    **Statements about "prespecified subgroup results."**

Plaintiffs point to various statements referencing "prespecified subgroup results," including:

- Lebovits's statement on November 17, 2020 that trial participants in a "prespecified subgroup of patients with less advanced disease" exhibited a superior treatment response.  Am. Compl. ¶¶ 218-220.

- BrainStorm's statements in a press release on August 15, 2022 that a correction to the statistical analysis produced "newly published results . . . employ[ing] the efficacy model as prespecified in the statistical analysis plan" and "result[ing] in a statistically significant treatment difference . . . in the prespecified efficacy subgroup"; and statements on an investor call the same day that the correction led to "statistical significance in . . . the trial's pre-specified efficacy subgroup" and had "meaningful positive implications."  *Id.* ¶¶ 225-29.

- Lindborg's statement that "these "pre-specified analyses [are] important" and "give objectivity and a different level of rigor to being able to draw conclusions from the trial" and "carry a different level of credence."  *Id.* ¶ 231.

Plaintiffs maintain that these statements were false because "these subgroup analyses were not prespecified for hypothesis testing," but rather were "exploratory and hypothesis generating and do not constitute evidence [of] effectiveness."  Pls.' Opp'n at 12.

Defendants argue that they "did not falsify any facts about the analysis of the trial data," and that they accurately described the subgroup as "participants with a baseline score of at least 35."  Def. Br. at 20 n.20 (quoting Ex. 6 at 6).  That may be true, but Defendants do not directly address Plaintiffs' point that it was incorrect to describe this subgroup as "pre-specified."  As the FDA briefing document clearly explains, "it is important to note that these subgroup analyses were not prespecified . . . ."  *See* Am. Compl. ¶ 145 (citing Ex. A at 37).  And Defendants' mischaracterization of the subgroup analysis as pre-specified was important—*i.e.*, material—because, as the FDA explained, "[p]respecification is the cornerstone of reliable regulatory evidence," and that, "[i]n the presence of an overall negative trial result," a post-hoc subgroup analysis like the one at issue here "cannot be used to rescue the trial because of a large chance of a false positive finding."  *Id.* ¶ 146 (quoting Ex. B at 123).  Defendants could have stated the results of their subgroup analysis without characterizing it as "pre-specified," which it plainly was not.

Accordingly, the Court concludes that Plaintiffs have adequately alleged a false or misleading statement with respect to pre-specification.

      c.      **Statements about a "floor effect."**

Plaintiffs point to various statements referencing a "floor effect" in their clinical trials, including:

- A press release issued on November 14, 2022 stating that "after controlling for the impact of the ALSFRS-R floor effect, participants treated with NurOwn had a higher rate of clinical response and less function lost across 28 weeks compared to placebo." Am. Compl. ¶ 239.

- A statement by Lindborg on March 27, 2023 that the Trial's failure to demonstrate efficacy was "driven by participants who entered the trial with advanced ALS, who fell victim to the floor effect . . . ." *Id.* ¶ 251. In response to a question about the floor effect, Lindborg added, "the FDA certainly has seen this data and clearly has not disagreed with the statements we've made." *Id.* ¶¶ 252-53.

- A statement by Lindborg during a quarterly earnings call on May 15, 2023 that the Phase 3 Trial's findings as to a pre-specified subgroup of participants with less advanced disease "enabled us to focus on data that is not as impacted by the floor effect in the scale . . . ." *Id.* ¶ 265.

Plaintiffs maintain that these statements were false because, "on February 16, 2021"—*i.e.*, long before the challenged statements quoted above—the "FDA told Defendants the Trial's failure to demonstrate efficacy was not due to supposed floor effects, because the floor effect was inconsistent across the study population." Pls.' Opp'n at 12. (citing Am. Compl. ¶ 130). According to Plaintiffs, the FDA explained that, "if a 'floor-effect' accounted for the study's failure, a similar floor effect would be present in both the treatment and placebo arm (it was not)." *Id.* The FDA reiterated this view at the meeting on January 11, 2023. *See id.* (citing Am. Compl. ¶ 166). Defendants may have disagreed with the FDA's assessment—and, as noted *supra*, differences of opinion about the results of a clinical trial are generally not actionable. But here, Lindborg stated that "*the FDA* certainly has seen this data [on floor effects] and *clearly has not disagreed* with the

statements we've made," *id.* ¶¶ 252-53 (emphasis added), which was not correct. The Court therefore concludes that Plaintiffs have adequately alleged false or misleading statements regarding the *FDA's views* as to floor effects.

Defendants nevertheless contend that these statements were not false or misleading, because the FDA's feedback regarding the floor effect was not as unequivocal as Plaintiffs suggest. According to Defendants, the FDA stated only that the "'floor effect' did not *appear* to be consistent." Def. Br. at 20 (quoting Leiwant Decl. Ex. 16 at 53, ECF No. 33-16) (emphasis added). Defendants also emphasize that feedback from the FDA at the February 16, 2021 meeting was not final and therefore not material, *see id.*, as a "defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 584 n.13 (S.D.N.Y. 2016).

The February 16, 2021 feedback from the FDA was arguably equivocal (as Defendants suggest) and interim in nature, but the January 11, 2023 feedback was neither of those things: the FDA stated conclusively that NurOwn's lack of efficacy "cannot be explained by a floor effect." Am. Compl. ¶ 166 (quoting Ex. A at 37-38). Thus, Lindborg's statement that the FDA "clearly has not disagreed with the statements [Defendants] made" regarding floor effects, *id.* ¶¶ 252-53, was plainly not correct. And given that Defendants made "several public statements concerning the back-and-forth with the FDA" about this issue, they cannot claim now that the FDA's feedback on this point was immaterial. *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *11. Indeed, the materiality of the FDA's views on floor effects is evidenced by the fact that an investor posed a question specifically about it. *See Shapiro*, 652 F. Supp. 3d at 421 (defining materiality of an omitted fact as something that a "reasonable investor" would regard as "significantly alter[ing] the total mix of information made available.").

       **d.**     **Statements about biomarker data.**

Plaintiffs point to various statements concerning biomarker data, including:

- A statement by Kern during an investor conference call on August 15, 2022 that "we consistently see biomarkers that are statistically relevant to clinical endpoints," including "increasing markers of neuro protection" that "appear to be important in explaining the clinical response that we have observed." Am. Compl. ¶ 232.

- A press release issued on November 14, 2022 stating that "new biomarker data" "provided further evidence confirming NurOwn's multifaceted mechanism of action." *Id.* ¶ 240.

- A statement by Lindborg during a quarterly earnings call on May 15, 2023 that "we are further encouraged by the strong and consistent biomarker data, which are predictive of clinical response," and that "we have clinical and biomarker data that demonstrate evidence of significantly better outcomes in participants treated with NurOwn." *Id.* ¶¶ 264-65.

Plaintiffs maintain that these statements were false, as the FDA's September 2023 briefing document ultimately concluded that Defendants' biomarker data "was associated with a worse clinical outcome," "greater loss of function" and was "the opposite of what would be expected." Pls.' Opp'n at 12-13 (quoting Am. Compl. ¶¶ 150, 204). But "Plaintiff[s] do[] not dispute Defendants' representations" regarding the presence of the referenced biomarker; rather "Plaintiff[s] argue[] that [the referenced biomarker] is not an appropriate or accurate barometer for [NurOwn's] efficacy." *Zagami v. Cellceutix* Corp., No. 15 Civ. 7194, 2016 WL 3199531, at *12-13 (S.D.N.Y. June 8, 2016). While the FDA did not agree with Defendants' interpretation of the biomarker data, Plaintiffs do not allege that Defendants misrepresented that particular fact. Defendants only offered their own interpretation of the biomarker data. As noted above, differences of opinion about the design or results of a clinical trial do not establish a false or misleading statement.

     Accordingly, the Court concludes that Plaintiffs have not alleged a misstatement with respect to biomarker data.

###### e.    Statements about safety.

Plaintiffs point to various statements concerning safety and patient deaths, including:

- A statement by Lindborg on March 27, 2023 that "[w]e have fewer deaths than we expected. We have a very strong safety profile." Am. Compl. ¶ 247.

- A statement by Lindborg during a quarterly earnings call on March 30, 2023 that "the physician's [sic] closest to our trial, including our Data Safety Monitoring Board, have continued to express that there were no safety concerns . . . ." *Id.* ¶ 262.

Plaintiffs maintain that these statements were false, because in February 2021, "FDA told BrainStorm it was concerned about the large number of deaths," as "there were over three times the number of deaths in the Trial's treatment arm, higher numbers of serious adverse events, higher incidence of respiratory failure and pain." Pls.' Opp'n at 13 (quoting Am. Compl. ¶¶ 131, 198-99). Overall, "[s]urvival in the [Trial] was worse at study completion for subjects who received NurOwn." *Id.* (citing Am. Compl. ¶ 132). In their briefs Defendants do not address Plaintiffs' arguments about these particular statements head-on; here, the Court concludes that Plaintiffs have adequately alleged misstatements regarding safety and that such misstatements were plainly material.

\*        \*        \*

In sum, the Court concludes that Plaintiffs have sufficiently alleged false or misleading statements with respect to the FDA's views on trial design; pre-specification; the FDA's views on floor effects; and safety. Accordingly, as further discussed below, Defendants' motion to dismiss is denied with respect to any claims arising from those particular categories of statements. But Defendant's statements regarding biomarker data and any other opinion statements regarding Defendants' own interpretation of their clinical trial, as well as any statements properly characterized as forward-looking or puffery regarding the likelihood of FDA approval, are not actionable. Accordingly, Defendant's motion is granted as to such statements.

### B. Scienter

#### 1. Standard for Scienter

"[A] complaint must, with respect to each defendant and with respect to each act or omission alleged to constitute securities fraud, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Bristol-Myers*, 658 F. Supp. 3d at 230 (cleaned up); *see also* 15 U.S.C. § 78u-4(b)(2). Scienter can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (describing pre-PSLRA standard for scienter in the Second Circuit, and noting that the PSLRA "did not change the basic pleading standard for scienter in this circuit") (internal quotation marks and citation omitted). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 324 (2007)).

#### 2. Application

##### a.    Motive and opportunity to commit fraud.

Plaintiffs allege two different motives to commit fraud: (1) to maintain BrainStorm's cash flow to perpetuate its survival; and (2) insider trading.

> *i.    Cash Flow.* With respect to the alleged cash flow motivation, Defendants argue that Plaintiffs' proffered "financial survival" motive is too generic to satisfy the PSLRA's requirement that scienter be pled "with particularity," because it "is shared by every start-up development stage company," and "is supported only by the fact that the Company conducted run-

of-the-mill offerings of common stock." Defs.' Br. 10. According to Defendants, allegations of a financial motive necessary to support the requisite "strong inference" of scienter must be more particularized and concrete allegations, such as an allegation that a company's financial survival "depended on raising capital at an *inflated* price"—something that Plaintiffs has not alleged here. *Id.* at 11.

Here, Defendants have a point. In *Kalnit v. Eichler*, the Second Circuit explained that "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud," such as where officers "misrepresent[] corporate performance to inflate stock prices while they sold their own shares." 264 F.3d at 139. *Kalnit* is not directly on-point; it rejected as "too generalized" the plaintiff's argument that the defendant's motive to defraud could be inferred from a "desire to maintain or increase executive compensation," because "such a desire can be imputed to all corporate officers." *Id.* at 140. But some district courts have directly addressed the question whether a desire to ensure the financial survival of a company constitutes a sufficient basis to infer motive. For example, in *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 220 (E.D.N.Y. 2022), the court rejected as "too generalized" the plaintiff's "bet the company" theory that the defendant's "fate was dependent on the . . . success [of an antibody test] to a degree that should satisfy motive." 586 F. Supp. 3d at 220. The court stated that "[a]lleging a motivation of avoiding an event that would threaten the survival of a company is still far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." *Id.*; *see also Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) (finding no motive where defendants merely sought avoid an outcome that would have "financially crippled" the company).

22

Plaintiffs attempt to distinguish *Chembio* by noting that, here, "BrainStorm needed to raise capital to fund its operating expenses." Pls.' Opp'n at 24 n.22, ECF No. 34. But in *Chembio*, the plaintiffs similarly alleged that the defendants made false statements about the results of an antibody test because the company's financial "fate" was at stake, 586 F. Supp. 3d at 220, which is the same sort of generalized motive that the *Chembio* court and others have deemed insufficiently particularized to support an inference of scienter. *See also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y. 2009) ("[R]aising capital as part of an amorphous scheme to stave off a company's collapse . . . does not suffice."), *aff'd sub nom.*, *Condra v. PXRE Grp. Ltd.*, No. 09 Civ. 1370, 2009 WL 4893719 (2d Cir. Dec. 21, 2009). Ultimately, the Amended Complaint fails to allege with sufficient particularity any facts supporting the notion that, absent an *inflation* of its stock price, BrainStorm could not cover its operating expenses.

            *ii. Insider trading.* Plaintiffs also argue that "Defendant Lebovitz's [sic] insider sales also support his scienter," noting that "between July 9, 2020 and July 16, 2020, Lebovits sold 71,753 shares of BrainStorm stock . . . for proceeds of nearly $1 million ($960,632)." Am. Compl. ¶ 277. "It is generally true that scienter may be established by showing insider trading, however, the mere allegation of insider sales during the Class Period does not, without more, properly allege motive. Instead, Plaintiffs must further allege adequately that the insider sales were unusual. . . ." *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (cleaned up). "Factors considered in determining whether insider trading activity is unusual include [1] the amount of profit from the sales, [2] the portion of stockholdings sold, [3] the change in volume of insider sales, and [4] the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir.2001).

Here, Plaintiffs do not make sufficient factual allegations that would support the conclusion that Lebovits's trades were unusual. While they note the total value of the shares sold by Lebovits (approximately $1 million), they offer no factual allegations to contextualize that figure, such as the portion of his holdings sold, the change in volume of such insider sales, or the number of insiders who were selling (apparently, there were no others). Moreover, as Defendants note, Lebovits's trades "occurred a full three years before the release of the Briefing Document that Plaintiff alleges caused BrainStorm's stock to drop." Defs.' Br. at 11-12. Defendants further note that Lebovits "personally acquired more BrainStorm shares during the Class Period." *Id.* at 12 (emphasis added). Finally, Defendants argue that Plaintiffs' failure to allege insider sales other than those by Lebovits undermines any inference of scienter. *Id.*

Plaintiffs respond by noting that Lebovits's sales occurred fewer "than eight weeks before the Trial completion, whose design FDA disagreed with, [and] which Lebovits knew failed." Pls.' Opp'n at 25 n.25 (citing Am. Compl. ¶ 277). Even then, however, the timing of these sales is not, by itself, sufficiently proximate to form the basis for an inference of scienter. *See In re Axonyx Sec. Litig.*, No. 05 Civ. 2307, 2009 WL 812244, at *4 (S.D.N.Y. Mar. 27, 2009) (rejecting inference of scienter based on the fact that the "individual defendants sold some Axonyx stock just weeks before the announcement of the disappointing results of the first Phase III trial," where the "sales still left the individuals with substantial holdings in Axonyx stock, and therefore a considerable stake in ensuring the company's success."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385-86 (E.D.N.Y. 2003) ("[T]he court does not find the two-month gap [between stock sales and release of negative information] to be strongly suspicious in light of the other factors weighing against an inference of fraud.").

In their opposition, Plaintiffs cite *Scholastic*, 252 F.3d at 74-75, but that case stands for the general proposition that "[u]nusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." *Id.* As noted, Plaintiffs do not identify any allegations in the Amended Complaint that would suggest something "unusual" about Lebovits's sales of BrainStorm stock that could support an inference of bad faith and scienter.

### b. Circumstantial evidence of conscious misbehavior or recklessness.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

> To survive dismissal under the "conscious misbehavior" theory, the appellants must show that they alleged reckless conduct by the appellees, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

*In Re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). "[T]his is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142, but generally speaking,

> securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Here, Plaintiffs argue that Defendants were aware of information contradicting their alleged misstatements, and that "[t]his alone suffices to allege scienter." Pls.' Opp'n at 22. For their part, Defendants argue that "the drug approval process is unique territory in securities fraud cases," one with an "exacting standard" whereby "complaints of this nature are regularly dismissed unless [plaintiffs] specifically allege that management knows that certain facts will *necessarily prevent* regulatory approval . . . and conceals those facts from the investing public." Defs.' Br. at

13.  The essence of Defendants' argument is that despite BrainStorm's alleged knowledge of FDA's concerns about various aspects of NurOwn and the drug's trial design, its "refusal to give up" and "statements to that effect" are not a basis for securities fraud in light of other, more "encouraging feedback" it received from FDA. *Id.* at 13-15.  Defendants maintain that, because of this feedback, "Defendants could not foretell with any certainty the contents of the Briefing Document prior to receiving it." *Id.* at 15; *see In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008) (holding that scienter not established where plaintiff did not allege that defendant knew of, or should have known of, "certain facts [that would] *necessarily* prevent the regulatory approval . . . and conceal[ed] these facts from the investing public" (emphasis added)), *aff'd sub nom.*, *State Univs. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).  Finally, Defendants note that they were careful to provide cautionary language in their statements to the investing public.  *See Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, No. 21 Civ. 801, 2021 WL 5782079, at *2 (2d Cir. Dec. 7, 2021) (concluding no strong inference of recklessness where, *inter alia*, "Defendants did disclose that [its proposed design] was novel and that there was a risk of FDA inflexibility in accepting the design.").

Defendants are correct that allegations, misstatements, or omissions regarding facts that would necessarily prevent regulatory approval constitute a sufficient basis for inferring scienter.  But it does not follow that those types of misstatements are *necessary* for such an inference.  Here, for reasons stated above, the Court has determined that Plaintiffs have sufficiently alleged misleading or false material statements regarding specific topics: (1) the FDA's views on the design of NurOwn's clinical trial; (2) whether the a particular subgroup analysis in that trial was "pre-specified"; (3) whether the FDA agreed that the results in the trial could be explained by "floor effects"; and (4) the safety of NurOwn.  With respect to each category, Plaintiffs have alleged that

Defendants were aware of information contradicting their challenged statements—*i.e.*, that Defendants were aware: (1) of FDA feedback contradicting the notion that the FDA expressed views indicating that it did *not* believe that Defendant's clinical trial was "a well-designed trial"; (2) that the subgroup analysis that they characterized as "pre-specified" was, in fact, *not*; (3) that the FDA disagreed with their assertions about "floor effects" confounding the results of their clinical trial; and (4) that there were, in fact "safety concerns" about NurOwn. Plaintiffs' allegation that Defendants knew of information "contradicting their public statements" about these issues is "[sufficient] to state a claim based on recklessness." *Novak*, 216 F.3d at 308.[4]

### C. Loss Causation

#### 1. Standard for Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). "[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173 (cleaned up). Loss causation is adequately pled where a plaintiff alleges either "(a) . . . that the market reacted negatively to a corrective disclosure of the fraud; or (b) that

---

[4] The parties devote a substantial amount of attention to the issue of whether Plaintiffs' allegations regarding confidential witnesses support scienter. Because the Court concludes that Plaintiffs have adequately alleged scienter on other bases, it need not address this issue. But the Court notes that Plaintiffs do not allege that these witnesses "were privy to the Individual Defendants' knowledge or Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013). In fact, Plaintiffs allege the opposite: that the former employees were not privy to Defendants' purported knowledge. Thus, as alleged in the Amended Complaint, the former employees' statements do not appear to be a basis to infer that Defendants knew of information that would show that their public representations were false.

that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters*, 750 F.3d at 232-33. The Second Circuit has not decided whether Rule 9(b)'s heightened pleading standard applies to loss causation, *see Abramson*, 965 F.3d at 179 n.65, but it has stated that "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

### 2. Application

Here, Plaintiffs have met their relatively low burden of adequately alleging loss causation. While Defendants contend that the decline in BrainStorm's stock prices followed the results of "disappointing news" about the failure to obtain approval for NurOwn, *see* Defs.' Br. at 25, Plaintiffs have also alleged that the decline was the result of information coming to light that contradicted specific material misleading or false statements by Defendant concerning the FDA's views on clinical trial design; the nature of a subgroup analysis of the trial's results (i.e., that it was pre-specified, when in fact it was not); the FDA's views as to whether the results of the trial could be explained by reference to floor effects; and the safety of NurOwn. As Plaintiffs argue, these statements "concealed the true risks associated with the NurOwn BLA that materialized in a series of partial corrective disclosures which culminated when FDA released the Briefing Document," which revealed the alleged falsity of these statements, and were ultimately manifested with the vote against approval of NurOwn. Pl. Opp. at 25 (citing Am. Compl ¶¶ 195-207, 280-89). While it ultimately may be difficult to disentangle precisely how much of the decline in BrainStorm's share prices was due to the release of information revealing the misleading or false nature of these

specific statements, the Court cannot conclude that Plaintiffs have failed to meet their relatively low burden of adequately alleging loss causation here.

## II.    Remaining Issues

### A.  Insider Trading

Plaintiffs also bring claims for insider trading under Section 10(b) based on Lebovits and BrainStorm's sales of shares during the Class Period.  Am. Compl. ¶¶ 312-17.  These claims fail for the same reason the Court has found Plaintiffs' allegations insufficient to support a finding of insider trading as a motive to commit fraud.  *See supra* Part I.B.2.a.ii.  The facts alleged do not demonstrate anything "unusual" about the sales of BrainStorm stock during the class period, and Plaintiffs do not provide any meaningful argument on this point in their Opposition.  *See* Pls.' Opp'n.  Accordingly, the insider trading claims are dismissed.

### B.  Control Person Liability

Finally, Defendants argue that Plaintiffs' control person claims under Section 20(a) must be dismissed on the grounds that Plaintiffs have failed to plead a Section 10(b) claim, which is a prerequisite to a successful claim under Section 20(a).  Because the Court rejects Defendants' arguments with respect to Plaintiffs Section 10(b) claim, this argument fails.

## CONCLUSION

For the reasons given above, Defendant's motion is **GRANTED IN PART AND DENIED IN PART**.  Specifically, Plaintiffs' Section 10(b) claim is dismissed with respect to statements concerning biomarker data, as well as any other statements constituting opinion statements, forward-looking statements, or puffery.  Plaintiffs' insider trading claims are also dismissed.  The motion is denied with respect to all other claims.

An order scheduling an Initial Pretrial Conference in this matter will issue separately.

The Clerk of Court is respectfully directed to close the motion at ECF. No. 31.

SO ORDERED.


Dated: September 15, 2025

New York, New York


_____

DALE E. HO

United States District Judge